IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ARRELLO BARNES,

                Plaintiff,                         Civil Action No.
                                                  9:15-CV-0777 (GLS/DEP)

      v.

ANTHONY ANNUCCI, *et al.*,[1]

                Defendants.

_____

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

ARRELLO BARNES, *Pro Se*
00-A-0597
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

FOR DEFENDANTS:

HON. LETITIA JAMES              COLLEEN D. GALLIGAN, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

---

[1]     Defendants' filings indicate that the correct spelling of defendant Ollies is Anthony Olles, the defendant sued as J. Whitford is John Whiteford, and Donald Venetozzi is Donald Venettozzi. *See* Dkt Nos. 97-7, 97-10, 97-12. Accordingly, the clerk of the court will respectfully be directed to modify the court's records to reflect the proper spellings of the names of these three defendants.

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>ORDER, REPORT, AND RECOMMENDATION</u>

This is a civil rights action brought by plaintiff Arrello Barnes, who is proceeding *pro se* and *in forma pauperis* ("IFP"), pursuant to 42 U.S.C. § 1983, against several individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff alleges that his First and Fourteenth Amendments rights were violated in connection with a series of incidents that resulted in disciplinary proceedings being brought against him while he was incarcerated at four different correctional facilities operated by the DOCCS.

Currently pending before the court are cross motions brought by the parties, both seeking the entry of summary judgment in their favor. For the reasons set forth below, I recommend that plaintiff's cross motion be denied, defendants' motion be granted, and plaintiff's second amended complaint ("SAC") be dismissed in its entirety.

I.    BACKGROUND[2]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 72; *see also* Dkt. No. 97-4 at 6. Although he is presently confined in the Elmira Correctional Facility ("Elmira"), the events giving rise to this suit transpired at various points between 2011 and 2015, while plaintiff was held in the Sullivan Correctional Facility ("Sullivan"), the Attica Correctional Facility ("Attica"), the Clinton Correctional Facility ("Clinton"), and the Great Meadow Correctional Facility ("Great Meadow"). *See generally* Dkt. No. 72. Each of the discrete incidents that give rise to this suit is more fully described below.

A.    The 2011 Assault and the 2012 Tier III Disciplinary Hearing

On August 8, 2011, plaintiff's fellow inmate at Sullivan, George Mims, was assaulted with a razor while he was exercising in the West Yard of that facility. Dkt No. 97-3 at 65; Dkt. No. 97-4 at 15. As a result of

---

[2]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *See Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). Because the parties have filed cross motions for summary judgment, the court draws "all factual inferences . . . 'against the party whose motion is under consideration.' " *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 283-84 (2d Cir. 2005) (quoting *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003)) (internal quotation marks omitted).

the incident, plaintiff was issued an inmate misbehavior report ("MBR") on

August 10, 2011 charging him with violating certain inmate behavior rules.

Dkt. No. 97-3 at 52; Dkt. No. 102-5 at 3; *see generally* 7 N.Y.C.R.R. §

270.2. Plaintiff has denied any role in the assault, asserting that he was

working in a different area of the facility at the time the assault occurred.

Dkt. No. 97-3 at 234 ("[W]hen this took place[,] I was at work").

　　　Plaintiff was initially found guilty following a disciplinary hearing held

on October 25, 2011 at Sullivan. Dkt. No. 97-3 at 58. That determination

was ultimately revisited as a result of a court challenge, and a new hearing

was ordered to address the charges associated with the stabbing of

inmate Mims. Dkt. No. 97-3 at 58-59.

　　　Following the administrative expungement, a second hearing was

conducted by defendant Raymond Coveny, a corrections captain, in

August and September of 2012, while plaintiff was confined to Attica. Dkt.

No. 97-3 at 231-92; Dkt. No. 97-9. In his SAC and his cross motion for

summary judgment, plaintiff alleges that although he requested that Officer

Connors, Officer Zarrias, and inmate Mims be called as witnesses at the

second hearing, defendant Coveny denied each of those requests. Dkt.

No. 72 at 9; Dkt No. 102-1 at 1; Dkt. No. 102-3 at 1. According to plaintiff,

　　　　　[defendant] Coveny told me 'I will not call officers to

4

> testify so they can contradict other officers' after [I]
> requested two [corrections officers] witnesses. He
> also refused George Mims to be a witness.[3]

Dkt. No. 102-1 at 1; *but see* Dkt. No. Dkt. No. 97-3 at 280, Dkt. No. 102-5 at 4.

The documentary evidence adduced by the parties reflects that although inmate Mims provided testimony at plaintiff's original disciplinary hearing, *see* Dkt. No. 97-4 at 23, he refused to testify at the second hearing. Dkt. No. 97-3 at 69. When inmate Mims was asked to specify why he refused to testify, he stated, "[b]ecause I am not doing it." *Id.*; Dkt. No. 97-3 at 240-41; *see also* Dkt. No. 102-5 at 5. With respect to Officer Connors, when he was contacted, he indicated that he was not working on the date of the assault, and as a result, defendant Coveny denied plaintiff's

---

[3]    Plaintiff appears to be referring to following statement made by defendant Coveny during the course of the second hearing:

> [O]kay, I am not missing your point and the point was
> made and I understand[.] [H]owever[,] I reviewed the video
> with the assistance [of] Lieutenant Maxwell and I am of the
> opinion that the person I saw in the video is you[.] Lieutenant
> Maxwell has testified that the person in the video is you[.] . . .
> [S]o to have a staff member come and state that you[]
> weren't in the yard [when] I already have a staff member that
> [says] that you were[,] and I personally as the hearing officer
> have viewed the video and I am convinced that it is you that
> is in the video . . . . [they're] going to be denied [as]
> witnesses.

Dkt. No. 97-3 at 280; Dkt. No. 102-5 at 4.

request for his testimony as irrelevant. Dkt. No. 97-3 at 279; *see also* Dkt. No. 97-3 at 61. Despite plaintiff's allegation to the contrary, there is no indication in the record that plaintiff sought the testimony of Officer Zarrias at the second hearing.[4]  *See generally* Dkt. No. 97-3 at 231-92.

On September 6, 2012, defendant Coveny dismissed one charge, but found plaintiff guilty of all remaining charges. Dkt. No. 97-3 at 49-50, 290-91. As a result, plaintiff was sentenced to two years of disciplinary special housing unit ("SHU") confinement, coupled with the corresponding loss of certain privileges. Dkt. No. 97-3 at 49.

B.    The 2013 "Return to Sender" Letter and the Tier III Disciplinary Hearing

On January 24, 2013, a letter written by plaintiff to a female friend was returned to the mailroom at Attica, with the envelope having been marked "return to sender." Dkt. No. 97-7 at 2; *see also* Dkt. No. 97-3 at 101. Because "return to sender" mail is frequently used by gang members as a method to communicate within the facility and circumvent scrutiny, the letter was confiscated by prison personnel, who then asked defendant Anthony Olles, a corrections officer and member of the Crisis Intervention

---

[4]    It appears that plaintiff may be conflating the witness requests made in connection with his initial disciplinary hearing with the witness requests made in connection with his second hearing. *See* Dkt. No. 97-4 at 17.

Unit ("CIU") at Attica, to review the correspondence to determine whether it contained prohibited gang material. Dkt. No. 97-7 at 1-3. Based upon his training and experience, defendant Olles determined that the "return to sender" letter contained gang codes associated with the Hunta Bloods, a subset of the larger Bloods gang, and issued plaintiff an MBR charging him with violating Rule 105.13.[5] Dkt. No. 97-3 at 100-08; Dkt. No. 97-7 at 3.

On January 29 and 30, 2013, a Tier III disciplinary hearing was held before defendant John Whiteford, a senior corrections counselor at Attica.[6] Dkt. No. 97-3 at 293-303; Dkt. No. 97-10 at 1-2. During the hearing, plaintiff requested the testimony of Officer Eric Kentzel,[7] whom plaintiff indicated would testify that plaintiff "did[ not] write that letter" and that

---

[5]    Rule 105.13 is part of Rule Series 105, which addresses an inmate's "Unauthorized Assembly or Activity." 7 N.Y.C.R.R. § 270.2(B)(6). Rule 105.13 provides that "[a]n inmate shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material." 7 N.Y.C.R.R. § 270.2(B)(6).

[6]    Plaintiff continues to assert in his cross-motion that defendant Whiteford violated his procedural due process rights because he was biased during the hearing. However, that claim was previously dismissed by the court, and it was not re-asserted in plaintiff's SAC. Dkt. No. 70 at 33 ("[D]efendant [Whiteford's] statement did nothing more than advise plaintiff that, if evidence was presented on the record that plaintiff violated rule 105.13, he would be found guilty."); see also Dkt. Nos. 72, 75.

[7]    The precise spelling of this officer's name is not clear from the record before the court. See, e.g., Dkt. No. 97-1 at 4 ("Kenzel" and "Kinzel"); Dkt. No. 97-4 at 39 ("Kintzel); Dkt. No. 97-10 at 2("Kentzel").

"another inmate . . . [was] throwing [plaintiff's] name" on correspondence. Dkt. No. 97-3 at 295-99, 301-02; Dkt No. 97-4 at 39, 44-45; Dkt. No. 97-10 at 2. Defendant Whiteford denied plaintiff's request, however, because there was no indication that Officer Kentzel had knowledge or information regarding the specific letter that led to the issuance of the MBR. Dkt. No. 97-4 at 46 ("Irrelevancy, I believe."); Dkt. No. 97-10 at 2-3; Dkt. No. 102-1 at 1; Dkt. No. 102-3 at 1; *see also* Dkt. No. 72 at 10.

At the conclusion of the hearing, defendant Whiteford found plaintiff guilty as charged, and plaintiff was sentenced to one year of disciplinary SHU confinement, coupled with the loss of certain privileges. Dkt. No. 97-3 at 86; *see also* Dkt. No. 97-3 at 299-304.

C.   The 2015 Conspiracy, Gang Material, Grievance, and the Tier III Disciplinary Hearing

On January 29, 2015, members of the CIU at Clinton received confidential information that inmate gang members, including plaintiff, were conspiring to assault security staff at the facility. Dkt. No. 97-8 at 1-2. As a result of an investigation into the matter, Corrections Officer J. Hanson ("C.O. Hanson") issued plaintiff an MBR charging him with violating multiple inmate behavior rules including, *inter alia*, gang activity and threats on staff. Dkt. No. 97-3 at 116; *see generally* 7 N.Y.C.R.R. §

8

270.2.

After plaintiff was removed from his cell, defendant Richard J.

Mahuta, a corrections officer assigned to the CIU, and another officer

conducted a cell search. Dkt. No. 97-3 at 117; Dkt. No. 97-8 at 1-2. In his

SAC, plaintiff accused defendant Mahuta of confiscating and discarding

three of his religious head coverings. Dkt. No. 72 at 11-12. According to

defendant Mahuta, during the course of that cell search, he did not remove

or throw away any religious head coverings from plaintiff's cell. Dkt. No.

97-8 at 3. Plaintiff counters by alleging that two other inmates overheard

defendant Mahuta state, "[i]sn't [plaintiff] a Blood? What is he doing with

kufis?" prior to disposing of those head coverings.[8] Dkt. No. 72 at 12; Dkt.

No. 97-4 at 56-57; *compare* Dkt. No. 97-8 at 3 *with* Dkt. No. 102-1 at 2;

Dkt. No. 102-5 at 24-25.

However, during the cell search, defendant Mahuta discovered three

handwritten pages of material that he believed to be prohibited gang

material. Dkt. No. 97-8 at 3. Those three pages, along with three Bibles

and other materials, were confiscated by defendant Mahuta, who had the

materials placed inside a contraband locker for further review at a later

---

[8]     A "kufi" is headgear that is associated with the Muslim religion. *Nicholas v. Tucker*, 89 F. Supp. 2d 475, 477 (S.D.N.Y. 2000).

time. Dkt. No. 97-8 at 3; Dkt. No. 97-3 at 413-14. Defendant Mahuta

ultimately determined that only the three handwritten pages constituted

prohibited gang material and issued plaintiff am MBR charging him with

possession of that material. Dkt. No. 97-3 at 117.

      1.    <u>Plaintiff's Tier III Disciplinary Hearing and Appeals</u>

Between February 5, 2015 and February 27, 2015, defendant

Kenneth McKeighan, an industrial superintendent at Great Meadow,

conducted a Tier III disciplinary hearing with respect to the two MBRs. Dkt.

No. 97-5;Dkt. No. 97-6; *see also* Dkt. No. 97-3 at 116-117. At the hearing,

plaintiff requested, *inter alia*, the testimony of his brother, Exondus Barnes

who, plaintiff asserted, would testify that he was the author of the three

handwritten pages of material confiscated during the cell search. Dkt. No.

97-5 at 5; Dkt. No. 97-6 at 8, 17-18; *see also* Dkt. No. 97-3 at 115.

Defendant McKeighan denied the request as irrelevant, however, because

plaintiff was charged with possession of the materials, and thus the

question of authorship was not relevant.[9] Dkt. No. 97-3 at 119; Dkt. No.

97-4 at 66-68; Dkt. No. 97-6 at 33-34; Dkt. No. 97-11 at 3.

---

[9]     Specifically, defendant Mahuta charged plaintiff with violating Rule 105.13 of the standards of inmate behavior. *See* footnote 5, *supra*; *see also* 7 N.Y.C.R.R. § 270.2(B)(6).

At the hearing, plaintiff also requested copies of the "call outs" or "yard go-arounds" for Clinton, contesting that those materials would demonstrate that he was not in the yard with his co-conspirators during the relevant times. Dkt. No. 97-5 at 5-6. Although defendant McKeighan initially reserved decision regarding plaintiff's request, he ultimately denied it after C.O. Hanson testified that no such document existed at Clinton. Dkt. No 97-6 at 4. Nonetheless, defendant McKeighan obtained "program sheets" for the relevant time, Dkt. No. 97-5 at 126-154, and compiled that information into a spreadsheet, which showed that plaintiff and his co-conspirators were in fact together on the evening of January 19, 2015.[10] Dkt. No. 97-5 at 218; *see also* Dkt. No. 97-6 at 18-19.

Plaintiff also requested that video footage from Clinton's North Yard be provided at the hearing, arguing that it would show that he was not in the area during the relevant time, thereby undercutting the claims made by the confidential informant. *See, e.g.*, Dkt. No. 97-5 at 6, 11. Defendant McKeighan's denial of that request was two-fold. First, he noted that the

---

[10]     January 19, 2015 is a significant date because it is the day after prison officials at Clinton used force against a suspected Bloods gang member. Dkt. No. 97-8 at 2; Dkt. No. 97-11 at 2. Defendants theorize that plaintiff and fellow inmates attempted to plan the assaults on prison staff in retaliation for the use of force. Dkt. No. 97-5 at 36; Dkt. No. 97-11 at 2, 4.

video footage simply did not exist inasmuch as by the time the conspiracy
had been uncovered, the video footage had been recorded over. Dkt. No.
97-3 at 397; Dkt. No. 97-5 at 6; Dkt. No. 97-6 at 3. Second, he noted that
even if footage of the North Yard existed, that footage would have shown
only a general view of the North Yard instead of focusing on any particular
group of people, and he believed the footage likely would have been
"inconclusive." Dkt. No. 97-3 at 397; Dkt. No. 97-6 at 3, 10, 12.

At the conclusion of the hearing, defendant McKeighan found
plaintiff guilty as charged. Dkt. No. 97-3 at 110-115. Plaintiff was
sentenced to 910 days of disciplinary SHU confinement, coupled with the
loss of certain privileges. Dkt. No. 97-3 at 110; *see also id.* at 114 ("Due to
the nature of the entire incident and the fact your actions would have
resulted in the injury to the staff and would have likely disrupted the entire
facility and DOCCS in general, I have exceeded the recommended
confinement guidelines considerably.").

Following the conclusion of the hearing, plaintiff filed a series of
appeals challenging defendant McKeighan's determination. Dkt. No. 97-3
at 340-99; *see also* Dkt. No. 97-12 at 3. On May 12, 2015, defendant
Donald Venettozzi, the Director for the DOCCS Special Housing/Inmate
Disciplinary Program, affirmed the finding of guilt, but reduced plaintiff's

penalty from 910 days to twelve months of disciplinary SHU confinement.

Dkt. No. 97-3 at 341-42; Dkt. No. 97-12 at 4.

In addition to addressing one of his appeals to defendant Anthony

Annucci, the Acting Commissioner of the DOCCS, *see* Dkt. No. 97-3 at

344, plaintiff also sent defendant Annucci a letter on April 1, 2015,

complaining that his due process rights were violated at the hearing. Dkt.

No. 97-3 at 348-49; Dkt. No. 97-13 at 2; *see also* Dkt. No. 102-1 at 2.

Defendant Annucci did not respond to plaintiff's appeal or letter or

undertake any investigation as a result of plaintiff's correspondence. Dkt.

No. 97-13 at 2.

### 2.    Plaintiff's Grievance

On February 20, 2015, plaintiff filed a grievance in connection with

defendant Mahuta's cell search, stating

> On 1/29/15, my cell [was] searched by
> [defendant] Mahuta at [Clinton] . . . , and my letters,
> Bible, etc. were confiscated for review. After the
> paper [was] review[ed], I received a misbehavior
> report for only [three] papers. [T]he Bible, address
> book, etc., were [not deemed] gang material.
>
> I did not receive[] my documents [back] as of
> yet.
>
> Action requested: for my papers, bible, etc. to
> be return[ed] to me.

Dkt. No. 97-3 at 403 (errors in original); *see also* Dkt. No. 97-4 at 75. It appears that prison personnel were initially confused with respect to the nature of the relief plaintiff sought, as well as the location of plaintiff's property, because in initially denying plaintiff's grievance, the superintendent stated that "[t]he items in question were deemed to be contraband and as such were properly disposed of." Dkt. No. 97-3 at 404, 442. In his appeal of the grievance determination to the DOCCS Central Office Review Committee ("CORC"), plaintiff explained that he was seeking the return of only those materials that were determined not to constitute gang-related contraband. Dkt. No. 97-3 at 404-05. While plaintiff's appeal was pending before the CORC, the materials that he sought were returned to him, *see* Dkt. No. 97-3 at 400, 413, 418, 442, although plaintiff has denied ever having received those materials back from prison officials. Dkt. No. 97-4 at 77.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about June 25, 2015, by the filing of a complaint accompanied by an application for leave to proceed IFP and a motion for a preliminary injunction. Dkt. Nos. 1, 2, 4. Although plaintiff's original IFP application was denied by the court as incomplete, his subsequent motion for leave to proceed without prepayment of fees

was granted. Dkt. Nos. 5, 6, 10.

By decision and order dated September 17, 2015, Senior District Judge Gary L. Sharpe denied plaintiff's motion for preliminary injunctive relief. Dkt. No. 10. In addition, he reviewed plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A and dismissed a number of claims and defendants from the action. *See generally id.*

On October 26, 2015, and prior to service upon defendants, plaintiff filed an amended complaint ("FAC"), which was accepted by Judge Sharpe because it was deemed "a pleading which reflects the [c]ourt's rulings in the [initial] order." Dkt. No. 17. In response to plaintiff's FAC, defendants filed a motion on September 21, 2016, seeking its dismissal for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 30.

On July 14, 2017, I issued a report, which recommended the dismissal of various claims and several defendants from the action. *See generally* Dkt. No. 70. In addition, in light of my recommendation that multiple claims and defendants be dismissed from the action, I further recommended that plaintiff be afforded an opportunity to file a SAC. *Id.* at 41. Although neither party filed any objections to my report, before Judge Sharpe had an opportunity to review it, plaintiff availed himself of my

recommendation and filed his SAC on July 24, 2017. Dkt. No. 72. On September 1, 2017, Judge Sharpe issued an order adopting my report and recommendation in its entirety. Dkt. No. 75.

Plaintiff's SAC was referred to me for review to determine whether the deficiencies that were discerned in my July 14, 2017 report and recommendation had been cured by the filing of plaintiff's SAC. Dkt. No. 76. Following my review, I issued a report and recommendation on September 22, 2017, recommending that plaintiff's SAC be accepted for filing, but that various of plaintiff's claims be dismissed. Dkt. No. 76. By decision and order dated October 19, 2017, Judge Sharpe adopted my report and recommendation in its entirety over plaintiff's objections. Dkt. Nos. 77, 78. As a result of these rulings, the following four claims survived and proceeded to discovery: (1) Fourteenth Amendment procedural due process claim against defendants Coveny, Whiteford, and McKeighan; (2) First Amendment free speech claim against defendants Olles and Mahuta; (3) First Amendment free exercise claim against Mahuta; and (4) Fourteenth Amendment procedural due process claim against defendants Annucci and Venettozzi in their supervisory capacities. *See id.* at 3.

On January 23, 2018, following the close of discovery, defendants filed a motion for summary judgment, seeking dismissal of plaintiff's claims

on various grounds, both procedural and on the merits. Dkt. No. 97.

Plaintiff has opposed defendants' motion and cross moved for summary

judgment in his favor. Dkt. No. 102. Defendants have submitted papers in

opposition to plaintiff's motion and in further support of their motion. Dkt.

No. 103. The parties' motions, which are now fully briefed and ripe for

determination, have been referred to me for the issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

    Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure, which provides that the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion. *Anderson*, 477

U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial

burden is met, the opposing party must show, through affidavits or

otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P.

56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences, in a light most favorable to the

non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of

summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg.*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary

judgment appropriate only when "there can be but one reasonable

conclusion as to the verdict").

B.    Plaintiff's Failure to Exhaust Administrative Remedies[11]

Defendants contend that plaintiff failed to fully exhaust his administrative remedies with respect to his First Amendment free speech claim against defendants Olles and Mahuta and his First Amendment free exercise claim against Mahuta. Dkt. No. 97-14 at 12-15. As a result of plaintiff's failure, defendants argue, those claims must be dismissed. *Id.*; *see also* Dkt. No. 103 at 4-5. In his cross motion, plaintiff does not acknowledge defendants' argument, instead focusing his opposition on the underlying merits of the First Amendment claims defendants Olles and Mahuta. *See generally* Dkt. No. 102.

1.    Generally

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

---

[11]    As will be seen, because I recommend that each of plaintiff's claims be dismissed, have elected not to address defendants' alternative argument that they are shielded by the doctrine of qualified immunity. Dkt. No. 97-4 at 31-33.

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[12]

---

[12]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[13] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a

---

[13] The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

written decision within a certain number of days after receipt of the grievant's appeal.[14]  7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(f). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a

---

[14]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availab[ility] of administrative remedies." (alteration in original) (internal quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (internal quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which

a court could find that internal administrative remedies are not available to prisoners under the PLRA.[15] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

> 2.    Analysis

During his deposition, plaintiff testified that he had filed "a lot" of grievances during his time in DOCCS custody. Dkt. No. 97-4 at 71-72; *see* Dkt. No. 97-3 at 28-44. Although he did not believe that the number of grievances that he had filed reached the "triple digits," he speculated that it

---

[15]    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

was approaching fifty to sixty grievances. Dkt. No. 97-4 at 72. Plaintiff

expressed a general understanding that the use of the inmate grievance

process was necessary to effectively "exhaust [his] remedies." Dkt. No.

97-4 at 78.

During his deposition, plaintiff was asked whether he had filed a

grievance regarding the allegation that defendant Olles violated plaintiff's

First Amendment right to free speech by his unjustified confiscation of

plaintiff's "return to sender" letter in January of 2013. *See* Dkt. No. 72 at 9.

Dkt. No. 97-4 at 72-73. In response, plaintiff indicated that he was unable

to specifically recall whether he had, but that he did not "see why [he]

would" have filed one. Dkt. No. 97-4 at 72-74. Because plaintiff effectively

concedes that he did not file a grievance with respect to this incident, I can

easily conclude that he failed to exhaust his administrative remedies prior

to commencement.

With respect to plaintiff's free exercise and free speech claims

against defendant Mahuta, both of which arise out of the January 29, 2015

search of plaintiff's cell, plaintiff acknowledged that he filed only one

grievance arising out of that incident on February 20, 2015 (GM 59,129-

15). Dkt. No. 97-3 at 403; Dkt. No. 97-4 at 75-76. According to that

grievance,

> On 1/29/15, my cell [was] searched by [defendant] Mahuta at [Clinton] . . . , and my letters, Bible, etc. were confiscated for review. After the paper [was] review[ed], I received a misbehavior report for only [three] papers. [T]he Bible, address book, etc., were [not deemed] gang material.
>
> I did not receive[] my documents [back] as of yet.
>
> Action requested: for my papers, bible, etc. to be return[ed] to me.

Dkt. No. 97-3 at 403 (errors in original). When prison officials appeared to

initially misapprehend which materials he sought to have returned, in an

appeal to the CORC on August 24, 2015, plaintiff stated:

> If you review the 1/29/15 [inmate misbehavior report], only 3 pages were confiscated, which was the only material I was found guilty on. The contraband list which stated my Bible, letters, phone book, etc. were being review which Dep. Brendel could verify. The review[ed] material was never charged on the misbehavior report. . . . [T]he I.G.R.C. staffs are merely covering up the fact that grievant['s] property was stolen.

Dkt. No. 97-3 at 404-05 (errors in original). Plaintiff's grievance and appeal

to the CORC makes no mention of religious headwear. *See generally id.*

Plaintiff's grievance also fails to indicate that he believed the seizure of the

three pages of material was in violation of his First Amendment rights. *See*

*generally id.* Instead, plaintiff's grievance solely seeks the return of those

materials that prison personnel determined did not constitute gang-related material. *See generally id.*

Consistent with the objectives of the PLRA, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697. In determining whether exhaustion has been achieved, the standard for determining the sufficiency of an administrative grievance is analogous to that of notice pleading. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (citing *Johnson*, 380 F.3d at 697).

Although it is "appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell*, 446 F.3d at 310; *see also Singh v. Lynch*, 460 F. App'x. 45, 47 (2d Cir. 2012); *Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that [the] plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance."). Even affording plaintiff the appropriate lenity as a *pro se* litigant, plaintiff's grievance failed to describe any First Amendment concern arising out of defendant

Mahuta's cell search.

Although it is true that "a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance," *Simmons v. Robinson*, No. 07-CV-7383, 2011 WL 31066, at *4 (S.D.N.Y. Jan. 4, 2011) (citing *Espinal v. Goord*, 55 8 F.3d 119, 128 (2d Cir. 2009)), I am unable to conclude that the sole grievance filed by plaintiff provided the facility with sufficient information to permit an investigation of his concerns regarding the disposal of religious headwear or the seizure of three pages of gang-related material.[16]  Instead, it is clear from plaintiff's grievance that his primary concern was with securing the return of his non-gang related material. Dkt. No. 97-3 at 403-05. Accordingly, because plaintiff's grievance failed to provide the facility enough information to investigate his free speech and free exercise concerns, plaintiff's February 20, 2015 grievance was not sufficient to exhaust his administrative remedies prior to commencement of this action. *See, e.g.*, *Dailey v. Fuller*, 15-CV-1051, 2016 WL 7732236 *7-*8 (Dec. 5, 2016) (Dancks, M.J.), *report and recommendation adopted by* (N.D.N.Y. Jan 11, 2017) (Sannes, J.); *Wright v. Potter*, No. 14-CV-01041, 2016 WL 5219997, at *5 (Jun. 28,

---

[16]    Copies of all unreported decisions have been appended for the convenience of the *pro se* plaintiff.

2016) (Dancks, M.J.), *report and recommendation adopted by* 2016 WL

5173283 (Hurd, J.) (N.D.N.Y. Sept. 21, 2016).

This, of course, does not end the court's inquiry with respect to

exhaustion. Plaintiff, however, has not claimed that the IGP process was

unavailable to him during the relevant times periods. To the contrary, the

record evidence indicates that plaintiff was able to successfully navigate

the grievance procedure while housed in a SHU at a different facility.

Accordingly, the undisputed facts in this case reveal that with

respect to his First Amendment claims, plaintiff failed to fully comply with

the IGP prior to the commencement of this action, despite his remedies

remaining available to him at all relevant times. I therefore recommend

that defendants' motion for summary judgment on this basis be granted on

this procedural basis.[17]

C.    Due Process

Defendants contend that plaintiff was afforded adequate due

process during the disciplinary proceedings conducted by defendants

Coveny, Whiteford, and McKeighan. Dkt. No. 97-14 at 21-28. In his cross

motion, plaintiff disagrees, and asserts that defendants' decisions deprived

---

[17]    In light of this recommendation, I have elected not to address defendants'
alternative argument on the merits.

him of procedural due process in connection with each of his Tier III

disciplinary hearings. *See generally* Dkt. No. 102.

        1.    Generally

      To establish a procedural due process claim under section 1983, a

plaintiff must show that he (1) possessed an actual liberty interest, and (2)

was deprived of that interest without being afforded sufficient process.

*Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*,

143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-

52 (2d Cir. 1996). Much like their prior motions, defendants do not seek

dismissal of any of plaintiff's due process claims on the basis that he was

not denied a constitutionally significant liberty interest, *see generally* Dkt.

No. 97-14 at 21-28, and as a result the court will not address that issue.

Instead, defendants' argument is focused on whether plaintiff was

deprived of a liberty interest without being afforded sufficient process. *See*

*generally id*.

      The procedural safeguards to which a prison inmate is entitled

before being deprived of a constitutionally cognizable liberty interest are

well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its

decision in *Wolff*, the Court held that the constitutionally mandated due

process requirements include (1) written notice of the charges to the

inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to. . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing, *inter alia*, *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges."

*Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). "A hearing officer may satisfy the standard of impartiality if there is *'some evidence* in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (emphasis in original) (quoting *Hill*, 472 U.S. at 455).

### a.    Defendant Coveny

According to plaintiff, defendant Coveny violated his due process rights during the second hearing by improperly denying his request to call Officer Connors, Officer Zarrias, and inmate Mims as witnesses. Dkt. No. 72 at 9 (first cause of action); *see also* Dkt. No. 102 at 11. Although due process includes the "right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board," that right is not unfettered. *Ponte v. Real*, 471 U.S. 491, 495 (1985). An inmate's right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991).

In this case, after an exhaustive review of the record evidence, I

conclude that no reasonable factfinder could conclude that defendant Coveny violated plaintiff's due process rights at the second hearing. First, with respect to plaintiff's alleged request to call Officer Zarrias, although it appears plaintiff did call him as a witness for the initial hearing, there is no record evidence that plaintiff sought his testimony in connection with the second hearing. Dkt. No. 97-4 at 17-18; *see* Dkt. No. 97-9 at 3. Plaintiff cannot now turn his own lack of diligence into a constitutional deprivation. *See, e.g.*, *Hasan Jamal Abdul Majid v. Henderson*, 533 F. Supp. 1257, 1273 (N.D.N.Y.) (Munson, C.J.) (concluding that due process was not violated where the inmate failed to request witnesses at or before the hearing), *aff'd mem.*, 714 F.2d 115 (2d Cir. 1982).

In addition, although plaintiff requested testimony from inmate Mims, who had also testified at the initial hearing, that witness refused to provide testimony at the second hearing and declined to elaborate on the reasons for his refusal beyond "[b]ecause I am not doing it." Dkt. No. 97-3 at 69. Courts in this circuit have routinely held that a hearing officer's failure to call a fellow inmate who refuses to testify does not offend procedural due process. *See, e.g.*, *Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018)

(Sharpe, J.); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL

667528, at *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844 ,

2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("The fact

that these witnesses refused to testify on [the plaintiff's] behalf does not

alter the fact that he was given the opportunity to call witnesses.").

Finally, with respect to the testimony of Officer Connors, the record

reveals that plaintiff's request to call him as a witness was initially granted

and defendant Coveny contacted him to "make arrangement for [his]

testimony." Dkt. No. 97-3 at 234, 241. In response to being contacted to

provide "confidential testimony" for the proceeding, however, Officer

Connors indicated that "he was not working on the date of [the] alleged

incident." Dkt. No. 97-3 at 279. As a result, defendant Coveny properly

denied plaintiff's request based upon a finding that the officer could not

provide relevant evidence. Dkt. No. 97-3 at 85; *see* Dkt. No. 97-9 at 2-3;

*see also Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999). ("[A]

hearing officer does not violate due process by excluding irrelevant or

unnecessary testimony.").

Accordingly, because no reasonable factfinder could conclude that

defendant Coveny violated plaintiff's procedural due process rights, I

recommend that the claim against defendant Coveny be dismissed.

b.     Defendant Whiteford

Plaintiff alleges that defendant Whiteford violated his due process rights during the January 2013 disciplinary hearing when he denied his request to call Officer Kentzel as a witness. Dkt. No. 72 at 9-10 (third cause of action); *see also* Dkt. No. 102-1 at 1. According to plaintiff, Officer Kentzel would have testified that plaintiff did not write the "return to sender" letter and that there was another inmate that was "throwing [plaintiff's] name" on correspondence. Dkt. No. 97-3 at 295-99, 301-02; *see also* Dkt. No. 97-10 at 2.

During the disciplinary hearing, Sergeant O'Connell stated that he had compared the handwriting and signature on the "return to sender" letter with correspondence known to be written by plaintiff, and concluded that plaintiff was the author of the letter at issue. Dkt. No. 97-3 at 299-300. Sergeant O'Connell's testimony provided defendant Whiteford with a rational basis for concluding that Officer Kentzel's testimony would have been irrelevant or unnecessary. Dkt. No. 97-4 at 46 ("Irrelevancy, I believe."); *see also* Dkt. No. 97-10 at 2-3. Defendant Whiteford believed that Officer Kentzel did not have "any knowledge of the actual letter at issue in the hearing and whether or not it had been authored by plaintiff." Dkt. No. 97-10 at 3.

Based upon the record evidence, no reasonable juror could find that defendant Whiteford violated plaintiff's due process rights by denying his request to call Officer Kentzel. *See Delee v. Hannigan*, 729 F. App'x 25, 31 (2018) ("[D]efendants had the right to refuse to hear irrelevant testimony from witnesses with no personal knowledge.") (citing 7 N.Y.C.R.R. § 253.6(c); *Kingsley*, 937 F.2d at 30 (2d Cir. 1991)); *see also Kalwasinski*, 201 F.3d at 109. I note moreover, courts have been cautioned not to "second guess" a hearing officer's decision to deny an inmate's witness requests where the hearing officer articulates a basis for his decision. *See Wolff*, 418 U.S. at 566 (explaining that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators").

Because no reasonable factfinder could conclude that defendant Whiteford violated plaintiff's procedural due process rights by refusing to call Officer Kentzel, I recommend that the claim against him be dismissed.

### c.   Defendant McKeighan

Plaintiff alleges that defendant McKeighan violated his due process rights in connection with the February 2015 disciplinary proceeding by (1) denying plaintiff's request to call his brother as a witness; (2) permitting the admission of fabricated evidence; and (3) denying plaintiff's request for

video footage. Dkt. No. 72 at 10-11 (sixth cause of action); Dkt. No. 102-4 at 12.

First, when the search of plaintiff's cell uncovered three pages of gang-related material, plaintiff was charged with violating Rule 105.13 of the standards of inmate behavior, *see* Dkt. No. 97-3 at 182, which prohibits possessing gang-related material. Although plaintiff wished to call his brother to testify that he was the author of the three pages in question, defendant McKeighan determined that the testimony would be irrelevant in light of the fact that plaintiff was charged with possession—not authorship—of the material in question. Defendant McKeighan's decision to deny plaintiff's request to call his brother as a witness was well within the discretion of the hearing officer, and comports with procedural due process. *See Kalwasinksi*, 201 F.3d at 108-09.

Next, there is no merit to plaintiff's allegation that defendant McKeighan permitted the admission of evidence that was purportedly fabricated, and this allegation evinces plaintiff's misapprehension of the evidence that was provided pursuant to his own request. Plaintiff requested copies of what he referred to as "call outs" or "yard go-arounds" for Clinton which, he asserted, would demonstrate that he was not in the yard with his co-conspirators during the relevant times. Dkt. No. 97-5 at 5-

[6](6). After defendant McKeighan determined that no such documents existed, he instead obtained "program sheets" for the relevant period. [Dkt. No. 97-5 at 126-154](Dkt. No. 97-5 at 126-154). Defendant McKeighan then compiled the information on the "program sheets" into a spreadsheet, so that he could readily ascertain whether plaintiff and his co-conspirators were together the evening of January 19, 2015. [Dkt. No. 97-5 at 218](Dkt. No. 97-5 at 218); *see also* [Dkt. No. 97-6 at 18-19](Dkt. No. 97-6 at 18-19). The undisputed evidence demonstrates that a meaningful effort was made to locate the information that plaintiff sought, although it was not in the precise form requested.

Finally, to the extent that defendant McKeighan denied plaintiff's request for certain video footage, the record is clear that the evidence did not exist inasmuch as it had been taped over in the normal course of business by the time the conspiracy had been uncovered. Accordingly, because no reasonable factfinder could conclude that defendant McKeighan violated plaintiff's procedural due process rights, I recommend that the claim against him be dismissed.

D.    Supervisory Liability[18]

---

[18]    If the above-described recommendation regarding plaintiff's due process claims is adopted by Senior District Judge Sharpe, there is no remaining underlying cause of action upon which to hold defendants Annucci and Venettozzi liable in their capacities as supervisors. *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying

Defendants argue that plaintiff's supervisory liability claim against defendant Annucci must be dismissed because there is no evidence that he was personally involved in the review or determination of plaintiff's appeals. Dkt. No. 97-14 at 29. Defendants further argue that plaintiff's supervisory liability claims against defendant Venettozzi must be dismissed because there is no proof that he was aware of any alleged underlying constitutional violation. Dkt. No. 97-14 at 30-31. Plaintiff asserts in his cross motion that defendant Annucci "did not remedy the wrong acts" and defendant Venettozzi "affirmed or modified" the procedural due process violations. *See generally* Dkt. No. 102.

### 1.    Supervisory Liability - Generally

It is well-established that a defendant cannot be liable under section 1983 solely by virtue of being a supervisor, " 'and [liability] cannot rest on respondeat superior.' " *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003)); *see also Wright*, 21 F.3d at 501. To establish responsibility on the part of a

---

constitutional deprivation."); *see also, e.g., Caimite v. Venettozzi*, 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (Sharpe, J.). However, this ground has not necessarily been advanced by defendants in support of their motion for summary judgment. *See generally* Dkt. No. 97.

supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.[19]

## 2.     Defendant Annucci

Plaintiff alleges that he wrote to defendant "Annucci, making him aware of the [c]onstitutional violations, conducted by his subordinates[,]"

---

[19]     Subsequent to issuance of the Second Circuit's decision in *Colon*, the Supreme Court addressed the question of supervisory liability in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Although the issue has been discussed, the Second Circuit has declined to squarely address the impact of *Iqbal* upon the categories of supervisory liability addressed in *Colon*. *See, e.g., Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citation and internal quotation marks omitted)); *see also Reynolds v. Barret*, 685 F.3d 193, 206 n.14 (2d Cir. 2012) ("*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in [*Colon*,] . . . [b]ut the fate of *Colon* is not properly before us[.]").

but that Annucci "failed to remedy the wrong." Dkt. No. 102-1 at 2; *see also* Dkt. No. 72 at 12-14. This allegation is based upon plaintiff having addressed one of his amended appeals to defendant Annucci, as well as one additional letter that he sent to defendant Annucci. Dkt. No. 97-3 at 344 (amended appeal dated March 9, 2015); Dkt No. 97-3 at 348-49 (letter dated April 1, 2015). There is no dispute that defendant Annucci did not respond to plaintiff's appeal or letter or undertake any investigation as a result of plaintiff's correspondence. Dkt. No. 97-13 at 2.

It is well settled that Annucci's failure to respond to plaintiff's amended appeal and letter, without more, is not sufficient to give rise to personal involvement under section 1983. C*ole v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-0539, 2016 WL 5394752, at *22 (Aug. 25, 2016) (Peebles, M.J*.), report and recommendation adopted by* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.); *see also, e.g.*, *Houston v. Schriro*, No. 11-CV-7374, 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) ("[I]gnoring a prisoner's letter or complaint is insufficient to render an official personally liable."); *Parks v. Smith*, No. 08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

41

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3.    Defendant Venettozzi

With respect to defendant Venettozzi, plaintiff alleges that after learning of the violation of his due process rights through his appeal, defendant Venettozzi failed to remedy the wrong. Dkt. No. 102-1 at 2; *see also* Dkt. No. 72 at 13. According to plaintiff, although he alerted defendant Venettozzi as to the constitutional violations by way of a series of appeals, defendant Venettozzi merely affirmed the disposition, while modifying the penalty. Dkt. No. 72 at 13; *see also* Dkt. No. 97-3 at 340-99.

Here, there is no genuine dispute of material fact that Venettozzi received and decided plaintiff's appeal in connection with the February 27, 2015 disciplinary determination that was issued by defendant McKeighan. *See generally* Dkt. No. 97-12. According to defendant Venettozzi,

> After reviewing the entire record of the hearing and considering all the grounds for overturning or modifying the determination asserted in plaintiff's appeal documents, I found that the hearing had been properly conducted, plaintiff had been provided constitutionally adequate due process of law and sufficient opportunity to put on a defense, and the findings of the hearing officer were supported by the evidence.

I affirmed the findings of guilt.

*Id.* at 3-4. As a result, defendant Venettozzi affirmed the finding of guilt, but reduced plaintiff's penalty from 910 days to twelve months of disciplinary SHU confinement. Dkt. No. 97-3 at 12, 341-42; Dkt. No. 97-12 at 4.

As defendants observe, upon plaintiff's appeal defendant Venettozzi did not identify any constitutional violations, including the failure to provide plaintiff with due process of law. Dkt. No. 97-14 at 30-31. Likewise, I have concluded that no reasonable factfinder could conclude that plaintiff's due process rights were violated. *See* Point III.C, *supra*. As a result, because no constitutional violation occurred, and there was no wrong to remedy, no supervisory liability can exist as against defendant Venettozzi. *See, e.g.*, *Martin v. Oey*, No. 16-CV-00717, 2017 WL 6614680, at *10 (Nov. 28, 2017) (Dancks, M.J.), *report and recommendation adopted by* 2017 WL 6611575 (N.D.N.Y. Dec. 27, 2017) (McAvoy, J.); *Toole v. Connell*, No. 04-CV-0724, 2008 WL 4186334, at *1, 7 (N.D.N.Y. Sep. 10, 2008) (Kahn, J.) (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under section 1983); *Lighthall v. Vadlamudi*, 04-CV-0721, 2006 WL 721568, at *13 (N.D.N.Y. Mar. 17, 2006) (Mordue, J.) ("Since no constitutional violation

occurred and there was no wrong to remedy, no supervisory liability

exists."); *Rambaldi v. City of Mount Vernon*, 2003 WL 23744272, at *10

(S.D.N.Y. Mar. 31, 2003) (concluding that because there was no wrongful

conduct, there were "no 'wrongs' to remedy" by the supervisory

defendants).

For these reasons, I find that no reasonable factfinder could

conclude, based on the record evidence, that defendant Venettozzi was

personally involved in any of the constitutional deprivations giving rise to

this action.

III.    SUMMARY, ORDER, AND RECOMMENDATION

According to plaintiff, following a series of incidents that resulted in

disciplinary proceedings being brought against him, defendants violated

his First and Fourteenth Amendments rights. Discovery having closed,

defendants seek dismissal of plaintiff's claims on a variety of grounds,

while plaintiff has cross moved for the entry of summary judgment. Having

carefully reviewed the record before the court, defendants are entitled to

the entry of summary judgment dismissing all claims. Accordingly, it is

hereby respectfully

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 97) be GRANTED, plaintiff's cross motion for summary judgment

(Dkt. No. 102) be DENIED, and plaintiff's second amended complaint (Dkt. No. 72) is DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[20]   FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993). It is further hereby

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant Ollies to "Anthony Olles", defendant J. Whitford to "John Whiteford", and Donald Venetozzi to "Donald Venettozzi", as set forth in footnote number one; and it is further

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

---

[20]     If you are proceeding pro se and are served with this order, report, and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order, report, and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

David E. Peebles
U.S. Magistrate Judge

Dated:      March 12, 2019
            Syracuse, New York

2015 WL 667528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jalil ABDUR–RAHEEM, Plaintiff,
v.
T. CAFFERY and Albert Prack, Defendants.

No. 13–CV–6315 (JPO).
|
Signed Feb. 17, 2015.

*OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Jalil Abdur–Raheem ("Abdur–Raheem"), proceeding *pro se* while incarcerated at a correctional facility in New York, alleges that Defendants Terry Caffery ("Caffery") and Albert Prack ("Prack") (collectively, "Defendants") deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. Specifically, Abdur–Raheem alleges violations of the Fourth, Eighth, and Fourteenth Amendments. Defendants move to dismiss the complaint for failure to state a claim. For the reasons that follow, Defendants' motion is granted.

**I. Background**

**A. Factual Background** [1]
In January 2011, Abdur–Raheem was a prisoner at New York State's Green Haven Correctional Facility ("Green Haven"), and worked as a porter in the Family Reunion Program ("FRP"), where his duties included cleaning the FRP trailers. (Dkt. No. 1 ("Compl."), Ex. A ("N.Y.S.Decision").) Defendant Caffery was a Tier III hearing officer at Green Haven. (Compl. at 5.) Defendant Prack was the Director of Special Housing/ Inmate Disciplinary Program for the New York State Department of Corrections and Community Supervision ("DOCCS"). (*Id.* Ex. B.)

On January 27, 2011, Abdur–Raheem cleaned the trailer where one of his own FRP visits was to be held and brought a few personal items into the trailer. (Compl. at

5; N.Y.S. Decision.) Soon thereafter, a corrections officer who worked in the FRP office noticed that two cartridges of film were missing from the office, and, after a search, discovered one cartridge hidden between the mattresses of the bed in the trailer in which Abdur–Raheem was to have his FRP visit. (N.Y.S.Decision.) Abdur–Raheem was immediately placed in the Special Housing Unit, or "SHU." (Compl. at 5.)

Abdur–Raheem was charged in a prison misbehavior report with smuggling, stealing, and violating FRP guidelines. (N.Y.S.Decision.) On February 14, 2011, he was found guilty of the charges following a Tier III disciplinary hearing before Defendant Caffery. (*Id.;* Compl. at 5; Compl. Ex. B.) Caffery sentenced Abdur–Raheem to six months in the S.H.U. The punishment included loss of packages, commissary, and phone privileges for the full six-month period. (Compl. at 5.) It appears from the complaint that Abdur–Raheem may have been released early on April 4, 2011. (*Id.*) In any event, Caffery's determination was affirmed on administrative appeal. (N.Y.S.Decision.)

Abdur–Raheem subsequently initiated a proceeding in New York state court pursuant to CPLR Article 78, contending that his right to call witnesses had been infringed at the Tier III hearing when Caffery failed to make a personal inquiry concerning the reason Abdur–Raheem's witness refused to testify. (N.Y.S.Decision.) The witness, a fellow inmate, was the other porter in the FRP program who had access to the FRP trailers. (*Id.*) He had initially agreed to testify, but later refused. (*Id.*) At the hearing, Caffery informed Abdur–Raheem of the inmate's refusal to testify and indicated that two officers had spoken to the inmate about his refusal. (*Id.*) In addition, Caffery gave Abdur–Raheem a copy of the inmate refusal form, which indicated that the requested witness did not "have knowledge of any photos" and "did not want to be involve[d]." (*Id.*)

**\*2** On September 13, 2012, the Appellate Division, Third Department annulled the disciplinary determination. (*Id.*) [2] The court held that under New York law, Caffery was required to conduct a "personal inquiry" into the witness's reason for refusing to testify "unless a genuine reason for the refusal [was] apparent from the record and [Caffery] made a sufficient inquiry into the facts surrounding the refusal to ascertain its authenticity." (*Id.*) The court held, first, that the witness's desire not to

be involved, as indicated on the inmate refusal form, was not a legitimate basis for an inmate's refusal to testify, and second, that "[e]ven if the refusal form were construed to contain a justifiable reason based upon a lack of knowledge," there was no evidence that Caffery had spoken with the officers who obtained the refusal form to establish this reason as authentic. (*Id.*) Therefore, Caffery's obligation to conduct a personal inquiry was not excused by the refusal form. (*Id.*) The court concluded that Abdur–Raheem "was denied his regulatory right to call witnesses," and the matter was "remitted for a new hearing." (*Id.*)

On September 20, 2012, Prack sent a letter to Abdur–Raheem advising him "on behalf of the Commissioner" that his prison disciplinary determination had been "reviewed and administratively reversed," and that rehearing was "not warranted." (Compl.Ex.B.)

Abdur–Raheem sues Caffery and Prack in their official and individual capacities under 42 U.S.C. § 1983. He alleges that Caffery violated his Fourth, Eighth, and Fourteenth Amendment rights when he failed to personally inquire as to why the witness refused to testify, and that Prack "unconstitutionally left [him] confined to S.H.U. from Jan[uary] 27, 2011, until April 4, 2011." (Compl. at 5.) He seeks damages of $150 for each day in SHU, $.32 per hour for the wages he lost as a result of being held in SHU, and punitive damages of $2,500. (*Id.* at 5–6.) [3] Caffery and Prack move to dismiss the complaint for failure to state a claim.

**B. Procedural History**
The complaint was filed on July 8, 2013. (Dkt. No. 1.) On September 24, 2013, the Court *sua sponte* dismissed Abdur–Raheem's official-capacity claims against the Defendants on the ground that, as state agents, Caffery and Prack have Eleventh Amendment immunity from suit for damages in their official capacities. [4] (Dkt. No. 7.) On March 12, 2014, Defendants moved to dismiss the complaint. (Dkt. No. 18.) Abdur–Raheem subsequently received two extensions of time to respond to the Motion to Dismiss (Dkt. Nos. 22 & 25), after which he applied for the appointment of counsel (Dkt. No. 29). The Court denied his application, but *sua sponte* granted him a third extension of time within which to respond to the Motion to Dismiss, to December 20, 2014. (Dkt. No. 30.) Abdur–Raheem failed to meet this deadline, and the

Court warned him that the Motion would be considered unopposed if he did not deliver his opposition to prison authorities by February 1, 2015. (Dkt. No. 31.) The Motion to Dismiss remains unopposed.

**II. Legal Standard**
**\*3** On a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475 (2d Cir.2009) (internal quotation marks omitted). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "This standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010) (quoting *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted)).

In determining whether a plaintiff has pleaded facts sufficient to survive a motion to dismiss, a court will not consider mere conclusory allegations that lack a factual basis. *Hayden v. Paterson,* 594 F.3d 150, 160–61 (2d Cir.2010). A plaintiff's complaint "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 254 (2d Cir.2014) (quoting *Iqbal,* 556 U.S. at 680) (alterations and internal quotation marks omitted).

In assessing the sufficiency of the complaint, a court may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations and internal quotation marks omitted). "Integral" documents are those "either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). In order for a document to be "integral," however, a plaintiff must actually have relied on its terms and effect in drafting the complaint; mere possession or notice is not enough. *Id.*

Finally, Abdur–Raheem's *pro se* complaint is subject to more lenient standards than a complaint filed by a represented party. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks omitted); *see also* Fed. Rule Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

### III. Discussion

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must " 'show that [an] official, acting under color of state law, caused the deprivation of a federal right.' " *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005) (quoting *Graham,* 473 U.S. at 166 (1985)). There is no dispute here that Caffery and Prack, employees of the DOCCS, were acting under color of state law. The parties dispute the second element, that is, whether Abdur–Raheem has stated a plausible claim that Caffery or Prack deprived him of a right guaranteed by the United States Constitution. Abdur–Raheem alleges violations of his Fourth, Eighth, and Fourteenth Amendment rights.

### A. Fourth Amendment Claim Against Caffery

**\*4** Abdur–Raheem merely lists "4th Amend[ment] violations" in the complaint as part of the list of claims against Caffery, without elaboration. (Compl. at 5.) He states no facts from which the Court can infer the Fourth Amendment violations to which he refers. Accordingly, this claim is dismissed. [5]

### B. Eighth Amendment Claim Against Caffery

Abdur–Raheem alleges that his Eighth Amendment rights were violated when he was placed in the SHU. (*Id.*) "In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). A prison official has a culpable state of mind if he "participated directly in the alleged event, ... learned of the inmate's complaint and failed to remedy

it, ... created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Id.*

Abdur–Raheem has not plausibly pleaded either of these elements. As to his detention in the SHU, he states only that he lost his privileges with respect to receiving packages, the commissary, and phone calls. Even assuming that Abdur–Raheem's SHU confinement lasted for the full six-month period, these allegations are not sufficient to give rise to an Eighth Amendment violation. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 748–49 (S.D.N.Y.2002) (holding that "allegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement," which lasted ten months, were "not violations of the Eighth Amendment"). And he makes no allegation as to Caffery's culpable state of mind in sentencing him to six months in the SHU. Accordingly, Abdur–Raheem's Eighth Amendment claim is dismissed. [6]

### C. Fourteenth Amendment Claim against Caffery

Abdur–Raheem's Fourteenth Amendment claim against Caffery is a procedural due process claim. To state such a claim, Abdur–Raheem must allege that he has a protected liberty interest and that he was deprived of sufficient process to protect that interest. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). Abdur–Raheem argues that Caffery deprived him of due process when he sentenced him to the SHU without inquiring into the requested witness's reason for refusing to testify at the Tier III hearing. (Compl. at 5.)

*Liberty or Property Interest:* A prisoner's liberty interest is implicated by SHU confinement only if the confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998).

**\*5** "Although the Second Circuit has explicitly declined to create a 'bright line rule' that a certain period of

SHU confinement automatically fails to implicate due process rights,' it has established 'guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed.' " *Zappula v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *6 (S.D.N.Y. Apr. 5, 2013) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). For example, "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64–65 (internal quotation marks omitted). Confinement of 305 days or more has been deemed to be an "atypical and a significant hardship." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)). In contrast, typical punitive segregation conditions imposed for 101 days or fewer "generally do not constitute 'atypical' conditions of confinement." *Id.* (quoting *Sealey v.. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). However, "[i]n the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in [punitive segregation] was exceedingly short—less than ... 30 days ...—and there was no indication that the plaintiff endured unusual ... conditions." *Palmer,* 364 F.3d at 65–66.

It is unclear from the complaint whether Abdur–Raheem spent 67 days or six months (180 days) in the SHU. Either way, he spent more than 30 days in the SHU, and therefore development of a detailed record of the SHU conditions he was subject to is advisable before the Court will dismiss this claim for failure to plead a protected liberty interest. The factual record before the Court is far from detailed; Abdur–Raheem states only that the SHU sanction "included loss of packages, commissary, [and] phone privileges." (Compl. at 5 .) The Court will therefore not dismiss Abdur–Raheem's procedural due process claim on this ground. Rather, the Court assumes without deciding that Abdur–Raheem's SHU confinement implicates a protected liberty interest, and asks whether he was given sufficient process.

*Process:* "A prisoner may not properly be deprived of a cognizable liberty interest without due process of law." *Gaston,* 249 F.3d at 163. Due process requires that a prisoner be provided, at minimum, with "advance written warning of the charges against him, the opportunity to call witnesses, and a written final decision on the hearing

describing how the state reached its determination." *Odom v. Kerns,* No. 99 Civ. 10668(KMK)(MHD), 2008 WL 2463890, at *9 (S.D.N.Y. June 18, 2008) (citing *Wolff v. McDonnell,* 418 U .S. 539, 563–67 (1974)); *see also Ponte v. Real,* 471 U.S. 491, 495 (1985) ("Chief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board."). Abdur–Raheem challenges only the second of these requirements; he alleges that his right to call witnesses was infringed when Caffery failed to make a personal inquiry into Abdur–Raheem's witness's refusal to testify. (Compl. at 5.)

**\*6** A prisoner does not have an absolute right to call witnesses on his behalf in a prison disciplinary proceeding. An "unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff,* 418 U.S. at 566. Accordingly, "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators.... [W]e must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.* Some legitimate reasons for refusing a prisoner's request to call a witness include "irrelevance, lack of necessity, [and] the hazards presented in individual cases." *Odom,* 2008 WL 2463890, at *9 (quoting *Wolff,* 418 U.S. at 566) (internal quotation marks omitted).

"Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him. [Therefore,] if a prison official ... reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights." *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Courts in this and neighboring districts have consistently held that a prison hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process. *See Odom,* 2008 WL 2463890, at *10 ("A witness's refusal to testify is a rational reason for denying Plaintiff's request to call witnesses."); *Jamison v. Fischer,* No. 11 Civ. 4697(RJS), 2013 WL 5231457, at *3 & n. 4 (S.D.N.Y. July 11, 2013) (holding that a hearing officer could have reasonably concluded that it would be futile to call witnesses where those witnesses submitted witness refusal sheets, and that therefore the fact that these witnesses were not made

Case 9:15-cv-00777-GLS-DEP Document 105 Filed 03/12/19 Page 51 of 210
Abdur-Raheem v. Caffery, Not Reported in F.Supp.3d (2015)
2015 WL 667528

to testify did not deprive the plaintiff of due process); *Turner v. Grant,* No. 98 Civ. 706A, 2000 WL 362032, at *5 (W.D.N.Y. Mar. 29, 2000) (holding that a hearing officer did not violate the plaintiff's due process rights in failing to call a witness who refused to testify); *Merced v. Moylan,* No. 9:05 Civ. 1426 (FJS/RFT), 2007 WL 3171800, at *9 (N.D.N.Y. Oct. 29, 2007) ("A failure to summon the testimony of a witness who refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.").

Moreover, "[t]here is no indication in Second Circuit or Supreme Court case law that a hearing officer must make an independent evaluation of the basis for the refusal to testify." *Greene v. Coughlin,* No. 93 Civ. 2805(DLC), 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (holding that a Tier III hearing officer does not violate a prisoner's due process rights when he fails to investigate the reasons for an inmate refusing to testify); *Jamison,* 2013 WL 5231457, at *3 (same); *Dumpson v. Rourke,* No. 96 Civ. 621(RSP), 1997 WL 610652, at *1 (N.D.N.Y. Sept. 28, 2006) (same). While failure to make such an independent evaluation violates state regulations, it does not violate the complaining prisoner's federal constitutional rights. *See Martinez v. Minogue,* No. 9:06 Civ. 546, 2008 WL 4241746, at *5–6 (N.D.N.Y. Sept. 11, 2008).

**\*7** To be sure, a prison official who refuses to call a requested witness has a constitutional obligation to explain to the prisoner-defendant why the witness was not allowed to testify. *Ponte,* 471 U.S. at 497; *Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). The reasons need not be in writing, and may be provided at the disciplinary hearing itself or by presenting testimony in court when there is a later constitutional challenge to the hearing. *Ponte,* 471 U.S. at 497.

Under this precedent, Caffery did not violate Abdur–Raheem's due process rights when he proceeded without the testimony of Abdur–Raheem's proposed witness. That witness had indicated, by way of an inmate refusal form, that he would not testify. Further, while Caffery may have had an obligation under New York law to further investigate the inmate's refusal to testify, he did not have an obligation under the Due Process Clause to do so. Rather, he constitutionally required only to explain to Abdur–Raheem why the witness was not called. Caffery fulfilled this obligation when he gave Abdur–Raheem a copy of the inmate refusal form at the Tier III hearing, which indicated that the inmate had refused to testify because he did not have knowledge of the event and did not want to be involved. Accordingly, Abdur–Raheem's Fourteenth Amendment procedural due process claim against Caffery is dismissed.

**D. Claim Against Prack**

The complaint also names Prack, who was the Director of the DOCCS Special Housing/Inmate Disciplinary Program when Abdur–Raheem was confined in the SHU. (Compl. at 5; *id.* Ex. B.) The complaint alleges only that Prack left Abdur–Raheem "unconstitutionally ... confined to S.H.U. from Jan[uary] 27, 2011, until April 4, 2011." (*Id.* at 5.) [7] Abdur–Raheem's claim against Prack is best read as stemming from his claims against Caffery: because Caffery unconstitutionally sentenced him to the SHU, Abdur–Raheem alleges, Prack's keeping him there was unconstitutional as well. Accordingly, because Abdur–Raheem has failed to state a claim against Caffery, he has failed to state a claim against Prack. [8]

**IV. Conclusion**

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED. The Clerk of Court is directed to close the motion at docket number 18 and to close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 667528

---

Footnotes

1    The following facts, taken from the complaint and attached exhibits, are assumed true for the purpose of resolving the motion to dismiss. *Goonewardena v. New York,* 475 F.Supp.2d 310, 320 (S.D.N.Y.2007).

2    *Abdur–Raheem v. Prack,* 98 A.D.3d 1152 (N.Y.App. Div.3d Dep't 2012).

2015 WL 667528

3    Abdur–Raheem's favorable Article 78 determination does not foreclose this subsequent § 1983 action for damages, since damages are unavailable to compensate a party in an Article 78 proceeding for civil rights violations. *Davidson v. Capuano,* 792 F.2d 275, 278–80 (2d Cir.1986).

4    Accordingly, this Opinion addresses only the claims against the Defendants in their individual capacities.

5    The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6    The Court notes that there is no evidence that Abdur–Raheem exhausted his Eighth Amendment claim as required to bring a prison condition claim under § 1983. *See* 42 U.S.C. § 1997e(a); *Baskerville v. Blot,* 224 F.Supp.2d 723, 729 (S.D.N.Y.2002) (detailing New York state's three-step inmate grievance process available to prisoners to exhaust their administrative remedies). The defense of failure to exhaust, however, is an affirmative defense; a defendant must prove its factual basis. *Jones v. Bock,* 549 U.S. 199, 216 (2007). Caffery has made no effort to do so here.

7    Although not pleaded in the complaint, the Defendants state that Prack was responsible for affirming Caffery's decision on administrative appeal, before it was reversed in the Article 78 proceeding. (Dkt. No. 20 at 2.) This is perhaps what Abdur–Raheem intends by his allegation that Prack left him "unconstitutionally ... confined to S.H.U." In any event, whether Prack passively left him in the SHU or affirmed Caffery's holding against him on administrative appeal, Abdur–Raheem has failed to state a claim against Prack.

8    Abdur–Raheem's claim against Prack could also be liberally construed as faulting Prack for placing Abdur–Raheem in the SHU on January 27, 2011, 18 days before Abdur–Raheem was given any kind of hearing. This claim fails. Absent any indication that Abdur–Raheem endured unusual prison conditions, 18 days in the SHU is insufficient to allege interference with a liberty interest such that the protections of procedural due process apply. *See Palmer,* 364 F.3d at 6566; *see also Arce v. Walker,* 139 F.3d 329, 335–37 (2d Cir.1998) (18 days in SHU).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 53 of 210
Allred v. Knowles, Not Reported in F.Supp.2d (2010)

2010 WL 3911414

2010 WL 3911414
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.

Jeffrey ALLRED, Plaintiff,
v.
Captain KNOWLES, Hearing Officer Sgt. Noto, Defendants.

No. 06–CV–0456Sr.
|
Oct. 5, 2010.

**Attorneys and Law Firms**

Jeffrey Allred, Queensvillage, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

***DECISION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 14.

Plaintiff, Jeffrey Allred, filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Gowanda Correctional Facility ("Gowanda") his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 18. For the following reasons, defendants' motion for summary judgment is granted and the plaintiff's complaint is dismissed in all respects.

***BACKGROUND***

Plaintiff filed this action on July 11, 2006, against defendants, Michael Knowles and Louis Noto, pursuant to 42 U.S.C § 1983, seeking monetary damages. *Id.* The action arises from a misbehavior report issued on or about July 27, 2003 by defendant Noto against plaintiff and the resulting Tier III disciplinary hearing conducted by defendant Knowles. *Id.* Specifically, the complaint alleges the issuance of a false misbehavior report, retaliation and violation of plaintiff's due process rights. *Id.*

At the time of the events alleged in the complaint, plaintiff was an inmate in the care and custody of the New State Department of Correctional Services ("DOCS") housed at Gowanda. Dkt. # 1, p. 2; Dkt. # 20, p. 1. Defendant Knowles was a Captain at Gowanda and his duties included, from time to time, conducting inmate disciplinary hearings. Dkt. # 1, pp. 3–4; Dkt. # 21, pp. 1–2. Sergeant Noto was a DOCS Sergeant on plaintiff's housing unit at Gowanda. Dkt. # 1, p. 4; Dkt. # 22, pp. 1–2.

On July 22, 2003, at approximately 8:30 p.m., Correctional Officer Millich discovered several marijuana cigarettes during a search of inmate Meja's cell. Dkt. # 22, p. 3. Consequently, defendant Noto initiated an investigation into the matter. Dkt. # 1, p. 8; Dkt. # 22, p. 3. Defendant Noto maintained that Meja told him that he had purchased the marijuana cigarettes from plaintiff. Dkt. # 22, p. 3. Based on Meja's identification of plaintiff and information allegedly received from confidential informant(s)—who identified plaintiff as a drug dealer and indicated that the sale in question occurred between 7:00 and 8:00 p.m. on July 22, 2003 in the prison yard —defendant Noto issued a misbehavior report charging plaintiff with violating Inmate Rule 113.25. Dkt. # 1, pp. 22 and 25; Dkt. # 22, p. 3. Inmate Rule 113.25 provides that "an inmate shall not make, possess, sell or exchange any narcotic, narcotic paraphernalia, controlled substance or marijuana. An inmate shall not conspire with any person to introduce such items into the facility." Dkt. # 22, p. 2; *see also* 7 NYCRR § 270.2(14)(xv).

On July 28, 2003, a Tier III disciplinary hearing was conducted before defendant Knowles. Dkt. # 1, p. 23; Dkt. # 21, p. 2. At the hearing, plaintiff testified in his own defense that he was at a Nation of Islam ("NOI")/ Black studies program during the period of the alleged drug sale in the prison yard. Dkt. # 1, p. 24; Dkt. # 21, p .6. Plaintiff called two other inmates, Ford and

Williams, as alibi witnesses. Dkt. # 1, p. 29; Dkt. # 21, p. 7. Ford and Williams attended the NOI/Black studies program with plaintiff, but could not verify the time plaintiff left. Dkt. # 21, pp. 7 and 16. The sign-out sheet for the NOI/Black studies class did not indicate the time plaintiff left, although it indicated that both Ford and Williams left at 7:00 p.m. *Id.* Plaintiff did not sign back into his housing unit until 8:10 p.m. and no one was able to verify his whereabouts after 7:00 p.m. Dkt. # 21, p. 17. Defendant Knowles interviewed the confidential informant(s) outside the presence of plaintiff and found them to be credible witnesses. Dkt. # 21, pp. 7–8. The confidential informant(s) identified plaintiff as a drug dealer and indicated that the sale of the drugs to Meja occurred between 7:00–8:00 p.m. in the prison yard. *Id.* Meja also testified at the hearing, and recanted his initial identification of plaintiff as the person who sold him drugs. Dkt. # 1, p. 26; Dkt. # 21, p. 11. When asked by defendant Knowles why he initially told defendant Noto that plaintiff was the individual who sold him drugs, Meja answered that he did so because he wanted defendant Noto to "leave [him] alone." Dkt. # 24, Ex. D, p 5. In response, defendant Knowles asked Meja to confirm, by answering in either the affirmative or the negative, if he initially identified plaintiff as the individual who sold him drugs, to which Meja answered in the affirmative. *Id.*

**\*2** On August 3, 2003, at the close of the disciplinary hearing, defendant Knowles entered a guilty finding against plaintiff. Dkt. # 24, Ex. C. Based on the Hearing Disposition Report completed by defendant Knowles, he based his guilt determination on the following evidence: defendant Noto's misbehavior report and his testimony that Meja initially identified plaintiff as the individual who sold Meja drugs in the yard; and the testimony of the confidential informant(s). *Id.* Defendant Knowles imposed a penalty of 12 months of confinement in special housing unit ("SHU") and a loss of privileges between the period August 22, 2003 and August 22, 2004.

### *DISCUSSION AND ANALYSIS*

#### Summary Judgment
Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the appropriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**Due Process Claim**

**\*3** Plaintiff alleges that defendants deprived him of his constitutional right to procedural due process. Dkt. # 1, p. 42. This allegation appears to be based on the following: (1) that he was not afforded all of the procedural safeguards set forth in *Wolff v. McDonnell* [1] during the Tier III disciplinary hearing; and (2) that defendant Knowles was not an impartial hearing officer.

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 U.S. Dist. LEXIS 18103, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), *aff'd,*

*Palmer,* 364 F.3d 60; *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4½ month period, Sims was sentenced to SHU for a total of nearly 3½ years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003) (quoting *Tookes v. Artuz,* No. 00CIV4969, 2002 U.S. Dist. LEXIS 12540, 2002 WL 1484391 (S.D.N.Y. July 11, 2002)) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"). Here, following the Tier III disciplinary hearing, defendant Knowles imposed a penalty of 12 months of confinement in SHU and a loss of privileges between the period August 22, 2003 and August 22, 2004. Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest. The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process. Defendants maintain that plaintiff was not. Dkt. # 21, p. 2; Dkt. # 22, p. 7.

**\*4** In *Wolff,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff,* 418 U.S. at 563–66. Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety; and a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken. *Id.* Additionally, the findings must be supported by some evidence in the record. *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, contrary to plaintiff's contention, he was afforded all of the procedural safeguards set forth in *Wolff.* Dkt. # 24, p 4–5. Plaintiff was provided with a copy of defendant Noto's misbehavior report before the hearing, giving him advance notice of the charge against him. [2] Dkt. # 1, p. 22; Dkt. # 21, p. 5. Plaintiff had the opportunity

to call witnesses and present evidence. Dkt. # 1, pp. 26, 29; Dkt. # 21, pp. 6, 8. Plaintiff was also provided with a written statement of the guilty finding and the evidence relied on for the disposition. Dkt. # 21, p. 12. The guilty disposition was supported by evidence in the form of defendant Noto's notes; defendant Noto's misbehavior report and testimony; and the testimony of the confidential informant(s), particularly because plaintiff's alibi was uncorroborated. *Id.* at pp. 10–11. Thus, plaintiff's claim that he was deprived of procedural due process fails as a matter of law.

**Impartial Hearing Officer**
Plaintiff contends, in particular, that his due process rights were violated because defendant Knowles was not an impartial hearing officer. *See* Dkt. # 1, p. 6–8. Plaintiff points to the following to support his allegation: (1) that defendant Knowles was involved in both the Tier III hearing and in the investigation into plaintiff's drug sale; (2) that defendant Knowles instructed Meja to respond affirmatively at the hearing that plaintiff had sold Meja drugs although Meja testified at the hearing that he did not know plaintiff; and (3) that defendant Knowles rejected his alibi and confused the time of the drug sale at issue. Dkt. # 1, pp. 28, 39; Dkt. # 24, p. 6.

Indeed, as plaintiff correctly contends, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at 570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

**\*5** It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,*

100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is *"some evidence* in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis added).

In this case, there is ample evidence to support defendant Knowles' guilty finding: defendant Noto's misbehavior report and his testimony that Meja originally identified plaintiff as the individual who sold him drugs; and the testimony of the confidential informant(s); which was considered outside the presence of plaintiff. Dkt. # 21, pp. 8–9.

Notably, plaintiff's only defense at the Tier III hearing was that he had been at an NOI/Black studies program at the time of the drug sale, which took place allegedly between 7:00–8:00 p.m. Dkt. # 21, p. 7. However, inmates Ford and Williams could not verify plaintiff's alibi defense. *Id.* Because plaintiff did not sign back into his cell area until 8:10 p.m., defendant Knowles determined that there was ample time for plaintiff to sell the drugs in the yard during the period of his unexplained absence. Dkt. # 21, pp. 7, 16–18.

Plaintiff further contends that defendant Knowles violated his constitutional right to due process by failing to adhere to the state guidelines for conducting prison disciplinary hearings (set forth in Title 7 of the NYCRR §§ 253.1(b), 254.1 [3]) because, he alleges, that defendant Knowles conducted the Tier III hearing and was also involved in the investigation of plaintiff's drug sale. Dkt. # 24, p 6.

This argument fails because violations of state law that do not deprive the plaintiff of a right "secured by the Constitution and laws" are insufficient to support a claim under § 1983. *See Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004); *Blouin v. Spitzer,* 356 F.3d 348, 362 (2d Cir.2004). State procedural protections do not give rise to substantive federal rights. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures."). Moreover, "[s]tate procedures designed to protect substantive liberty interests entitled to protection under the federal constitution do not

Allred v. Knowles, Not Reported in F.Supp.2d (2010)

2010 WL 3911414

themselves give rise to additional substantive liberty interests." *Blouin,* 356 F.3d at 363. It is "federal law, not state regulations, [that] determines the procedures necessary to protect that liberty interest ." *Id.* (citing *Watson v. City of New York,* 92 F.3d 31, 38 (2d Cir.1996)). Therefore, "the only relevant inquiry was whether the constitutional [procedures] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (citing *Holcomb,* 337 F.3d at 224). As set forth above, plaintiff's constitutional rights were not violated during the Tier III hearing. Plaintiff's exclusive reliance on defendants' alleged violations of 7 NYCRR §§ 253.1(b) and 254.1 is insufficient to support his claim under § 1983. *See Shakur,* 391 F.3d at 119; *Holcomb,* 337 F.3d at 224; *Ramsey v. Goord,* 661 F.Supp.2d 370, 391–92 (W.D.N.Y.2009).

**\*6** Accordingly, since plaintiff received all of the process he was due in the course of the Tier III disciplinary hearing, defendants' motion for summary judgment on plaintiff's due process claim is granted.

**Retaliation Claim**

Plaintiff alleges that, in retaliation for attending a Nation of Islam ("NOI")/Black Studies course and/or for his affiliation therewith, defendant Noto filed a false misbehavior report and gave false testimony and that defendant Knowles found him guilty. Dkt. # 1, p. 43.

"In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for 'adverse action' taken against him by defendants." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App.

LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**\*7** Here, even assuming plaintiff's affiliation with the NOI/Black studies program was constitutionally protected conduct, he cannot show that his affiliation therewith was a substantial motivating factor for the filing of the misbehavior report and the subsequent finding of guilt concerning the report. Defendant Knowles declares that he "did not even recall plaintiff prior to the hearing he conducted," and had no involvement whatsoever in any NOI activities. Dkt. # 21, p. 22. Similarly, defendant Noto declares that he had no knowledge of plaintiff's participation in the NOI/Black Studies program, and, up until the time of the instant litigation, "did not know that plaintiff attended such a course or was a member of the NOI." Dkt. # 22, p. 6. To this extent, plaintiff cannot demonstrate that his affiliation with the NOI/Black studies program was a motivating factor in defendants' actions. Since plaintiff cannot establish any plausible connection between NOI/Black studies

participation and the misbehavior report and the guilty finding, his retaliation claim fails as a matter of law.

Assuming, *arguendo,* that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). The record shows that there was sufficient evidence, based on defendant Noto's investigation, to have charged plaintiff with a drug sale. Further, there was ample evidence at the Tier III disciplinary hearing for defendant Knowles to find plaintiff guilty of the drug sale charge. This is so particularly in the context of prison administration where courts must be cautious to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is granted.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. Dkt. # 18. The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*8  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3911414

---

Footnotes

1    418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1975).

2    Plaintiff concedes this fact. However, he suggests that he was deprived of his due process rights under the standard set forth in *Wolff* because defendant Knowles found him guilty of drug possession, rather than sale of a narcotic substance, which he was charged with in the misbehavior report. Dkt. # 24, p 5. However, inmate Rule 113.25, which plaintiff was charged with in the misbehavior report and found guilty of at the close of the Tier III hearing, encompasses possession *and* sale of a narcotic. Dkt. # 21, pp. 5 and 19.

3    7 NYCRR § 253.1 gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings. Pursuant to § 253.1(b), "[n]o person who has participated in any investigation of the acts shall be a hearing officer at a hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a hearing is held, act as the hearing officer on that charge." Section § 254.1 of 7 NYCRR precludes a person who was a witness to or who investigated an incident that is the subject of a disciplinary proceeding from acting as a hearing officer relating to that incident.

---

End of Document                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6069458
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Escon CAIMITE, Plaintiff,

v.

D. VENETTOZZI; A. Rodriguez; E.F.
Corbett; J.A. Esgrow, Defendants.

No. 9:17-CV-0919 (GLS/CFH)
|
Signed 10/29/2018

**Attorneys and Law Firms**

Escon Caimite, 01-A-2313, Greene Correctional Facility,
P.O. Box 975, Coxsackie, New York 12051, Plaintiff pro
se

Attorney General for the State of New York The Capitol,
Albany, New York 12224, Attorney for defendants, OF
COUNSEL: MATTHEW P. REED, ESQ., Assistant
Attorney General

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Escon Caimite ("plaintiff"), an inmate
who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to
42 U.S.C. § 1983 alleging that defendants D. Venettozzi,
A. Rodriguez, E.F. Corbett, and J.A. Esgrow — who, at
all relevant times, were employed by DOCCS or Great
Meadows Correctional Facility ("Great Meadows") —
violated his rights under the Eighth and Fourteenth
Amendments, as well as Article I, § 5 of the New
York State Constitution. See Dkt. No. 1 ("Compl."). 
Presently pending before the Court is defendants' Motion
to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 19. [2]
Plaintiff opposed defendants' motion. Dkt. No. 24. For
the following reasons, it is recommended that defendants'
motion be granted in part and denied in part.

## I. Background

The facts are reviewed in the light most favorable to
plaintiff as the non-moving party. See subsection II.A.
infra.

### A. November 2015 Misbehavior Reports and Disciplinary Hearing

On November 13, 2015, non-party Corrections Officer
("C.O.") Doan issued plaintiff a misbehavior report
charging him with assault on an inmate (100.10), violent
conduct (104.11), fighting (100.13) and refusing a direct
order (106.10). Compl. ¶ 15; Dkt. No. 19-1 ("Def. Mem. of
Law") at 3. In the misbehavior report, C.O. Doan stated
that he had observed plaintiff making a stabbing motion
at inmate Nesmith, throw a weapon onto the ground,
and instigate a fist fight. Id. That same day, non-party
C.O. Londrigan issued plaintiff a second misbehavior
report charging him with possession of a weapon (113.10),
contraband (113.23), and smuggling (114.10). Compl. ¶¶
16, 17; Def. Mem. of Law at 4. C.O. Londrigan alleged
that after responding to the altercation in the recreation
yard, he recovered a sharpened piece of wood with a
masking-tape handle. Compl. ¶ 16; Def. Mem. of Law at
4. C.O. Doan confirmed that he observed plaintiff throw
the sharpened piece of wood onto the ground. Id. In the
misbehavior report, C.O. Londrigan stated that he took
possession of the alleged weapon, photographed it, and
placed it in evidence. Compl. ¶ 17; Def. Mem. of Law at 4.

On November 19, 2015, Hearing Officer ("H.O.") Corbett
commenced a Tier III disciplinary hearing concerning
plaintiff's two misbehavior reports. Compl. ¶ 18; Def.
Mem. at 4. Plaintiff requested inmate Nesmith as a
witness, but his hearing assistant informed him that
inmate Nesmith refused to testify. Compl. ¶ 19; Def. Mem.
of Law at 4. At the start of the hearing, plaintiff informed
H.O. Corbett that he never received a witness refusal
form, and that he was not told the reason inmate Nesmith
refused to testify. Id. H.O. Corbett again informed
plaintiff that inmate Nesmith refused to testify, but did
not provide a reason as to why he refused. Compl. ¶ 20;
Def. Mem. of Law at 4. He also failed to provide plaintiff
with a witness refusal form. Compl. ¶ 21; Def. Mem. of
Law at 4. Plaintiff repeatedly requested inmate Nesmith
as a witness, and H.O. Corbett responded that he could
not force inmate Nesmith to testify. Compl. ¶ 22.

**\*2** On December 18, 2015, H.O. Corbett found plaintiff guilty on all charges, and sentenced him to 545 days in solitary confinement. Compl. ¶ 22; Def. Mem. of Law at 4. Plaintiff appealed his sentence, and the sentence was modified to 220 days, with 50 days suspended. Compl. ¶ 23; Def. Mem. at 4. Plaintiff's modified sentence was set to expire on July 24, 2016. Compl. ¶ 24; Def. Mem. at 4. Plaintiff filed an Article 78 proceeding in Albany County Supreme Court challenging his disciplinary sentence, and on January 10, 2017, the court reversed the decision and ordered a rehearing. Compl. ¶ 25; Def. Mem. of Law at 4. On January 20, 2017, DOCCS Director of Special Housing/Inmate Disciplinary Program Venettozzi administratively reversed and expunged the December 18, 2015 Tier III disciplinary sentence. Compl. ¶ 26; Def. Mem. of Law at 4-5. Plaintiff had already served his entire 220-day sentence in the Special Housing Unit ("SHU"). [3]

### B. January 2016 Misbehavior Report and Disciplinary Hearing

On January 7, 2016, non-party C.O. Gebo issued plaintiff a misbehavior report charging him with possession of contraband (113.23), possession of marijuana (113.25), and smuggling (114.10). Compl. ¶¶ 27, 30; Def. Mem. of Law at 5. In the misbehavior report, C.O. Gebo alleged that an x-ray of plaintiff's rectum showed an unidentified foreign object, that was later revealed to be 0.8 grams of marijuana. Compl. ¶¶ 28, 29; Def. Mem. of Law at 5. Soon after, plaintiff transferred to Southport Correctional Facility ("Southport"). Compl. ¶ 30; Def. Mem. of Law at 5. On January 28, 2016, H.O. Esgrow commenced a Tier III disciplinary hearing concerning the January 7, 2016 incident at Great Meadows. Compl. ¶ 31; Def. Mem. of Law at 5. At the hearing, plaintiff objected to the "unlawful strip frisk" that proceeded the finding of the unidentified foreign object, as he believed probable cause was never corroborated by reviewing the hospital log book, the SHU log book, or by Physicians Assistant ("P.A.") Nesmith.[4] Compl. ¶ 32; Def. Mem. of Law at 5. Plaintiff requested several witnesses be called at the hearing including P.A. Nesmith; all of the inmate hospital porters working the morning of the incident; and non-party J. Webster, the person who performed the drug test. Compl. ¶ 33; Def. Mem. of Law at 5. H.O. Esgrow denied plaintiff's request for witnesses; instead, he permitted the x-ray technician to testify. Compl. ¶ 34; Def. Mem. of Law at 5. Plaintiff asked H.O. Esgrow

why the witnesses refused to testify, and he declined to reply, only stating, "you will get it in writing." Compl. ¶ 34. Plaintiff also requested a five minute phone call with the attorney handling his state court criminal appeals to seek assistance, but H.O. Esgrow denied that request and informed plaintiff that he did not have the authority to grant his request. Id. ¶¶ 35, 36. Before the conclusion of the hearing, H.O. Esgrow provided plaintiff with Form 2176, a witness refusal form. Id. ¶ 37; Def. Mem. of Law at 5.

Form 2176, Witness Interview Notice, states that six witnesses were called at the February 25, 2016 disciplinary hearing. Def. Mem. of Law at 5. [5] The requested hospital porters, inmates within B-block,[6] and P.A. Nesmith were not called to testify. Id. at 5-6. Plaintiff did not identify the relevancy of the inmate hospital porters, what questions he intended to ask, or the basis of their potential testimony. Id. at 6. H.O. Esgrow denied the B-block inmates because their testimony was duplicative of testimony already offered by C.O. McCarthy, who testified consistently with plaintiff's recollection of the pat frisk. Id. H.O. Esgrow denied P.A. Nesmith after plaintiff stated that he intended to ask P.A. Nesmith the same questions he had already asked the x-ray technician. Id. The x-ray technician testified that the "plot" in plaintiff's hip could not produce the same image in an x-ray as the found contraband. Id.

**\*3** On February 25, 2016, H.O. Esgrow found plaintiff guilty of all charges, and sentenced him to 240 days in SHU. Compl. ¶ 38; Def. Mem. of Law at 6. Plaintiff appealed his sentence, and the sentence was modified to 140 days with 40 days suspended. Compl. ¶ 39; Def. Mem. of Law at 6. Plaintiff filed an Article 78 proceeding challenging his disciplinary sentence, and, before the Third Department rendered their decision, Acting Director A. Rodriguez reversed and expunged the February 25, 2016 Tier III disciplinary sentence. Compl. ¶¶ 40, 41; Def. Mem. of Law at 6. Plaintiff claims he was subjected to 380 days of solitary confinement with no access to educational programs, work programs, telephones, commissary, and visitation. Compl. ¶ 42. Defendants contend that plaintiff was only confined for 360 days, the sum of his 220 days as modified from the November 2015 sentence and 140 days as modified from the February 2016 sentence. Def. Mem. of Law at 5 n.4.

## II. Discussion [7]

### A. Legal Standard

Under Rule 12 (b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering such a motion, a court must "construe plaintiff[']s complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff[']s favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009) ) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009) ) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." ) ); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff, 537 F.3d at 191-92 ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.") (internal citations omitted).

### B. Fourteenth Amendment

**\*4** Plaintiff contends that H.O. Corbett and H.O. Esgrow violated his due process rights by refusing to call his requested witnesses at the November 2015 and January 2016 disciplinary hearings. Compl. ¶ 42. Plaintiff also claims that Director Venettozzi and Acting Director Rodriguez violated his due process rights by upholding the November 2015 and February 2016 disciplinary sentences on administrative appeal "when there were clear violations of [plaintiff's] right to call witnesses ... then administratively reverse said decisions only after [plaintiff] serv[ed] all of his SHU time[.]" Id. ¶ 44. Defendants argue that plaintiff's Fourteenth Amendment claims fail as a matter of law. See Def. Mem. of Law at 8-13.

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. To state a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001)

(citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### 1. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486) ("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous."). Defendants assume that, for the purposes of this motion, plaintiff's 360-day confinement in SHU implicated a liberty interest. See Def. Mem. of Law at 8.

### 2. Procedural Due Process

Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citations omitted).

Plaintiff's due process claims center on his inability to call witnesses at the November 2015 disciplinary hearing presided over by H.O. Corbett at Great Meadow and the February 2016 disciplinary hearing presided over by H.O. Esgrow at Southport. See generally Compl. Although it is well-established that inmates are entitled to a reasonable opportunity to call witnesses, see Luna, 356 F.3d at 487, "this right is not unfettered ... [and] may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance of lack of necessity." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *28 (N.D.N.Y. Mar. 28, 2014) (citations omitted). "While inmates are entitled to call witnesses at disciplinary hearings, hearing officers may deny witness testimony as irrelevant or redundant." Richard v. Fischer, 38 F. Supp. 3d 340, 359 (W.D.N.Y. 2014) (citation omitted).

### a. November 2015 Disciplinary Hearing

**\*5** As to the November 2015 disciplinary hearing at Great Meadows, plaintiff's due process claim centers on the fact that he was unable to call inmate Nesmith as a witness. Compl. ¶ 19. Plaintiff also seems to suggest that H.O. Corbett failed to provide him with the witness refusal form. Id. ¶ 21; Dkt. No. 24 ("Pl. Opp.") at 10. It has been held that "if a witness will not testify if called, it cannot be a 'necessity' to call him," and the prison official that "reasonably concludes that it would be futile to call a witness to testify" does not violate the inmate's constitutional rights. Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993); see Abdur-Raheem v. Caffery, No. 13-CV-6315 (JPO), 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015) (citing cases for the proposition that "courts

[within this Circuit] have consistently held that a prison hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process.").

Here, plaintiff admits in his pleadings that both his non-party hearing assistant and H.O. Corbett informed him that inmate Nesmith refused to testify. Compl. ¶ 19. When plaintiff continued to request inmate Nesmith as a witness, H.O. Corbett informed him that "he could not force an inmate to testify as a witness." Id. ¶ 22. To the extent that H.O. Corbett failed to inquire as to why inmate Nesmith refused to testify, " '[t]here is no indication in Second Circuit or Supreme Court case law that a hearing officer must make an independent evaluation of the basis for the refusal to testify.' " Abdur-Raheem, 2015 WL 667528, at *6 (quoting Greene v. Coughlin, No. 93 Civ. 2805(DLC), 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (holding that a Tier III hearing officer does not violate a prisoner's due process rights when he fails to investigate the reasons for an inmate refusing to testify) ).

Moreover, although plaintiff indicates that H.O. Corbett failed to provide him with a witness refusal form and seems to suggest that such form must be provided to an inmate at his or her disciplinary hearing, see Compl. ¶ 21; Pl. Opp. at 10, the undersigned notes that a violation of DOCCS procedures or state procedural rules regarding disciplinary hearings do not, alone, demonstrate a federal due process claim under § 1983. See Jackson v. Ramey, No. 9:07-CV-874 (NAM/ATB), 2010 WL 3761891, at *3 (N.D.N.Y. Sept. 2, 2010), report-recommendation and order adopted by 2010 WL 3761867 (N.D.N.Y. Sept. 20, 2010) (citing Martinez v. Minogue, No. 9:06-CV-546 (DNH/DEP), 2008 WL 4241746, at *6 (N.D.N.Y. Sept. 11, 2008) ). In Martinez v. Minogue, this Court dismissed the plaintiff's Fourteenth Amendment claim where the "plaintiff's complaint allege[d] only a violation of state regulation related to the hearing officer's failure to ... provide ... a signed witness refusal form to the plaintiff [as] th[is] violation[ ] do[es] not rise to a level of constitutional significance." Martinez, 2008 WL 4241746, at *6. Similarly, here, plaintiff's claim that H.O. Corbett failed to provide him with a witness refusal form does not give rise to a federal due process claim. See id.; Jackson, 2010 WL 3761891, at *3. This is particular true where "there is no indication that [inmate Nesmith] would have testified at all, let alone provided testimony favorable to" plaintiff as he and plaintiff were the two inmates involved in the fight. Rodriquez v. Ghoslaw, No. 98 CIV.

4658(GEL), 2001 WL 755398, at *10 (S.D.N.Y. July 5, 2001) (quoting Silva, 992 F.2d at 22) (concluding that "[b]ecause only these [two] men were involved in the episode, any testimony exonerating [the plaintiff] would almost certainly incriminate [the inmate witness]. It is therefore highly unlikely that [he] would provide any help to [the plaintiff].").

The undersigned notes that the only claim against Director Venettozzi is that he upheld C.O. Corbett's disciplinary determination on appeal "when there were clear violations of [plaintiff's] right to call witnesses," and then administratively reversed that determination after plaintiff had served his time. Compl. ¶¶ 26, 44. As the undersigned recommends dismissal of plaintiff's due process claim against H.O. Corbett because he fails to establish a constitutional violation, it is similarly recommended that plaintiff's due process claim against Director Venettozzi be dismissed.

**\*6** Accordingly, it is recommended that defendants' motion to dismiss as to plaintiff's due process claim concerning the November 2015 disciplinary hearing be granted.

### b. February 2016 Disciplinary Hearing

As to the February 2016 disciplinary hearing at Southport, plaintiff contends that his constitutional rights were violated when C.O. Esgrow prevented him from calling certain witnesses. See Compl. ¶ 33. Plaintiff contends that he requested several witnesses during his disciplinary hearing including P.A. Nesmith; all of the inmate hospital porters that worked on the morning of the incident; and non-party J. Webster, the individual who performed the testing on the foreign substance removed from plaintiff's rectum. Id. Plaintiff claims that H.O. Esgrow denied plaintiff's requests, but "allowed [the] x-ray technician Kakowski to testify." Id. ¶ 33. When plaintiff asked H.O. Esgrow why he had refused the witnesses, he did not reply; instead, he informed plaintiff that he would "get it in writing." Id. ¶ 34. Prior to the conclusion of the hearing, H.O. Esgrow provided plaintiff with witness refusal forms. Id. ¶ 37.

Defendants have proffered Form 2176 entitled Witness Interview Notice concerning plaintiff's February 2016 disciplinary hearing. [8] The Notice establishes that six

witnesses were called at plaintiff's disciplinary hearing. Def. Mem. of Law at 20-21. It states that the six witnesses testified from Great Meadows via speaker phone, and noted that plaintiff had an opportunity to question them and hear their testimony. Id. at 20. As to plaintiff's request that the hospital porters be called as witnesses, Form 2176 states that plaintiff's request was denied because plaintiff was "offered an opportunity to qualify these witnesses[,] however, in [his] offer of proof [he was] not able to pose any material specific questions." Id. As to plaintiff's request that P.A. Nesmith testify, the Notice states that in plaintiff's "offer of proof, [he] indicated [he] wanted to ask 'how long did it take to produce the x-rays[?'] and ['] would a plot in the hip produce the image shown in [the] x-ray[?']" Id. at 21. The Notice further states that plaintiff had asked these questions to the x-ray technician during his testimony, and the technician indicated that the x-ray took one minute to complete and that a plot in plaintiff's hip was not consistent with the image in the x-ray. Id. The form does not reference the denial of J. Webster as a witness. See id. at 20-21.

The Second Circuit has held that it is the prison official's burden to establish the rationality of declining an inmate's witness request. See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991). To satisfy this burden, the prison official must provide "some explanation" during or after the hearing as to why he or she declined the witness. See Russell v. Selsky, 35 F.3d 55, 58 (2d Cir. 1994). "While prison officials need not put their reasons for refusing the inmate's request in writing or into the administrative record of the disciplinary hearing, due process does require that prison officials 'at some point' state their reasons for refusing the inmate's request." Gonzalez v. Chalk, No. 13 Civ. 5486(PKC), 2014 WL 1316557, at *5 (S.D.N.Y. Apr. 1, 2014) (citing Ponte v. Real, 471 U.S. 491, 492 (1985) ).

**\*7** Here, Form 2176 demonstrates that H.O. Esgrow explained that he denied plaintiff's request for the hospital porters because plaintiff could not proffer specific, material questions to ask the witnesses or otherwise indicate the relevancy of their testimony. Def. Mem. of Law at 20. As to P.A. Nesmith, Form 2176 demonstrates that H.O. Esgrow explained that the questions plaintiff planned to ask had already been answered by the x-ray technician, and, therefore, would be redundant. Id. at 21. As it is within the hearing officer's purview to deny a witness based on irrelevance

or lack of necessity, see Kingsley, 937 F.2d at 30, and because the pleadings demonstrate that H.O. Esgrow offered "some explanation" as to why he denied the request, the undersigned finds that H.O. Esgrow has "adequately demonstrated the rationality of declining to call" P.A. Nesmith and the hospital porters. Gonzalez, 2014 WL 1316557, at *5. As such, it is recommended that defendants' motion on this ground be granted.

However, as to H.O. Esgrow's denial of J. Webster, there is no indication in the pleadings that H.O. Esgrow offered "some explanation" as to why he denied the witness, as is required under the Fourteenth Amendment. See Gonzalez, 2014 WL 1316557, at *5; see LeBron v. Artus, No. 06-CV-0532(VEB), 2008 WL 111194, at *10 (W.D.N.Y. Jan. 9, 2008) ("When an inmate is precluded from obtaining certain witness testimony or other evidence, due process requires that the inmate be provided reasons for the denial either at the disciplinary hearing or at a later time") (citation omitted). Although defendants argue that the testimony J. Webster would have provided regarding the "green leafy substance" found in plaintiff's rectum was ultimately presented to H.O. Esgrow in written reports, due process requires that the hearing officer inform plaintiff why he denied a witness. See Russell, 35 F.3d at 58; Gonzalez, 2014 WL 1316557, at *5. Thus, H.O. Esgrow's refusal to call the individual who conducted the drug test on the foreign object found in plaintiff's rectum, "without any justification supported by institutional need, may well constitute a violation of [plaintiff's] due process rights." Sowell v. Bullis, No. 9:13-CV-1482 (GLS/DJS), 2016 WL 1696454, at *12 (N.D.N.Y. Mar. 25, 2016). Because of "the low standard required of a pro se plaintiff on a motion to dismiss," the undersigned finds that plaintiff has adequately alleged a due process claim with regard to H.O. Esgrow's failure to allow him to present J. Webster as a witness. Brooks v. Prack, 77 F. Supp. 3d 301, 318 (W.D.N.Y. 2014). As such, it is recommended that defendants' motion on this ground be denied.

The undersigned notes that the only claim against Acting Director Rodriguez is that he upheld C.O. Esgrow's disciplinary determination on appeal "when there were clear violations of [plaintiff's] right to call witnesses," and then administratively reversed that determination after plaintiff had served his time. Compl. ¶¶ 40-41, 44. "In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to

establish that official's personal involvement in an alleged constitutional violation, which is a prerequisite to liability under § 1983." Collins v. Ferguson, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011). Further, it is well-settled that a supervisor may be held liable if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." Whitley v. Miller, 57 F. Supp. 3d 152, 161 (N.D.N.Y. 2014) (citation omitted). At this stage in the litigation, it is unclear what involvement Acting Director Rodriguez had in the reversal and modification of plaintiff's disciplinary sentence. Thus, as the undersigned recommends that plaintiff's due process claim against H.O. Esgrow move forward, it is recommended that defendants' motion on this ground as to Acting Director Rodriguez be denied.

**\*8** Finally, insofar as plaintiff claims that H.O. Esgrow's denial of his request to speak with his attorney during his disciplinary hearing amounts to a constitutional violation, the Second Circuit has held that "there is no right to counsel ... at prison disciplinary hearings." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing Wolff, 418 U.S. at 567-70). Thus, to the extent that plaintiff bases his Fourteenth Amendment claim on his inability to confer with counsel during the February 2016 disciplinary hearing, his claim cannot stand. [9]

### C. Eighth Amendment

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities[.]" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). To satisfy the subjective prong of the test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to inmate health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

The objective prong of the test can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health[.]" Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995) ) (additional citation omitted).

Here, plaintiff contends that he was confined in SHU for twenty-three hours a day with visitation restrictions and without access to educational and work programs, telephone, or commissary. Compl. ¶ 42. The undersigned finds that plaintiff's complaint fails to raise facts plausibly suggesting that defendants subjected him to conditions that were sufficiently serious for the purposes of the Eighth Amendment. Plaintiff has failed to allege any deprivations of a single, identifiable human need. See Tavares v. Amato, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013) (concluding that plaintiff's claims that he was confined to his cell "for twenty-three hours a day, only allowed to shower during his one hour long recreation, prohibited from wandering around outside of his cell, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell, are insufficient to support an Eighth Amendment claim."); Greene v. Furman, 610 F. Supp. 2d 234, 237 (W.D.N.Y. 2009) (holding that inmate's Eighth Amendment claim originating from his confinement in segregation was insufficient to state a constitutional claim as the allegations of denied exercise, showers and haircuts, did not represent atypical treatment, result in physical injury, or establish cruel and unusual punishment). The loss of privileges plaintiff alleges do not amount to a "serious deprivation of basic human needs." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 381 (S.D.N.Y. 2011). Moreover, "[l]imitation on time out of cell, time to program, and on exercise ..., as well as denial of access to niceties ..., do not amount to constitutional violations, even when considered collectively." Burns v. Martuscello, No. 9:13-CV-0486 (LEK/CFH), 2015 WL 541293, at \*12 (N.D.N.Y. Feb. 10, 2015) (citation omitted).

**\*9** In his response, plaintiff cites Peoples v. Fischer for the proposition that "[n]umerous courts have found

that long stretches of segregation can constitute cruel and unusual punishment." Pl. Opp. at 14 (quoting Peoples v. Fischer, 898 F. Supp. 2d 618, 625 (S.D.N.Y. 2012) (internal quotation marks omitted) ). However, in demonstrating that the plaintiff had sufficiently stated an Eighth Amendment claim, the Southern District cited to cases where the plaintiff had been confined for upwards of twenty-seven years. See Peoples, 898 F. Supp. 2d at 625 n.52 (citing inter alia Silverstein v. Bureau of Prisons, 704 F. Supp. 2d 1077 (D. Colo. 2010) ). Plaintiff's 360-day confinement falls below the threshold used in Peoples.

As plaintiff has failed to adequately plead an Eighth Amendment conditions of confinement claim, it is recommended that defendants' motion on this ground be granted.

### D. State Law Claims

Plaintiff contends that defendants violated his right to be free from cruel and unusual punishment under Article I, § 5 of the New York State Constitution. See Compl. ¶ 47.

The undersigned recommends dismissal of plaintiff's state law claim concerning cruel and unusual punishment in light of the recommendation of dismissal of the federal Eighth Amendment claim pertaining to the same set of facts. See 28 U.S.C. § 1367(c)(3) (stating that the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997); Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994).

Even if the underlying federal cause of action survived, plaintiff's state law claim is still subject to New York Correction Law § 24. Pursuant to Correction Law § 24(1):

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out

> of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

N.Y. CORR. LAW § 24(1). Courts look at the following factors to determine whether a defendant's action is within the scope of employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in the actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have reasonably anticipated.

Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted) (holding that the defendant's alleged sexual harassment was not undertaken in the discharge of his duties and beyond the protection afforded to officers under § 24).

The test to determine whether the defendants' actions fall within the scope of their employment is "whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of the instructions." Cruz v. New York, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citing Cepeda v. Coughlin, 128 A.D.2d 995, 996 (N.Y. App. Div. 1987) ). Conduct that is "purely for personal reasons unrelated to the employer's interests, ... which is a substantial departure from the normal methods of performing the officer's duties is not considered within the scope of employment." Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision, No. 11-CV-079S, 2013 WL 5347468, at *2 (W.D.N.Y. Sept. 23, 2013) (quoting Gore v. Kuhlman, 217 A.D.2d 890, 891 (N.Y. App. Div. 1995) ).

**\*10** Plaintiff's complaint demonstrates that defendants were on duty in the correctional facility at the time of the alleged constitutional violations, and that their alleged acts were not significant departures beyond the scope of their employment. Accordingly, the undersigned recommends dismissal of plaintiff's state law claims.

### III. Conclusion

**WHEREFORE**, for the reasons herein, it is hereby

**RECOMMENDED**, that defendants' Motion to Dismiss (Dkt. No. 19) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against H.O. Corbett and Director Venettozzi;

(2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment conditions of confinement claim against H.O. Corbett, H.O. Esgrow, Director Venettozzi, and Acting Director Rodriguez;

(3) Insofar as it seeks dismissal of plaintiff's state law claims, the motion be **GRANTED**, and H.O. Corbett and Director Venettozzi be dismissed from the action; and it is further

**RECOMMENDED**, that defendants' Motion to Dismiss (Dkt. No. 19) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against H.O. Esgrow and Acting Director Rodriguez, the motion be **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [10]

### All Citations

Slip Copy, 2018 WL 6069458

---

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   Although plaintiff includes a document entitled "Notice of Motion" in his submission, the undersigned does not construe Dkt. No. 24 as a cross-motion, as plaintiff states that his "memorandum of law is submitted in support of his motion in response to defendants['] motion to dismiss," and he does not seek relief other than "an order dismissing defendants['] motion to dismiss." See Dkt. No. 24 at 3, 4. As such, the undersigned interprets Dkt. No. 24 as plaintiff's response to defendants' motion.

3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

4   P.A. Nesmith at Southport is not the same person as inmate Nesmith, who participated in the altercation at Great Meadows. Def. Mem. of Law at 5 n.2.

5   As defendants note, although plaintiff failed to include Form 2176 (or the witness refusal form) with his complaint, he references the document therein, and this Court acknowledged in its October 25, 2017 Decision and Order that plaintiff referenced various exhibits but failed to attach those exhibits. See Def. Mem. of Law at 5 n.3; Dkt. No. 15 at 4 n.3. "[A] court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any

Caimite v. Venettozzi, Slip Copy (2018)

2018 WL 6069458

documents that are integral to, or explicitly referenced in, the pleading." Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). Thus, the undersigned may rely on Form 2176 for the purposes of this motion.

6    The denial of the B-block inmate witness request is not alleged in the complaint as a constitutional violation. See generally Compl.

7    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

8    As stated above, the undersigned may reference this document as it is "integral to [and] explicitly referenced in" plaintiff's complaint. Matusovsky 186 F. Supp. 2d at 400; see subsection I.B supra, at 5 n.4.

9    Defendants argue that "[p]laintiff implies that, because his disciplinary sentences were reversed and expunged after bringing Article 78 proceedings, the underlying hearings were constitutionally flawed." Def. Mem. of Law at 13. In his opposition papers, plaintiff contends that he "does not imply that just because the hearings were reversed [and] expunged that they were automatically unconstitutional." Pl. Opp. at 13. He then reiterates that he was "deprived of his constitutional due process right to call witnesses." Id.

10    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6068414
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ecson CAIMITE, Plaintiff,
v.
D. VENETTOZZI et al., Defendants.

9:17-cv-919 (GLS/CFH)
|
Signed 11/20/2018

**Attorneys and Law Firms**

FOR PLAINTIFF: ECSON CAIMITE, Plaintiff Pro Se, 01-A-2313, Greene Correctional Facility, P.O. Box 975, Coxsackie, New York 12051.

FOR DEFENDANTS: HON. BARBARA D. UNDERWOOD, OF COUNSEL: MATTHEW P. REED, Assistant Attorney General, New York Attorney General, The Capitol, Albany, NY 12224.

### ORDER

Gary L. Sharpe, U.S. District Judge

**\*1** The above-captioned matter comes to this court following a Report-Recommendation and Order by Magistrate Judge Christian F. Hummel duly filed on October 29, 2018. (Dkt. No. 28.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report-Recommendation and Order for clear error, it is hereby

ORDERED that the Report-Recommendation and Order (Dkt. No. 28) is **ADOPTED** in its entirety; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED** in part and **DENIED** in part as follows:

> **GRANTED** as to the following claims, which are **DISMISSED**: (1) plaintiff's Fourteenth Amendment due process claim against defendants E.F. Corbett and D. Venettozzi; (2) plaintiff's Eighth Amendment conditions of confinement claim against all defendants; and (3) plaintiff's state law claims; and

**DENIED** in all other respects, leaving only plaintiff's Fourteenth Amendment due process claim against defendants J.A. Esgrow and A. Rodriguez; and it is further

ORDERED that the Clerk is directed to terminate Corbett and Venettozzi from this action; and

ORDERED that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 6068414

**End of Document**                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)
|
Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**
N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-
A-9212, Five Points Correctional Facility, Caller Box 119,
Romulus, NY 14541.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
615 Erie Boulevard West, Suite 102, OF COUNSEL:
KEVIN M. HAYDEN, ESQ., Ass't Attorney General,
Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 *1 *Pro se* plaintiff Ronnie Cole has commenced this
action asserting civil rights claims arising out of his
confinement in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS") pursuant to 42 U.S.C. § 1983. Plaintiff's
claims, which are multi-faceted, arise out of events
occurring at two separate DOCCS facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For
the reasons set forth below, I recommend that defendants'

motion for summary judgment be granted in part, but
otherwise denied.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1. [2] Plaintiff
is serving a sentence for robbery, possession of stolen
property, criminal possession of a weapon, and promoting
prison contraband. Dkt. No. 45-15 at 1. Plaintiff's claims,
however, arise out of his previous confinement at the
Walsh Regional Medical Unit ("Walsh") and the Upstate
Correctional Facility ("Upstate"). [3] *Id.* at 2.

A. Use of Force Incidents at Walsh
On October 29, 2013, defendant Corrections Officer
Anthony M. Durante entered plaintiff's room to conduct
a strip frisk of plaintiff and a search of his area. Dkt.
No. 29-1 at 15. [4] At the time, plaintiff was in his
pajamas and seated in his wheelchair. Dkt. No. 45-3 at
27. Plaintiff maintains that defendant Sergeant John A.
Wagner followed Durante into plaintiff's room in the E-
Wing and blocked the door. [5] *Id.* Plaintiff asserts that he
attempted to comply with Durante's orders and began to
unbutton his shirt. *Id.* at 29. Plaintiff claims that Durante
said "Happy Anniversary," and struck plaintiff on the
right side of his face. *Id.* at 30, 32. Plaintiff maintains
that defendant Stephen M. LoRusso entered the room and
joined defendants Durante and Wagner as they repeatedly
hit, kicked, and punched plaintiff in the head, face, and
neck. Dkt. No. 45-3 at 38-56. Defendants Durante and
LoRusso then pulled plaintiff out of his wheelchair, lifted
him overhead, and "slammed" him into the floor causing
plaintiff to land on his abdomen. *Id.* at 52-56. As a result,
plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that
restraints were applied and the assault terminated when
the medical staff and other officers entered the room. Dkt.
No. 45-3 at 57-59.

 *2 Defendant Durante, by contrast, has executed a
sworn affidavit in which he denies having assaulted the
plaintiff. [6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante
claims that plaintiff became agitated during the search and
began swinging his closed fists at Durante. *Id.* Plaintiff
struck Durante on the right side of his head and Durante
responded by pushing the plaintiff. *Id.* ¶1, 3. As a result,

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

plaintiff fell backwards into a locker. *Id.* Durante avers that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present. [7] *Id.* at 126.

### B. Facts Related to Plaintiff's Medical Treatment at Walsh [8]

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. *Id.* at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked. Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. *Id.* at 74-85. Plaintiff maintains that he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

**\*3** The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

### C. Facts Related to Medical Treatment at Upstate

Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 72 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

"swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a "one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. Id. at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. Id. at 14.

### 1. Medications and Supplies

**\*4**  From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace. Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa (an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used

to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. Id. at 64, 69.

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. Id. Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." Id. at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." Id. Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." Id. The nurse called the pharmacy technician to request a clear catheter, and was advised that one would need to be located. Id. Plaintiff refused the catheter change and said he would wait for a new one to arrive. Id. The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. Id. Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 73 of 210
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

 **\*5** On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failing to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges. [11] Dkt. No. 45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges. [12] *Id.* at 41-42. Cole

was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. *Id.* at 40.

Plaintiff appealed the disciplinary determination on November 20, 2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf, requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

 **\*6** On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

### II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 *et seq.*, and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 74 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 75 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

(E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see* *Woodford*, 548 U.S. at 91-92; *see also* *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit. [14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also* *Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also* *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See* *Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the

facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia, Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross*, 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, that no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross*, the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno*, ___

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

F.3d ____, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams,* plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at *2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross,* the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams,* 2016 WL 3729383, at *5-6. Although not the centerpiece of its decision in *Williams,* the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at *7.

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer,* No. 03-CV-1010, 2010 WL 1235591, at *4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 09-CV-1354, 2011 WL 4345299, at *5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord,* 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson,* 380 F.3d at 697 (quoting *Strong v. David,* 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom,* 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 77 of 210

the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

**\*10** Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Ross*, 136

S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension". *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill*, 380 F.3d at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis.* Dkt. No. 45-16 at 15-16.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. [16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component

"context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12** In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. He then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed this version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh.[17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2. Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of

plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

### D. Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 80 of 210

2016 WL 5394752

opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

E. Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

1. Legal Standard Governing
Deliberate Medical Indifference Claims

While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result

in pain and suffering no one suggests would serve any penological purpose." *Id.*

**\*14** A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 81 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

**\*15** It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998) (citation omitted). Accordingly, mere disagreement with prison officials regarding a course of treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex*

*rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

## 2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent*, 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni*, No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge*, No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

### a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his hearing aids.[18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

**\*16** While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. *See Johnson v. Woods*, No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at \*13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke*, No. 87-CV-7812, 1992 WL 310792, at \*2 (S.D.N.Y. Oct. 21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. *Id.* The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. *Id.* at 95. Even assuming that plaintiff was deprived of his hearing aids for any

period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. *See Alster v. Goord*, 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); *see also Fate v. Goord*, 2012 WL 3104884, at \*7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. *See Savage v. Brue*, No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at \*12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D. Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison*, 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed

to provide him with adequate medical care is also insufficient to state a claim.").

**\*17** In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted, and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally* Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have

his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2 at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at \*5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly,* No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at \*5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

**\*18** As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants

Case 9:15-cv-00777-GLS-DEP   Document 105   Filed 03/12/19   Page 84 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights. [19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

In the prison context, it is will established that the alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings. [20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

#### 1. Liberty Interest

**\*19** As to the first element, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [21] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that confinement, however, a court may not be required to undergo a detailed analysis

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' " Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were extraordinary,[22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine,

on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

**\*20** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff*, the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

report to an inmate is not cognizable under section 1983. *See* *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman*, 808 F.2d at 953.

### b. November 2013 Hearing

#### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin*, 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne*, 155 F. 3d at 28. That determination was ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing.[23] *Id.* Under these circumstances, the Second

Circuit concluded that it was unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

**\*21** In this matter, as in *Horne*, the record establishes that plaintiff was confined in the SHU as a result of penalties imposed following the November 2013 hearing, and remained in SHU confinement until and after the second hearing commenced on March 20, 2014, at which he was again found guilty. Accordingly, based upon the Second Circuit's decision in *Horne*, it is unnecessary to determine whether plaintiff was afforded due process in connection with his first hearing, and his claims against defendant Corey are subject to dismissal on this basis.

#### ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing was not rendered a nullity, for purposes of the plaintiff's procedural due process claims, I will address his substantive arguments. In connection with the first hearing, plaintiff claims that defendant Corey precluded him from questioning witnesses and improperly removed him from the first hearing. Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues that Hearing Officer Corey's failure to call an inmate, nurses, and Imam Muhammad violated his Fourteenth Amendment rights. *Id.* Plaintiff claims that Muhammad was present in his room after the assault, and would have offered testimony concerning his injuries. Dkt. No. 45-3 at 109-110.

#### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support of his procedural due process claim with regard to the first hearing is a deprivation of his right to call witnesses. While the Fourteenth Amendment guarantees an inmate's right to call witnesses and present evidence in his defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky*, 487 F.Supp.2d 340, 342 (W.D.N.Y. 2007) (citing *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Kingsley v.*

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 87 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

*Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). "Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff to call defendants Peterson and Judway as witnesses. Dkt. No. 45-9 at 42. On November 20, 2013, defendant Corey completed the required Form 2176 with an explanation of his decision not to call RN Hart, RN Schram, and Imam Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation.[24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing." *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

**\*22**  Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff*, 418 U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at *13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland*, No. 07 CIV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. *Johnson v. Doling*, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' " *Id.* (citing, *inter alia Wolff*, 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "beligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 88 of 210

yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." *Id.* at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see Ponte*, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

**\*23** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), abrogated on other grounds by (*Pearson*, 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S.Ct. at 2093). The Supreme Court has said that an officer's

"conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, the "contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky*, No. 01-CV-149S, 2008 WL 796179, at \*7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

### c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 89 of 210

2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips*, No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly, I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

### H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872

(2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

**\*25** With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No. 16 ¶¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of

harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' " [26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

**\*26** Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante, which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

### 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I*. For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ether v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp.3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

### 3. Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt.

No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

**\*27** I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy. [27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I*. These defendants were not named as defendants in *Cole I*, and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 92 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

#### 4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

#### I. Personal Involvement/Supervisory Liability

Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

*Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28** It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

#### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:15-cv-00777-GLS-DEP   Document 105   Filed 03/12/19   Page 93 of 210

and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

### 3. Defendant Prack

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I

have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

### 4. Defendants Danforth and Sharma

**\*29**  Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009

WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

### K. ADA Claims [28]

**\*30** Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. *Henrietta D.*, 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In *Cole v. Goord, et. al.*, No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("*Cole II*"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See Cole v. Goord*, 2009 WL 2601369, at *8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-

Case 9:15-cv-00777-GLS-DEP Document 105 Filed 03/12/19 Page 95 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Fall v. New York State United Teachers*, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013); *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007), cert denied, 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

**\*31** (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented – that is, whether his hearing loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair

Case 9:15-cv-00777-GLS-DEP Document 105 Filed 03/12/19 Page 96 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be

brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at \*21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at \*15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.). [29]

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at \*4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06-CV-0437, 2009 WL 3049613, at \*5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

**\*33** To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at \*3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at \*3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment, I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS

down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante. [30]

**\*34** Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:15-cv-00777-GLS-DEP Document 105 Filed 03/12/19 Page 98 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5394752

Footnotes

1   The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the relevant incidents. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the plaintiff's party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). To the extent that plaintiff's deposition testimony is at odds with his memorandum of law or submissions in his statement of facts, the court will follow the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

2   Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

3   Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

4   The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

5   Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

6   That affidavit, which is included with defendants' motion, was given by defendant Durante in connection with a matter brought by the plaintiff in the New York Court of Claims.

7   Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

8   In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

9   The record does not indicate what prescribed medications were administered.

10  On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

11  The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 99 of 210

2016 WL 5394752

infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

12    Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

13    All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

14    Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 &18.

15    The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

16    This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

17    The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

18    Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

19    Defendants have not submitted any argument in response to this claim.

20    Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ – ____, *post.*

21    In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

22    Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

23    That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne*, in which it stated:

> It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he was released from SHU thirteen days after the six – month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

*Horne*, 155 F. 3d at 31, n. 4.

24    Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

25    The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

26    In their motion, defendants do not dispute that plaintiff suffered adverse actions.

27    The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

28    Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

29    To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

30    As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 100 of 210

Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. New York State Department of Corrections and..., Not Reported in Fed...

2016 WL 5374125

2016 WL 5374125
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

9:14-CV-0539 (BKS/DEP)
|
Signed 09/26/2016

**Attorneys and Law Firms**

Ronnie Cole, 91-A-9212, Five Points Correctional
Facility, Caller Box 119, Romulus, NY 14541, Plaintiff,
pro se.

Kevin M. Hayden, Esq., Hon. Eric T. Schneiderman,
Office of New York State Attorney General, 615 Erie
Blvd. West, Suite 102, Syracuse, NY 13204, Attorney for
Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge.

**\*1** Plaintiff Ronnie Cole, a New York State inmate,
commenced this civil rights action asserting claims under
42 U.S.C. § 1983 arising out of his confinement at the
Walsh Regional Medical Unit at Mohawk Correctional
Facility and Upstate Correctional Facility. In the
Amended Complaint, Plaintiff alleges Eighth Amendment
excessive force, failure to protect, and medical indifference
claims; Fourteenth Amendment due process claims;
claims under the Americans With Disabilities Act, 42
U.S.C. § 12101 et seq.; and New York State negligence
claims. Dkt. No. 29. On November 13, 2015, Defendants
filed a motion for summary judgment under Fed. R.
Civ. P. 56(a). Dkt. No. 45. Plaintiff filed a response
in opposition on December 28, 2015. Dkt. No. 54.
This matter was referred to United States Magistrate
Judge David E. Peebles who, on August 25, 2016, issued
a Report and Recommendation recommending that
Defendants' motion for summary judgment be granted in
part and denied in part. Dkt. No. 58. Magistrate Judge

Peebles advised the parties that under 28 U.S.C. § 636(b)
(1), they had fourteen days within which to file written
objections to the report, and that the failure to object to
the report within fourteen days would preclude appellate
review. Dkt. No. 58, pp. 100-01. No objections to the
Report-Recommendation have been filed.

As no objections to the Report and Recommendation
have been filed, and the time for filing objections
has expired, the Court reviews the Report and
Recommendation for clear error. *See Petersen v. Astrue*,
2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ.
P. 72(b) advisory committee's note to 1983 amendment.
Having reviewed the Report and Recommendation
for clear error and found none, the Report and
Recommendation is adopted in its entirety.

For these reasons, it is

**ORDERED** that the Report and Recommendation (Dkt.
No. 58) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary
judgment (Dkt. No. 45) is **GRANTED IN PART AND
DENIED IN PART**; and it is further

**ORDERED** that Plaintiff's claims against Defendants
DOCCS, Annucci, Prack, Bullis, Corey, Tousignant,
Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson,
D. Williamson, J. Henderson, Danforth, Mandalaywala,
Schroyer, Kowalachuk, Smith, and M. Williamson are
**DISMISSED**; and it is further

**ORDERED** Plaintiff's retaliation claims against
Defendants LoRusso and Wagner are **DISMISSED**; and
it is further

**ORDERED** that the Defendants' motion is otherwise
**DENIED** in all respects and that the matter will proceed
with regard to Plaintiff's excessive force claims against
Defendants Durante, Wagner, and LoRusso; retaliation
claims against Defendant Durante; supervisory claims
against Defendants Judway and Gonyea; and failure to
protect claim against Defendant Michaels based upon
events occurring at the Walsh Regional Medical Unit; and
it is further

**ORDERED** that the Clerk serve a copy of this Order upon
the parties in accordance with the Local Rules.

**\*2  IT IS SO ORDERED.**

Dated: September 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5374125

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)

2016 WL 7732236

2016 WL 7732236
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alpheaus DAILEY, Jr., Plaintiff,
v.
Joshua FULLER, Ms. Iriving, Defendants.

9:15-cv-01051 (BKS/TWD)
|
Filed 12/05/2016

**Attorneys and Law Firms**

ALPHEAUS DAILEY, JR., also known as Alphaeus
Daily, Jr., 13-B-1253, Franklin Correctional Facility, P.O.
Box 10, Malone, NY 12953, Plaintiff, pro se.

ROBERT A. DURR, ESQ., ONONDAGA COUNTY
ATTORNEY, Onondaga County Department of Law,
John H. Mulroy Civic Center, 421 Montgomery St., 12th
Floor, OF COUNSEL: CAROL L. RHINEHART, ESQ.
Deputy County Attorney, Syracuse, NY 13202, Counsel
for Defendants.

## ORDER AND REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

## I. INTRODUCTION

*1 Presently before the Court is Defendants' motion for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. (Dkt. No. 16.) The motion has
been referred to me for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and Northern District of
New York Local Rule ("L.R.") 72.3(c) by the Honorable
Brenda K. Sannes, United States District Judge.

*Pro se* Plaintiff Alpheaus Dailey, Jr., is an inmate in the
custody of the New York Department of Corrections and
Community Supervision ("DOCCS"), and is currently
housed at the Franklin Correctional Facility ("Franklin").
(*See* Text Entry 11/04/2016.[1]) Plaintiff commenced this
civil rights action pursuant to pursuant to 42 U.S.C. §
1983 on September 27, 2015. (Dkt. No. 1.) The allegations
in Plaintiff's complaint relate to Plaintiff's previous

confinement at the Onondaga County Justice Center in
2012. *Id.* at 4-5.[2]

Plaintiff's claim for medical indifference against Deputy
Joshua Fuller ("Fuller") and Deputy Ms. Iriving[3]
("Iriving") survived initial review pursuant to 28 U.S.C.
§ 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). (Dkt. No.
4 at 8.[4]) Defendants have now moved for summary
judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure on the grounds that: (1) Plaintiff has
failed to exhaust his administrative remedies; and (2)
Defendants are entitled to judgment as a matter of law.
(Dkt. No. 16-11 at 4-11.) Plaintiff has not opposed the
motion or sought additional time within which to do so.
For the reasons explained below, the Court recommends
granting Defendants' motion for summary judgment and
dismissing the complaint in its entirety.

## II. FACTUAL BACKGROUND

In his verified complaint, Plaintiff claims that on or
about September 12, 2012, a seven-inch bolt fell from
the gymnasium ceiling at the Onondaga County Justice
Center, striking him on the head. (Dkt. No. 1 at 4.[5])
Plaintiff was knocked unconscious. *Id.* While Plaintiff
was unconscious "for a few seconds," witnesses explained
to Fuller and Iriving, the supervising deputies, what
had happened to Plaintiff. *Id.* Thereafter, Fuller and
Iriving questioned Plaintiff about the incident and Plaintiff
explained what had happened to the best of his abilities.
*Id.*

*2 Fuller and Iriving then "inform[ed]" Plaintiff to return
to his cell. *Id.* at 4-5. Plaintiff "was place[d] on bed rest, the
next day to await medical attention, which left [Plaintiff]
without medical attention for a whole 24 hours while
[he] sat in pain." *Id.* at 5. After the incident, Plaintiff
had a continuous headache, blurred vison, weakness,
and was vomiting in his cell. *Id.* Because Plaintiff kept
complaining, Plaintiff was finally seen by a nurse at one
o'clock in the morning, and was told he had a concussion.
*Id.*[6]

Plaintiff alleges Defendants were deliberately indifferent
to his serious medical needs. *Id.* at 4-6. More specifically,
Plaintiff claims that Fuller did not "pull or push [the]
emergency button when [the] injury took place" and Iriving
"did not call emergency medical attention which lead [sic]

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)

2016 WL 7732236

to [Plaintiff] having continuous pain and vomiting all nite [sic]." *Id.* at 4-5.

According to Defendants, on September 15, 2012, at approximately 5:25 p.m., while Fuller was supervising Unit 3A, Plaintiff approached the Deputy's Station holding a bolt and washer in one hand, while rubbing his head with his other hand. (Dkt. No. 16-7 at ¶ 9.)

Plaintiff informed Fuller that while he was in the recreation yard playing basketball, the bolt fell from the basketball hoop, striking him on the head. *Id.* at ¶¶ 7-10. Plaintiff told Fuller his head hurt and asked to see the nurse. *Id.* at ¶ 12. Fuller did not observe an open wound or any blood coming from Plaintiff's head. *Id.* Fuller contacted the medical unit, speaking to Julianne Seaton ("Nurse Seaton"). *Id.* at ¶ 13. Nurse Seaton advised she would come to the pod to assess Plaintiff. *Id.*

Seven minutes later, at 5:32 p.m., Nurse Seaton arrived to evaluate Plaintiff. *Id.* at ¶ 15. Nurse Seaton provided Plaintiff with an ice pack and determined no further medical attention was required. *Id.* According to Fuller, Plaintiff appeared satisfied after receiving the ice pack from Nurse Seaton. *Id.* Pursuant to customary practice, Fuller documented Nurse Seaton's presence on the unit in the facility's log book, and generated an Incident Report documenting Plaintiff's incident. *Id.* [7]

When Irving returned from her evening meal break to resume supervising Unit 3A, Fuller briefed Irving on the incident involving Plaintiff. (Dkt. No. 16-10 at ¶ 11.) Specifically, Fuller told Irving that Plaintiff stated a bolt fell from a piece of wood that was holding the basketball hoop to the wall in the large recreation yard and that Plaintiff said the bolt struck him on the head. *Id.* Fuller informed Irving that a nurse evaluated Plaintiff, and that Plaintiff was given an ice pack and did not require further medical attention. *Id.* at ¶ 12.

Thereafter, sometime around 6:00 p.m., while Irving was touring the pod, Plaintiff told Irving that his head hurt. *Id.* at ¶ 13. Irving called the medical unit and spoke to Nurse Seaton. *Id.* Irving informed Nurse Seaton that Plaintiff was complaining his head hurt. *Id.* Nurse Seaton told Irving she would notify a doctor. *Id.* Irving documented this information in the facility's log book. *Id.* Approximately ten minutes later, Nurse Seaton called Irving and stated that she had contacted the doctor and

Plaintiff would be reevaluated by medical staff and given pain medication later that evening during the routine medicine pass. *Id.* at ¶ 14. [8] Irving relayed this information to Plaintiff. *Id.* at ¶ 15. According to Irving, Plaintiff seemed irritated. *Id.*

**\*3** Around 7:00 p.m., Irving observed Plaintiff lying on his bunk rocking his foot up and down. *Id.* at ¶ 16. Irving documented this information in the facility's log book. *Id.* Approximately ten minutes later, Plaintiff approached Irving at the Deputy's Station, stating his head and face hurt and that his face felt numb. *Id.* at ¶ 17. Irving called the medical unit and spoke to Nurse Seaton again. *Id.* Nurse Seaton stated she would examine Plaintiff. *Id.*

At approximately 7:19 p.m., Plaintiff was reexamined by Nurse Seaton. *Id.* at ¶ 18. Nurse Seaton provided Plaintiff with two more ice packs and indicated that no further medical attention was necessary. *Id.* Irving documented Nurse Seaton's presence in the facility's log book. *Id.* At 8:25 p.m., nursing staff entered Unit 3A to distribute medication. *Id.* at ¶ 19. Irving declares the nurse was present on the unit for approximately twenty-five minutes, and Plaintiff received pain medication from the nurse during the medication pass. *Id.*

At 9:20 p.m., Fuller returned to supervise Unit 3A, relieving Irving for a ten minute break. (Dkt. No. 16-7 at ¶ 20.) Fuller does not recall having a conversation with Plaintiff during this time, nor does Fuller recall Plaintiff issuing any complaints during this time. *Id.* At 9:30 p.m., Irving returned from her break. *Id.* at ¶ 21. Fuller declares he did not return to Unit 3A the remainder of his shift, which ended at 11:00 p.m., and does not recall having any further interaction with Plaintiff in the days that followed. *Id.* Fuller also declares he has no knowledge of Plaintiff losing consciousness after the incident or vomiting in his cell. (Dkt. No. 16-7 at ¶ 22.) Neither Plaintiff, nor any other inmate, informed Fuller that Plaintiff had lost consciousness. *Id.* at 23. Fuller states Plaintiff never told him that his vision was blurry, he was weak, or had vomited. *Id.*

At approximately 10:32 p.m., Nurse Seaton returned to Unit 3A to examine Plaintiff. *Id.* (Dkt. No. 16-10 at ¶ 21.) At 10:55 p.m., Deputy Peck arrived at Unit 3A to assume responsibility of supervising the inmates for the next shift. *Id.* at ¶ 23. Irving briefed Deputy Peck on the activities and the status of the inmates, including Plaintiff's incident. *Id.*

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 105 of 210

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)

2016 WL 7732236

at ¶ 23. At 11:00 p.m., Irving completed her shift, and she had no further contact or involvement with Plaintiff. *Id.* at ¶ 24.

Irving declares that during her shift, she conducted tours of the unit every thirty minutes, and did not observe Plaintiff vomiting at any time in his cell, nor did Plaintiff report that he had vomited. *Id.* at ¶ 22. Irving further states that had she been aware that Plaintiff had vomited, she would have reported this information to the medical unit and would have documented the incident in the facility's log book. *Id.*

### III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*4** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to

be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, ... nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). Indeed, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *see also Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[9] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Woods*, 2006 WL 1133247, at *3 & n.11.

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)

2016 WL 7732236

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 106 of 210

983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**\*5** When a party fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the moving party. *See id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Here, Plaintiff has failed to respond to Defendants' Statement of Material Facts (Dkt. No. 16-5) as required under L.R.(a) (3). [10] Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, [11] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [12] *See Artuz*, 76 F.3d at 486. As set forth above, "[a] verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist[.]" *Colon*, 58 F.3d at 872 (2d Cir. 1995) (internal citations omitted); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (same). Accordingly, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts (Dkt. No. 16-15) are accepted as true as to those facts that are not disputed in Plaintiff's verified complaint. *See Rosario v. Anson*, No. 9:12-cv-1506 (BKS/CFH), 2015 WL 5692550, at *4 (N.D.N.Y. Sept. 28, 2015).

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion.

*Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record in this case.

## V. ANALYSIS

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard for Exhaustion

**\*6** Under the Prison Litigation Reform Act of 1996 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

According to Mark Casselmon ("Casselmon"), a Sergeant employed with the Onondaga County Sherriff's Office, the Onondaga County Justice Center has a written policy for handling inmate complaints and grievances, which is set forth in Directive CUS-007 entitled "Inmate Grievances." (Dkt. No. 16-11 at ¶¶ 1, 4. [13]) Every inmate entering the Onondaga County Justice Center receives an inmate handbook which sets forth the procedure for filing an inmate grievance. *Id.* at ¶ 5. [14]

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)

2016 WL 7732236

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 107 of 210

First, prior to filing a written grievance, an inmate must attempt to resolve his compliant with the housing pod deputy. *Id.* In the event that the housing pod deputy cannot resolve the complaint, the inmate may fill out a grievance form. *Id.* The deputy with whom the inmate addressed is required to fill out a portion of the grievance form. *Id.* The deputy will then notify a sergeant of the inmate's grievance. *Id.*

The sergeant will then attempt to resolve the inmate's complaint. *Id.* In the event that the sergeant is unable to resolve the complaint, the sergeant must fill out a portion of the grievance form, and then submit the grievance to a lieutenant for review. *Id.* If the lieutenant cannot resolve the complaint, the grievance form will be forwarded to the Grievance Coordinator. *Id.*

The Grievance Coordinator must either meet with the inmate or respond in writing within five business days of receipt of an inmate's grievance. *Id.* An inmate who is not satisfied with the Grievance Coordinator's response may appeal to the Chief Custody Deputy in writing. *Id.* That appeal must be made within two business days of receiving the Grievance Coordinator's response. *Id.* The Chief Custody Deputy must respond to the inmate's appeal within five business days of receiving the appeal. *Id.* Finally, if the inmate is not satisfied with the Chief Custody Deputy's decision, within three days of receipt of the unsatisfactory decision, the inmate may appeal to the New York State Commission of Correction. *Id.*

If a prisoner has failed to properly follow each of the applicable steps, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *See Woodford, 548 U.S.* at 93 (holding the PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly that the agency addressed the issues on the merits").

Because failure to exhaust is an affirmative defense, the defendant bears the burden of showing by a preponderance of the evidence that the plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

**\*7** A prisoner's failure to exhaust may nonetheless be excused if administrative remedies were unavailable to him. As the Supreme Court recently clarified, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1858 (2016). To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Whether a plaintiff has exhausted his administrative remedies is a question of law to be decided by the court as a matter of law. *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).

## 2. Exhaustion Analysis

Plaintiff alleges that on or about September 15, 2012, while confined at the Onondaga County Justice Center, he was struck on the head by a large bolt that fell from the basketball hoop in the recreation yard of Pod 3A. (Dkt. No. 1 at 4-5.) Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights. *Id.* More specifically, Plaintiff alleges Fuller failed to "pull or push [the] emergency button when [the] injury took place" and Irving "did not call emergency medical attention," which resulted in Plaintiff having continuous pain and vomiting throughout the night. *Id.* at 5. Plaintiff claims he was denied medical attention for "a whole 24 hours while [he] sat in pain." *Id.* According to Plaintiff, he was not seen by a nurse until one o'clock in the morning. *Id.* At that time, he was informed he had a concussion. *Id.*

Defendants argue Plaintiff failed to exhaust his administrative remedies regarding his medical indifference

2016 WL 7732236

claim. (Dkt. No 16-15 at ¶ 28; Dkt. No. 16-16 at 6-7.) The Court agrees.

In support of their motion for summary judgment, Defendants submit the affidavit of Casselmon, who served as the Compliance Supervisor at the Onondaga County Justice Center from 2012 to 2014. (Dkt. No. 16-11 at ¶ 2.) In that capacity, Casselmon also served as the Grievance Coordinator and was responsible for ensuring that all written complaints filed by inmates were properly investigated and that all policies and procedures were followed at the Onondaga County Justice Center. *Id.* at ¶ 3. As the Grievance Coordinator, Casselmon maintained a Grievance Log for all submitted inmate grievances. *Id.* at ¶ 13.

According to Casselmon, Plaintiff was an inmate at the Onondaga County Justice Center on eight separate occasions between 2006 and 2013, including the period from August 17, 2012, through April 29, 2013. *Id.* at ¶ 14. Casselmon reviewed the Grievance Log for the relevant time period, which indicated Plaintiff filed one grievance (Number 12-349) dated September 18, 2012. *Id.* at ¶¶ 15-16. Plaintiff's grievance states in full:

> **Brief Description of the Grievance**: "This grievance for lack of maintance of this Onondaga County Sheriff Building. Recently a big screw (drop off) come from ceiling and hit my head. Now I have problems."

> **Action Requested**: "Check gym make sure nothing else is broken so, no one else gets hurt. Thank you."

(Dkt. No. 16-14 at 2.)

Plaintiff's grievance was submitted to a deputy, sergeant, and watch commander. (*See* Dkt. No. 16-14 at 2.) Eventually it was received by the Grievance Coordinator. *Id.* at 3. On September 26, 2012, Casselmon accepted Plaintiff's grievance. *Id.* In so doing, Casselmon verified with the deputy about the missing screw (bolt), and confirmed that the recreational yard was checked before each shift. *Id.* Casselmon also placed a work order request to have maintenance check the basketball backboard in pod 3A. *Id.* Casselmon avers Plaintiff was satisfied with his response. (Dkt. No. 16-11 at ¶ 17.)

**\*8**  In this case, there is no record of Plaintiff filing an Inmate Grievance Form regarding a denial of medical care at the Onondaga County Justice Center. (Dkt. No. 16-11

at ¶ 18.) Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials "to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).

As set forth above, Plaintiff's sole grievance makes no mention of delayed or inadequate medical care. (*See* Dkt. No. 16-14 at 2-3.) Plaintiff's failure to describe *any* problem in his grievance concerning the lack of medical treatment after the incident did not give the facility enough information to investigate the allegations against Fuller and Irving. Because Plaintiff's grievance contains no mention of inadequate or delayed medical care after the incident, the Court finds Plaintiff's claim for medical indifference has not been exhausted.

Even if Plaintiff's Inmate Grievance could be liberally construed as filing a grievance for medical indifference against Fuller and Irving, Casselmon avers Plaintiff was satisfied with his response. (Dkt. No. 16-11 at ¶ 17.) Had Plaintiff been unsatisfied with the Grievance Coordinator's response, in order to fully exhaust his administrative remedies, Plaintiff was required to submit an appeal to the Chief Custody Deputy in writing within two days of receipt of Casselmon's Response. *See id.* at ¶ 11. Moreover, had Plaintiff had been unsatisfied with the Chief Custody Deputy's response, Plaintiff was required to appeal to the New York State Commission of Correction. *Id.* Here, Plaintiff did not appeal to the Chief Custody Deputy. (*See* Dkt. No. 16-14 at 3.) Thus, in the alternative, Plaintiff's grievance for medical indifference was not properly exhausted before commencing this action. *See Woodford*, 548 U.S. at 90 (holding the PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly that the agency addressed the issues on the merits").

In light of the above, the Court finds Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua*, No. 09-cv-7227 (SAS), 2010 WL 2159199, at \*3 (S.D.N.Y. May 26, 2010)

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)
Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 109 of 210
2016 WL 7732236

(finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed). Furthermore, there is no evidence that administrative remedies were unavailable to Plaintiff. It is undisputed there was a grievance program in place at the Onondaga County Justice Center, which was set forth in the inmate handbook. (Dkt. No. 16-15 at ¶ 25.) There is no evidence that the grievance procedure operated as a "simple dead end" or that it was "so opaque" it was incapable of use. To the contrary, Plaintiff utilized the administrative procedure to file a grievance concerning the lack of maintenance at the facility, which was addressed to Plaintiff's apparent satisfaction. (Dkt. No. 16-14 at 2-3.) Lastly, the record is devoid of evidence that Defendants "thwarted" Plaintiff "from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1860. Thus, Plaintiff's medical indifference claim against Fuller and Irving has not been exhausted.

**\*9** Based upon the foregoing, the Court recommends granting Defendants' motion for summary judgment for failure to exhaust available administrative remedies.

### B. Deliberate Indifference to Medical Needs

Even if Plaintiff had properly exhausted his medical indifference claim, the Court would still recommend summary judgment for Defendants on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).[15] Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition, and (2) deliberate indifference. *Farmer*, 511 U.S. at 834-35; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

Although medical deliberate indifference claims are most often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs where a plaintiff proves that "prison personnel intentionally delayed access to

medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin*, No. 92 Civ. 0622(LAP), 1994 WL 519902, at \*11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995) (table); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (same); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

Here, Defendants contend Plaintiff cannot demonstrate they were deliberately indifferent to Plaintiff's serious medical condition. (Dkt. No. 16-16 at 7-11.) The Court agrees.

Plaintiff claims Defendants showed deliberate indifference to his serious medical needs by failing to "pull or push" the emergency button when the injury took place, and failing to "call emergency medical attention," causing Plaintiff to have "continuous pain and vomiting" all night. (Dkt. No. 1 at 4-5.) However, the record belies Plaintiff's claims.

**\*10** The record evidence demonstrates that on September 15, 2012, at approximately 5:25 p.m., Plaintiff approached the Deputy's Station in Unit 3A informing Fuller that a large bolt fell out of the basketball hoop in the recreation yard striking him on the head. (Dkt. No. 16-15 at ¶¶ 9-10; Dkt. No. 16-9 at 2.) Plaintiff was holding a bolt and washer in one hand and rubbing his head with the other hand. (Dkt. No. 16-15 at 9.) Plaintiff asked to see a nurse; Fuller called the medical unit. (Dkt. No. 16-9 at 2; Dkt. No. 16-15 at ¶ 11.)

Nurse Seaton arrived at Plaintiff's housing unit at 5:32 p.m., approximately seven minutes after Fuller placed the call to the medical unit to assess Plaintiff's injury. (Dkt. No. 16-15 at ¶ 12.) Upon examination, Nurse Seaton found that Plaintiff had no change in mood/affect, he was alert and orientated, his pupils were equal and reactive to light, and his grips and gait were normal. *Id.* at ¶ 13. Nurse Seaton provided Plaintiff with an ice pack and informed Fuller that no further medical attention was necessary. *Id.* at ¶¶ 13-14. Fuller had no further interaction with Plaintiff concerning his medical needs. (Dkt. No. 16-6 at ¶¶ 19-21.)

The record establishes that Irving contacted the medical unit on two occasions after Plaintiff reported head pain and discomfort, which resulted in the issuance of two more

2016 WL 7732236

ice packs, pain medication, and neurological checks of Plaintiff every four hours. (*See* Dkt. No. 16-15 at ¶¶ 16-23; Dkt. No. 17 at 37, 101-102; Dkt. No. 16-8 at 4-6. [16]) Specifically, around 6:00 p.m., Plaintiff complained to Irving that his head hurt and Irving called the medical unit. (Dkt. No. 16-15 at ¶ 16.) Nurse Seaton indicated that she would contact the doctor. *Id.* Nurse Seaton informed Irving that she contacted Dr. Carlisle and received orders for Motrin and instruction to conduct neurological checks of Plaintiff every four hours. *Id.* at ¶ 18. At approximately, 6:25 p.m., Nurse Seaton told Irving that Plaintiff would be reassessed and provided with pain medication a little later in the evening. *Id.* Irving relayed this information to Plaintiff. *Id.*

About thirty minutes later, around 7:00 p.m., Plaintiff approached Irving at the Deputy's Station stating that his head and face hurt and that his face was numb. *Id.* at ¶ 19. Irving again contacted the medical unit and Nurse Seaton arrived at approximately 7:19 p.m., to reevaluate Plaintiff. *Id.* at ¶ 20. Nurse Seaton provided Plaintiff with two more ice packs and indicated that no further medical attention was needed. *Id.* at ¶ 21. Plaintiff received pain medication sometime between 8:25 p.m. and 9:00 p.m. *Id.* at ¶ 22. At approximately 10:30 p.m., nursing staff conducted a neurological check of Plaintiff. *Id.* at ¶ 23. At 11:00 p.m., both Fuller and Irving ended their shifts and had no further contact with Plaintiff. *Id.* at 24.

Based on the foregoing, Defendants did not withhold medical care from Plaintiff or delay treatment of his serious medical condition. Every time Plaintiff complained of pain, Defendants appropriately responded to Plaintiff's complaints, and Plaintiff received treatment from medical personnel. As custody deputies, Fuller and Irving were entitled to rely on the opinions of the medical staff. *See Rosario*, 2015 WL 5692550, at *12 (supervisory official entitled to rely on the opinions of medical staff concerning the proper course of treatment) (citing *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 183 (N.D.N.Y. 1996) (collecting cases)).

**\*11** Thus, Plaintiff's claim that despite informing Fuller and Irving of his serious medical condition, Plaintiff was "left ... without medical attention for a whole 24 hours while [he] sat in pain," and that he did not see a nurse until one o'clock in the morning, is wholly contradicted by the record, and is insufficient to create a material issue of fact. *See, e.g., Warren v. Corcoran*, No. 9:09-

CV-1146 (DHN/ATB), 2011 WL 5599587, at *6 n.12 (N.D.N.Y. Oct. 20, 2011) ("Plaintiff's conclusory claims to the contrary, which are flatly contradicted by medical records documenting the care he received, are insufficient to create a material issue of fact with respect to his claims of deliberate indifference."); *Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco*, 92 Civ. 7670 (DC), 1995 WL 444352, at *3 n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

In light of the above, no issue of fact exists as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 451 (2d Cir. 1999) (affidavits based on conclusory allegations insufficient at summary judgment). Accordingly, the Court also recommends granting summary judgment for Defendants on the merits.

## VI. FAILURE TO PROSECUTE

Lastly, the Court notes that this action could also be dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute the case, or to comply with the procedural rules or orders of the court. Fed. R. Civ. P. 41(b); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962). This power to dismiss may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Freeman v. Lundrigan*, No. 95-CV-1190 (RSP/RWS), 1996 WL 481534, at *1 (N.D.N.Y. Aug. 22, 19961). It is also well-settled that the term "these rules" in Rule 41(b) refers not only to the Federal Rules of Civil Procedure, but also to the local rules of practice for a district court. *See Tylicki v. Ryan*, 244 F.R.D. 146, 147 (N.D.N.Y. 2006).

**Dailey v. Fuller,** Not Reported in Fed. Supp. (2016)

2016 WL 7732236

Courts consider a Rule 41(b) dismissal in light of five factors: (1) the duration of the plaintiff's failure to comply with the court order (or the court's procedural rules); (2) whether the plaintiff was on notice that failure to comply would result in dismissal; (3) whether the defendant is likely to be prejudiced by further delay in the proceedings; (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and (5) whether the judge has adequately considered a sanction less drastic than dismissal. *Lucas v. Miller*, 84 F.3d 532, 535 (2d Cir. 1996); *Davis v. Citibank, N.A.*, 607 Fed.Appx. 93, 94 (2d Cir. 2015).

As to the first factor, the Court notes that Local Rule 41.2(a) states that "the plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y.L.R. 41.2(a). In this case, a review of the docket reveals that Plaintiff has failed to take any action in this case for more than ten months. Plaintiff's motion for appointment of counsel dated January 8, 2016, which was denied without prejudice, was Plaintiff's last communication with the Court. (*See* Dkt. Nos. 14 and 15.) In further support of Plaintiff's lack of interest in pursuing this case, Plaintiff failed to respond to Defendants' motion for summary judgment. Thus, the Court finds that the first factor weighs in favor of dismissal.

**\*12** "The Second Circuit requires that the plaintiff receive adequate notice that the case could be dismissed due to inaction." *Folk v. Rademacher*, No. 00-CV-199S, 2005 WL 2205816, at \*4, (W.D.N.Y. Sept. 9, 2005) (citing *Martens v. Thomann*, 273 F.3d 159, 180-81 (2d Cir. 2001)). In this case, the Court learned through publicly available records maintained by DOCCS that Plaintiff is currently housed at Franklin. (*See* Text Entry 11/04/2016.) The Clerk confirmed with inmate records at Franklin that Plaintiff arrived at their facility from Gowanda Correctional Facility ("Gowanda") on September 2, 2016. *Id.* Accordingly, this Court reminded Plaintiff that pursuant to the Local Rules, he was required to promptly notify the Court of any change of address. (*See* Text Order 11/04/2016.) Plaintiff was directed to file a change of address by November 30, 2016. *Id.* Plaintiff was notified that his failure to do so may result in sanctions including, but not limited to, a recommendation that this action be dismissed for failure to follow Court rules and directives. *Id.* The Court's November 4, 2016, Text Order was mailed to Plaintiff at both Franklin and Gowanda, neither of which were returned as undelivered to the Court. *See id.*

Thus, the second factor also weighs in favor of dismissal. *See e.g.*, *Nolan v. Primagency, Inc.*, No. 07 Civ. 134, 2008 WL 1758644, at \*3 (S.D.N.Y. Apr. 16, 2008) ("The Second Circuit has held that where a court puts a plaintiff on notice that the court is considering dismissal, and a plaintiff fails to file a document explaining the failures and outlining why the action should not be dismissed, this element has been met.") (citing *Shannon v. General Elec. Co.*, 186 F.3d 186, 194-95 (2d Cir. 1999)); *Europacific Asset Mgmt. Corp. v. Tradescape, Corp.*, 233 F.R.D. 344, 353 (S.D.N.Y. 2005) ("A court's prior warning of dismissal, and subsequent inaction by a plaintiff, weighs in favor of dismissal.").

The third factor is also satisfied as further delay is likely to prejudice Defendants. The events giving rise to Plaintiff's medical indifference claim occurred in September 2012. (*See* Dkt. No. 1 at 4-5.) This action was commenced in August 2015, and Defendants filed their answer more than one year ago. (Dkt. Nos. 1 and 8.) *See, e.g.*, *Georgiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y. 1996) (noting that passage of time would cause memories to fade). Moreover, Defendants filed their motion for summary judgment on July 25, 2016. (Dkt. No. 16.)

Under the circumstances, the Court finds that the need to alleviate congestion on the Court's docket would outweigh Plaintiff's right to receive a further chance to be heard in this case. It is the need to monitor and manage cases such as this that delay the resolution of other cases and contribute to the Second Circuit's relatively long median time to disposition for such civil rights cases. Finally, the Court has also carefully considered sanctions less drastic than dismissal and would find them to be inadequate under the circumstances.

In light of the above, the Court finds that Plaintiff has exhibited an apparent unwillingness to participate in this litigation. Accordingly, based upon Plaintiff's failure to comply with directives from the Court, and after considering the factors relevant to dismissal under Rule 41(b) of the Federal Rules of Civil Procedure, the Court also recommends dismissal for failure to prosecute.

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 16) be **GRANTED** and

Dailey v. Fuller, Not Reported in Fed. Supp. (2016)

2016 WL 7732236

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 112 of 210

the complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report and Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7732236

---

Footnotes

1    It appears DOCCS has inadvertently transposed two letters of Plaintiff's first name. (*See* Dkt. No. 1.)

2    Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

3    Although Plaintiff names Deputy Ms. Iriving as a Defendant, her surname is correctly spelled "Irving." (*See* Dkt. Nos. 7 and 8.) The Court will use the correct spelling of Defendant's surname name throughout the Report and Recommendation.

4    The Court *sua sponte* dismissed Plaintiff's "failure to protect" claim and all claims against Sheriff Kevin Walsh and Chief Administrative Officer Esteben for failure to state a claim upon which relief could be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). (Dkt. No. 4 at 5-8.)

5    Plaintiff's complaint is properly verified under 28 U.S.C. § 1746. (*See* Dkt. No. 1 at 8.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

6    Although not entirely clear from the complaint, it appears Plaintiff alleges the incident occurred around 6:00 p.m. (*See* Dkt. No. 1 at 4).

7    In addition, Fuller went to the recreation yard and observed that a bolt was missing from the piece of wood that holds the basketball hoop to the wall. (Dkt. No. 16-7 at ¶ 14.) Fuller gave the bolt and washer, along with the Incident Report to his supervisor, Lieutenant Raus. *Id.* at ¶ 17. Fuller also forwarded a maintenance request through the computer system for repair of the basketball hoop. *Id.*

8    Typically nursing staff arrives on the unit sometime between 8:00 p.m. and 9:00 p.m. to distribute medication to those inmates who had doctor's orders to receive medication. (Dkt. No. 16-10 at ¶ 14.)

9    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

10   L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

11   L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

12   The Court notified Plaintiff of the response deadline. (Dkt. No. 18.) Defendants provided Plaintiff with notice of the consequences of failing to response. (Dkt. No. 16 at 3.)

13   Directive CUS-007 complies with the minimum standards established by the New York State Commission of Correction. (Dkt. No. 16-11 at ¶ 4.) A copy is attached to Casselmon's affidavit as Exhibit A. (Dkt. No. 16-12.)

14   A copy of the Onondaga County Justice Center Handbook is attached to Casselmon's Affidavit as Exhibit B. (Dkt. No. 16-13.)

**Dailey v. Fuller, Not Reported in Fed. Supp. (2016)**

Case 9:15-cv-00777-GLS-DEP   Document 105   Filed 03/12/19   Page 113 of 210

2016 WL 7732236

15  Upon initial review, the Court explained that it is unclear whether Plaintiff was a pretrial detainee or was serving a sentence at the time of the events alleged in the complaint. (Dkt. No. 4 at 8 n.6) ("If Plaintiff was confined a the Onondaga County Justice Center as a pretrial detainee, he "received[d] protection against mistreatment at the hands of prison officials under ... the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.") (quoting *Caiozzo v. Koreman*, 581 F.3d 63, (2d Cir. 2009)). Neither the Supreme Court nor the Second Circuit has yet addressed the possible implications of *Kingsley v. Hendrickson*, —— U.S. ——, 135 S. Ct. 2466, 2470 (2015) for deliberate indifference medical claims brought by pretrial detainees. District Courts in this Circuit which have addressed this issue have concluded that the Eighth Amendment standards apply. (Dkt. No. 4 at 8 n.6 (collecting cases)). As a result, the Court will follow existing Second Circuit precedent and analyze Plaintiff's deliberate indifference medical claim under both a subjective and objective standard.

16  In fact, the record evidence demonstrates every time Plaintiff had a documented health issue, he received medical care while at Onondaga County Justice Center. (*See generally* Dkt. No. 17.) Plaintiff's medical records from September 16, 2012, through April 2013, show Plaintiff used sick call effectively, and received care when requested. (*See* Dkt. No. 17 at 17-23-51). Further, a CT scan of Plaintiff's head on November 6, 2012, revealed no fracture or intracranial hemorrhage. *Id.* at 66. Plaintiff also received eye glasses. *Id.* at 56-57.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4627120

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2014 WL 4627120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonard HINTON, Plaintiff,
v.
A. PRACK, et al., Defendants.

No. 9:12–CV–1844 (LEK/RFT).
|
Signed Sept. 10, 2014.
|
Filed Sept. 11, 2014.

**Attorneys and Law Firms**

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Joshua E. Mcmahon, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE KAHN, District Judge.

**I. INTRODUCTION**

 *1  This *pro se* action under 42 U.S.C. § 1983 comes
before the Court following a Report–Recommendation
filed on August 14, 2014, by United States Magistrate
Judge Randolph F. Treece, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–
Recommendation"). Judge Treece recommends that all
of Plaintiff Leonard Hinton's ("Plaintiff") claims be
dismissed, except that he be awarded nominal damages for
violation of his due process rights by Defendant Uhler.
Report–Rec. at 31–32. Plaintiff timely filed Objections.
Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For
the following reasons, the Report–Recommendation is
adopted in its entirety.

**II. STANDARD OF REVIEW**

When a party makes a timely objection to a Report–
Recommendation, it is the duty of the Court to "make a
*de novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." 28 U.S.C. § 636(b). Where, however,
an objecting "party makes only conclusory or general
objections, or simply reiterates his original arguments,
the Court reviews the Report and Recommendation only
for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301,
307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517
F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted);
*see also Brown v. Peters,* No. 95–CV–1641, 1997 WL
599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district]
judge ... may accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge." 28 U.S.C. § 636(b).

**III. DISCUSSION**

**A. First Disciplinary Hearing**

Plaintiff argues that the evidence presented at his
first disciplinary hearing was not "reliable evidence"
sufficient to support the hearing officer's determination
that Plaintiff was guilty of the alleged conduct. Objs.
at 1. Specifically, Plaintiff argues that the evidence was
insufficient because there was no independent credibility
assessment of, or written statements by, the confidential
informant or alleged victim to corroborate Sergeant
Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail
in his Motion for summary judgment, *see* Dkt. No.
39 at 19–22, and Judge Treece explicitly addressed it
in the Report–Recommendation, Report–Rec. at 12–
15. Because Plaintiff's argument is "a mere reiteration
of an argument made to the magistrate judge," *Dove
v. Smith,* No. 13–CV–1411, 2014 WL 1340061, at *1
(N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews
Plaintiff's objection only for clear error, *see Chylinski v.
Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)).
The Court finds that Judge Treece committed no clear
error in determining that Sergeant Gower's testimony was
sufficiently corroborated by his written report and other
evidence in the record. *See* Report–Rec. at 12–15; *see also
Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at
*10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony
and written report constituted "reliable evidence" under
the "some evidence" standard, and that an independent
assessment of the witnesses' credibility was not required).

### B. Second Disciplinary Hearing

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified [*sic*] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

### C. Third Disciplinary Hearing

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

### D. Qualified Immunity

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

### IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,
-v-

**A. PRACK,** *Commissioner's Designee,* **D. VENETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION

### A. Due Process

**\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty

interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at *5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement

may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

### 1. Liberty Interest

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest. [1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010; [2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2–3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue. [3]

### 2. First Disciplinary Hearing

The following facts are undisputed.

On July 25, 2010, Sgt. Gower [4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. *See* Pl.'s App., Sec. 1, at Exs. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). *Id.* at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. *Id.* at Ex. I, Dec., dated Nov. 9, 2012.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process

in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. *See, e.g.,* Dkt. No. 44–1, Pl.'s Opp'n at p. 2. [5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

### a. Notice

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. *See Sira v. Morton,* 380 F.3d at 70 (quoting *Taylor v. Rodriguez,* 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted). [6]

### b. Opportunity to be Heard

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not

possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin,* 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell,* 418 U.S. at 568–69 for the proposition that *"Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer,* 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

> **\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to

2014 WL 4627120

be involved he claimed he does not
know anything about this incident
on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional
deficiency in Plaintiff's opportunity to appear, call
witnesses, or present rebuttal evidence at the first
disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at
564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October
8, 2010, Plaintiff received a written statement as to the
evidence relied upon and the reasons for the disciplinary
action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g
Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all
of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence
to support Defendant Bullis's disciplinary determination.
While an inmate is *not* entitled to a hearing officer with
the same level of impartiality required by judges; it is true
that he is entitled to a hearing untainted by arbitrary or
pre-determined findings of guilt. *Francis v. Coughlin,* 891
F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's
limited impartiality requirements are satisfied where the
record contains "some evidence" to support the officer's
findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985).
"Ascertaining whether this standard is satisfied does not
require examination of the entire record, independent
assessment of the credibility of witnesses, or weighing of
the evidence. Instead, the relevant question is whether
there is any evidence in the record that could support the
conclusion reached." *Id.,* 472 U.S. at 455–56 (citations
omitted). That being said, only " 'reliable' evidence can
constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at
76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported
by ample reliable evidence, chiefly, the testimony and
misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I
at Ex. C.

As noted above, the misbehavior report stated, *inter alia:*
"[b]ased on an investigation [Sgt. Gower] conducted it has
been determined that inmate Hinton ... was attempting
to solicit sexual acts and was attempting to extort money
from a family member of inmate Veach .... Inmate Hinton
also gave inmate Veach two packs of tobacco without
authorization of any staff." 1st Misbehavior Rep. At the
hearing, Sgt. Gower explained, in sum and substance,
that on the morning of July 25, 2010, an unidentified
inmate told him that Plaintiff had attempted to solicit sex
from Inmate Veach. As a result, Sgt. Gower conducted an
investigation during which he interviewed Inmate Veach,
who reported that "approximately 2 weeks before that he
got two packs of tobacco from [Plaintiff] he was unable to
pay him so [Plaintiff] had requested he perform sexual acts
for approximately ten days to pay him for the tobacco."
1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower
that Plaintiff had attempted to pull him into a toilet
stall but stopped when Inmate Moody walked into the
bathroom area. Gower verified with Inmate Moody that
he saw Veach and Hinton in the bathroom at the same
time; however, Moody did not see Hinton pulling Veach
into the stall. Gower ordered that Veach be examined
by medical, and no evidence of sexual misconduct was
found. Gower also testified that Veach informed him
that Plaintiff and Inmate McGee had set up a three-way
call in an attempt to extort fifteen dollars from Inmate
Veach's sister for the tobacco. Gower reported that he
verified this with inmate McGee who admitted to helping
to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims
that Plaintiff solicited sex from Inmate Veach would
be insufficient to satisfy the "some evidence" standard
applicable to prison disciplinary hearings. *See Dawkins v.
Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing
*Sira v. Morton,* 380 F.3d at 78, for the proposition that "if
any confidential informant's testimony was based solely
on hearsay, a greater inquiry into the reliability of this
hearsay information is required."); *Howard v. Wilkerson,*
768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez
v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for
the proposition that "[s]ince *[Superintendent v.] Hill,*
[472 U.S. 445 (1985) ] it has been held that hearsay

evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton,* 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby,* 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly,* 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report was sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence. [7]

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing— reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks,* 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted). [8]

**\*10** Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this claim be **DISMISSED.**

*e. Defendant Prack*

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established

Hinton v. Prack, Not Reported in F.Supp.3d (2014)
2014 WL 4627120
Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 122 of 210

any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability"). Furthermore, we also recommend that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### 3. Second Disciplinary Hearing

The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio. [9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A, Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/ Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman [10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant Haug because he was improperly denied the right to call witnesses on his behalf, and against Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs.' Mem. of Law at pp. 17–19.

#### a. Notice

It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010. Accordingly, Plaintiff clearly received constitutionally sufficient notice.

#### b. Opportunity to be Heard

According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011

2014 WL 4627120

WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Guitierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regulations, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at *10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness, Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers [11] nor the many documents submitted by Defendants indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.,* Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha[d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

### c. Written Decision

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' CrossMotion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### d. Defendent Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED.**

### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commissary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

*b. Opportunity to be Heard*

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel. [12]

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures—Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action. [13] *See Williams v. Pepin,* 2011 WL 7637552, *6 (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

*c. Some Evidence*

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with [sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

3rd Disciplinary Hr'g Tr. at p. 4.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly,*

2012 WL 3776698, at *23; *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010) (finding disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff. [14]

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton,* 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007) (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell"* ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978), for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at *5 (N.D.N.Y. Aug. 19, 2008) (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann

with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d at 126, for the proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that Judge Feldestein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6. [15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury. [16]

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at *26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice. Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the

2014 WL 4627120

[Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at *28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

1. **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing

disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

2. **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

1. **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

2. **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action; [17] and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627120

Footnotes

1    We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three disciplinary hearings at issue. Dkt. No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing

*Sims v. Artuz,* 230 F.3d 14, 23–24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

2    A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

3    In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http://nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at *18 (S.D.N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that *"Heck [v. Humphrey]* does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence"); N.Y. CORR. LAW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

4    Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. *See* Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. *See* Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

5    Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference to the page numbers assigned by Plaintiff.

6    In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. *See generally* Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that "the report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton,* 380 F.3d at 71 (citing *Quinones v. Ricks,* 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban,* 2014 WL 2587746, at *6 (W.D.N.Y. June 10, 2014) (reaching similar conclusion).

7    Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " 'requirement is sterner than the 'some evidence' standard necessary to afford due process' ").

8    It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

2014 WL 4627120

9    Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

10   These individuals are not Defendants in the instant action.

11   It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

12   On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs.' Lt.-Br., dated July 21, 2014, & 56, Pl.'s Reply Lt.-Br., dated July 25, 2014.

13   Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton,* 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007) (citing *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

14   Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See* Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; *see also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

15   Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months. Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

16   To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29 (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the evidence relied upon, Plaintiff failed to add any new substantive arguments).

17   *See supra* Note 4.

---

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6694468
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone HOUSTON, a/k/a Tyronne Black, Plaintiff,
v.
Dora B. SCHRIRO, et al., Defendants.

No. 11 Civ. 7374(LAP).
|
Signed Nov. 24, 2014.
|
Filed Nov. 26, 2014.

*OPINION AND ORDER*

LORETTA A. PRESKA, Chief Judge.

**\*1** Tyrone Houston ("Houston" or "Plaintiff"), proceeding *pro se,* brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, asserting violations of his First, Fourth, and Eighth Amendment rights as well as his right to religious freedom under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq. Before the Court is Defendants' motion for summary judgment [dkt. no. 101][1] pursuant to Rule 56 of the Federal Rules of Civil Procedure, which argues that there is insufficient evidence to support Plaintiff's claims. Defendants' motion is GRANTED in part and DENIED in part.

**I. BACKGROUND**

Houston is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") who currently resides at the Five Points Correction Facility in Romulus, New York ("Five Points"). Between August, 2009 and November, 2011, the time period relevant to Plaintiff's claims, Houston was housed at three facilities operated by the New York City Department of Corrections ("DOC"): the Anna M. Kross Center ("AMKC"), the Manhattan Detention Complex ("MDC"), and the George R. Vierno Center ("GVRC") on Riker's Island. Houston initiated this action on October 17, 2011. (Second Amended Complaint ("SAC"), [dkt. no. 2].) On August 20, 2013, Judge Harold Baer, Jr. granted Defendants' motion to dismiss in part.

*Houston v. Schriro,* No. 11–CV–7374, 2013 WL 4457375 (S.D.N.Y. Aug. 20, 2013) [dkt. no. 80]. Six sets of claims survived, each of which is discussed below.

A. *Dental Care*

Prior to his initial incarceration in August, 2009, Plaintiff alleges that he visited a dentist who informed him that surgery was required to treat a broken tooth on the back left side of his mouth. (Houston Dep. at 52:6–18.) In March, 2010, Plaintiff was treated by a DOC dentist, Dr. Brian Martin, at which point he complained about pain in the upper right side of his mouth. (Martin Decl. ¶ 9.) According to Plaintiff, Dr. Martin determined that he would need to be treated by an outside oral surgeon. (SAC ¶ 14.) Based on his review of medical records maintained by Corizon Health Services, Dr. Martin denies referring Houston to an oral surgeon or suggesting that a visit to an oral surgeon was necessary. (Martin Decl. ¶ 10, Ex. A.) Plaintiff states that he filed complaints requesting to be seen by an oral surgeon and claiming that he was in substantial pain. (SAC ¶ 17.) Plaintiff was never treated by an oral surgeon during his time in DOC custody.

According to DOC records, Houston visited Dr. Martin again on May 10, 2011. (Martin Decl. Ex. D.) During this visit, Martin identified a fractured filling in his top left molar. (*Id.* ¶ 14–15.) Martin replaced the filling ten days later. (*Id.* Ex. P .) Following his transfer to State custody, a dentist at Five Points determined that Houston needed to have five front teeth removed from the top of his mouth. (Pl's Opp. to Summ. J. ¶ 6, Ex. B.) Plaintiff claims that Defendants' failure to provide appropriate dental care during his time in DOC custody—specifically, the failure of the Defendants named in this claim[2] to follow up on Dr. Martin's alleged referral to an oral surgeon—led to his need for tooth extractions. (*Id.*)

B. *Destruction of Property*

**\*2** Plaintiff alleges that Defendants illegally destroyed his property on two occasions. First, Houston claims that on August 30, 2011, he returned from the law library to find water and sewage covering the floor of his cell, submerging some of his documents relevant to this litigation. (Houston Dep. at 187:13–19.) He alleges that Rutherford Cipio, a DOC plumber, intentionally flooded his cell in retaliation for an earlier complaint to the warden about a lack of running water. (SAC ¶ 44.) Plaintiff was informed by an officer as well as other inmates that Cipio had been in his

cell. (Houston Dep. at 189:16–25.). He also recalls Cipio giving him a "look" communicating that the flooding had been purposeful. (Houston Dep. at 192:20–193:16.) Cipio and Plaintiff had no arguments or interactions of any kind prior to the alleged incident. (*Id.*) at 192:22–196:5. In fact, Plaintiff claims to have "[n]ever said anything to this man in 22 months." (*Id.* at 194:9–10.) Cipio denies these allegations, claiming that he has never intentionally flooded an inmate's cell or caused damage to an inmate's property in any manner. (Cipio Decl. ¶¶ 6–7.)

Second, Plaintiff contends that in March 2010 Yvette Bowers, the AKMC grievance officer, directed prison staff to search his cell and destroy his blood pressure, blood thinning, and glaucoma medication in retaliation for filing a lawsuit against Rosamund Padmore, the grievance program supervisor. (SAC ¶ 38.) Houston says he was present when several guards performing an institutional (pre-scheduled) search of his entire cell block threw his medication on the floor and swept it up with other trash. (Houston Dep. at 205:5–19.) He alleges that he was subsequently treated for a blood clot at Elmhurst Hospital as a result of his inability to take his medication. (SAC ¶ 57.) When he returned from the hospital, Houston says that Bowers told him he "should have dropped dead." (Houston Dep. 231:14–24.) Bowers denies these allegations. (Bowers Decl.) She claims that she is usually unaware of inmates' medication requirements unless such issues are raised in a grievance and does not recall learning that an inmate filed a grievance or lawsuit against Ms. Padmore. (*Id.* at ¶¶ 9, 11.)

C. *Inadequate Footwear*
Plaintiff claims that Defendants were deliberately indifferent to his need for orthopedic footwear in violation of the Eighth Amendment. Houston alleges that his prison-issued footwear caused him injuries, including gout, swelling, bunions, and painful corns. (SAC ¶ 20.) He claims that he visited a DOC podiatrist who issued him a pass to obtain workboots on May 4, 2010 and recommended further care from an outside podiatrist. (Houston Decl. at 124:18–125:25.) Plaintiff states that he did not receive workboots until over a year later, at some point between July and September, 2012, when an officer in the barber shop helped him to acquire them. (*Id.* at 144:11–145:10.) As a result of the delay, Houston alleges that his foot injuries worsened, causing difficulty walking and standing as well as the need for foot surgery. (SAC ¶ 55.) In response, Defendants claim that Houston

was, in fact, seen by a podiatrist and issued appropriate footwear in a timely manner. In the alternative, they argue that the alleged denial of footwear does not amount to a sufficiently serious deprivation of care in violation of the Eighth Amendment.

D. *Denial of Low–Sodium Halal Meals*
**\*3** Plaintiff brings claims under the Free Exercise Clause, RLUIPA, and the Eighth Amendment related to the alleged denial of low-sodium meals due to his religion. When Houston was first incarcerated, he claims he was placed on a list of inmates to receive low-sodium halal meals, which he received during his stay at Riker's Island. (Houston Dep. at 244:22–245:5.) Following his transfer to MDC, Houston filed a grievance alleging that in September, 2010 the MDC dietician informed him that low-sodium halal meals would no longer be provided, effectively forcing him to choose between his religious beliefs and his health. (Houston Dep. 247:21–248:2; P's Opp. to Summ. J., Ex I.) Defendants contend that Plaintiff was never required to make this decision. Moreover, even if he was, they argue that Plaintiff did not suffer from a serious medical condition and that his religious beliefs regarding halal meals were not sincerely held.

E. *Strip Searches*
Houston alleges that he was strip searched on six occasions between August 10, 2011 and August 20, 2011 (Houston Dep. at 270:1–16) in violation of his rights under the Free Exercise Clause, RLUIPA, and the Fourth Amendment. He claims that Officer Webb, a female security captain, observed the searches. (SAC ¶ 42, 57.) As a practicing Muslim, Houston maintains that it is a violation of his religious beliefs for a woman who is not his wife to view his naked body. (*Id.* at 276:14–25.) He claims that Webb continued to observe the searches even after he objected and informed her that such conduct violates his religious beliefs. (*Id.* at 277:19–278:15, 274:9–12.)

DOC policies prohibit female staff from observing strip searches of male inmates absent an emergency. (Hall Decl., Ex. A at 10.) Webb denies Houston's allegations. (Webb Decl. ¶¶ 10–13.) Thomas Hall, former MDC warden, and Artemio Colon, former deputy warden, claim that they have never witnessed a female staff member observing male inmates during strip searches. (Hall Decl. ¶ 10; Colon Decl. ¶ 20.) Houston states that Hall and Colon

2014 WL 6694468

were "probably" present at four of the six alleged searches. (Houston Dep. at 286:4–5.)

According to DOC records, at least two of the six searches were "institutional searches," which are generally scheduled one month in advance by the Deputy Warden of Security. (Webb Decl. Ex. A, Ex. B; Hall Decl. ¶ 8.) The logs for these searches, which were conducted on August 12, 2011 and August 15, 2011, indicate that Webb was not involved in the searches of Houston's cell, although she is listed as the security captain for the August 15th search. (*Id.*) DOG was unable to uncover records regarding the other four alleged searches. (Webb Dec. ¶ 21.)

## II. LEGAL STANDARDS

### A. *Summary Judgment*

Summary judgment is appropriate only if the court concludes that there is no genuine dispute as to the material facts and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under governing law." *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir.2008) (internal quotations and citation omitted). In determining whether there are genuine triable issues, "the court is required to resolve all ambiguities, and to credit all factual inferences that could rationally be drawn, in favor of the party against whom summary judgment is sought." *Howley v. Town of Stratford,* 217 F.3d 141, 150–51 (2d Cir.2000).

**\*4** The party moving for summary judgment bears the initial burden of informing the court of the basis for her motion and identifying portions of the record that demonstrate the absence of a genuine issue of material fact. *See, e.g., Celotex,* 477 U.S. at 322. In evaluating the movant's initial showing, "the judge must view the evidence through the prism of the substantive evidentiary burden" that would apply at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986). Thus, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995), *citing Celotex,* 477 U.S. at 322–23.

If this burden is satisfied, the opposing party must then "produce specific facts indicating that a genuine factual issue exists." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (internal quotations and citation omitted). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). If, however, the non-movant provides "a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983).

### B. *42 U.S.C. § 1983*

Plaintiff brings claims against Defendants under 42 U.S.C. § 1983, which provides citizens with a private right of action to safeguard their constitutional rights. *See* 42 U.S.C. § 1983. To succeed on a § 1983 claim, Plaintiff must prove "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1998) (citations omitted); see also *Gleason v. Scoppetta,* 566 Fed.Apx. 65 (2d Cir.2014).

The Prison Litigation Reform Act ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Prisoners must "properly" exhaust all available remedies before proceeding to court, *Woodford v. Ngo,* 548 U.S. 81, 83 (2006), which requires "compliance with an agency's deadlines and other critical procedural rules...." *Id.* at 90. Since procedures vary from system to system, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock,* 549 U.S 199, 219 (2007). However, a Plaintiff can successfully counter a defendant's failure to exhaust contention if administrative remedies were not, in fact, available. *Chavis v.. Goord,* 333 Fed.Apx. 641, 643 (2d Cir.2009) (citing *Hemphill v.. Mew York,* 380 F.3d 680, 686 (2004)); *see also Johnson v. Maha,* 460 Fed. Apx. 11, 15 (2d Cir.2012) (holding that *Woodford v. Ngo* "does not abrogate the unavailability defense to nonexhaustion." *Id.* at 15 n. 6).

## III. ANALYSIS

A. *Exhaustion*

**\*5** Defendants argue that Houston failed properly to exhaust available administrative remedies with respect to his dental care, cell flooding, and strip search claims because, as a factual matter, Plaintiff did not submit a grievance of any sort. With respect to Houston's footwear grievances, Defendants argue that Plaintiff's failure to appeal the Inmate Grievance Resolution Committee's ("IGRC") response constitutes inadequate exhaustion of available remedies. Accordingly, Defendant argues that Houston is barred from litigating these claims in federal court under the PLRA.

The Department of Corrections employs a specific grievance procedure known as the Inmate Grievance Resolution Program ("IGRP"). (*See* Johnson Decl. Ex. H.) The IGRP is designed to resolve inmate complaints related to "aspects of his/her confinement that fall within the scope of [the Program]." (*Id.* at 1.) The first step in the process requires the inmate to complete a written complaint on either an "Inmate Interview Slip" (Form # 143) or an "Inmate Grievance Form" (Form # 7101R) for submission to the IGRC. (*Id.* at 8.) However, "[i]f these forms are not available, a complaint may be submitted on plain paper ." (*Id.*) If DOC staff determines that the complaint is grievable, the Grievance Supervisor or Grievance Officer conducts an investigation and issues a written response. (Johnson Decl. ¶ 6.) Not all complaints relating to a prisoner's confinement are grievable. "Grievances that request actions that are not obtainable via the IGRP, will result in dismissal at the IGRC level." (Johnson Decl. Ex. H at 2.)

Four levels of appeal are available following the initial determination. The inmate can request a formal IGRP hearing, review by the Warden, review by the Central Office Review Committee ("CORC"), and review by the Board of Correction ("BOC"). (Johnson Decl. ¶¶ 7–10.) At each stage in the process, the inmate must indicate his desire to appeal on the formal determination form provided to the inmate along with the applicable reviewing body's decision. (*Id.*) Appeals must be filed within 5 days of the receipt of the committee's written response to the Grievance. (*Id.,* Ex H. at 9.)

1. *Strip Searches*
A material question of fact exists as to whether Houston submitted a grievance regarding his strip searches and

filed the relevant appeals in accordance with DOC policies. Defendants claim that they have no records of Houston's alleged strip search grievance filings. (Johnson Decl. ¶¶ 12, 13, Ex. A–G.) Houston claims that he did submit a grievance, which he includes as Exhibit N. Viewed in the light most favorable to Plaintiff, the evidence reduces to competing assertions that cannot be resolved on summary judgment. *See Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (noting that courts should "eschew credibility assessments" in ruling on summary judgment motions) (internal citation omitted).

**\*6** Defendants argue that Plaintiff nevertheless failed properly to exhaust administrative remedies because his subsequent appeal was not submitted on the appropriate form. (*See* Johnson Decl. ¶ 18) (suggesting that Houston drafted his appeal form himself because its contents, including the typeface and spelling errors contained therein, were inconsistent with official DOC forms). Houston claims that he was compelled to draft his own form because official appeal forms were unavailable. (Houston Dep. at 98:10–20.) It is inappropriate to determine, on summary judgment, whether Houston's allegation that official forms were unavailable is credible. If so, it is possible that administrative remedies were effectively unavailable to him. *See Barker v. Belleque,* No. CIV. 10–0093–AA, 2011 WL 285228 at \*4 (D.Or. Jan. 26, 2011) (administrative remedies effectively unavailable where agency refused to process appeal filed on wrong form). Alternatively, given that IGRP procedures explicitly state that initial complaints may be submitted on plain paper when the proper form is unavailable, Houston might have reasonably assumed that the same rule applied to appeals. *See e.g,. Giano v. Goord,* 380 F.3d 670, 679–80 (2d Cir.2004) (failure to exhaust justified where prisoner's erroneous interpretation of the regulations was reasonable).

Assuming, *arguendo,* that Houston failed to comply with DOC's grievance procedures, administrative remedies were nevertheless unavailable for the specific claim he sought to assert against Webb. The IGRP explicitly provides that "allegations of assault or harassment by either staff or inmates are not grievable ...." (Johnson Decl. Ex. H at 2.) Plaintiff repeatedly alleges that Webb's viewing of his strip searches constituted "sexual harassment ." (SAC.¶ 42.) Since the grievance procedure offered Houston no prospect for relief related

to a harassment claim, Defendants' non-exhaustion contention cannot succeed. *See Booth v. Churner,* 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief for the action complained of."). Whether Houston could have filed a different complaint that is grievable under the IGRP—alleging, for instance, a violation of DOC's strip search policy—is of no consequence. Viewing the record in the light most favorable to Plaintiff, his complaint would have raised a sexual harassment allegation, which is not grievable under DOC's policies.

### 2. *Footwear*

Defendants argue that Plaintiff failed to exhaust his administrative remedies by accepting the IGRP's favorable response to his two footwear grievances and declining to submit further appeals. (*See* Johnson Decl. Ex. E, F.) This argument is unpersuasive. "Where ... prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners ... have fully exhausted their available remedies." *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004). Similar to the New York State Department of Correctional Services procedures at issue in *Abney,* IGRP procedures do not provide a practical means to challenge prison authorities' failure to implement favorable decisions. An inmate has only five days to appeal a grievance resolution, (Johnson Decl. Ex. H at 10,) which is "insufficient to provide adequate time to assess, in many cases, whether prison officials have implemented a favorable disposition of an inmate's ... grievance." *Abney,* 380 F.3d at 668.

**\*7** Defendants also argue that Plaintiff failed to file his grievance within ten days of the initial incident (i.e., within ten days of the initial denial of footwear), which constitutes a failure to exhaust available remedies. As a preliminary matter, the alleged denial of footwear was an ongoing deprivation rather than a discrete incident, suggesting that Plaintiff's grievance may well have been timely. *See, e.g. Woodford,* 548 U.S. at 121 (questioning whether the "continuing nature of the injury" might render the Plaintiff's grievance timely) (Breyer, J., concurring). Moreover, "the exhaustion requirement of the PLRA is satisfied by the untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority." *Hill v. Curcione,* 657 F.3d 116, 125 (2d Cir.2011). Both of Plaintiff's grievances received favorable responses from the IGRC; as such,

Houston exhausted his available administrative remedies with respect to his footwear claims.

### 3. *Dental Care and Cell Flooding*

The parties dispute whether Plaintiff submitted any grievances or appeals with respect to Houston's dental care and cell flooding claims. Defendants allege that Plaintiff's grievance files do not contain any records related to these claims. (*See* Johnson Decl. ¶¶ 12–15; Johnson Decl. Ex. A–G.) Similar to Plaintiff's strip search claims, Defendants suggest that Houston's alleged grievance appeals were not submitted on the official forms. (*See* John Decl. ¶ 16.) Viewed in the light most favorable to Houston, the evidence once again reduces to competing assertions about whether Houston submitted the forms he claims to have filed and whether the official grievance and appeal forms were actually available.

### B. *Medical Claims*

Houston contends that he received constitutionally inadequate medical care while in DOC custody. Specifically, he alleges that his dental care, footwear provisions, and meals were improper. To succeed on such a claim, whether brought under the Eighth or Fourteenth Amendments, Plaintiff must demonstrate "deliberate indifference" to a need that is objectively "serious." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (reaffirming the deliberate indifference standard for threats to health or safety of persons in custody). "The standard for deliberate indifference includes a subjective and an objective component." *Hill,* 657 F .3d at 122. Objectively, the Plaintiff must demonstrate an actual deprivation of medical care and that "the inadequacy ... is sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). Subjectively, the Plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind," which "requires that the charged official act or fail to act while actually aware ... that serious inmate harm [would] result." *Id.*

### 1. *Dental Care*

Defendants successfully demonstrate that there is no genuine question of material fact regarding Houston's dental care claims. Drawing all reasonable inferences in favor of the Plaintiff, a trier of fact might credit Houston's testimony over Dr. Martin's and determine that oral surgery was required to treat Plaintiff's alleged pain in

Houston v. Schriro, Not Reported in F.Supp.3d (2014)
2014 WL 6694468
Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 136 of 210

the upper right portion of his mouth. But even in this scenario, Houston fails to establish that the inadequate care was sufficiently serious and that Dr. Martin acted with awareness of the harm that would result—later extraction of five teeth. Houston puts forth no evidence that the teeth he had removed upon his arrival at Five Points (his top front teeth) are the same as those that he initially complained about, or otherwise related to them. (*See* SAC ¶ 6; Martin Decl. ¶ 9) (noting Houston's initial complaints about pain in the upper right side of his mouth). Plaintiff fails to provide evidence that the eventual removal of his front teeth was the result of inadequate care from Dr. Martin. For these reasons, Plaintiff's dental care claims are dismissed.

### 2. *Footwear*

**\*8** Although Houston alleges he did not receive workboots until July, 2012 at the earliest (Houston Dep. at 144:11–25), his contemporaneously kept medical records indicate that he had access to workboots or at least that prison staff believed so. First, the medical record from Houston's May 3, 2010 appointment with Dr. Dorinda King–Adekunle, a podiatrist, states that Houston "ambulates in workboots since discharge from Rickers Main Island Facility." (Walker Decl., Ex. B.) Houston was discharged from Rikers in March 2010, two months before this appointment. (Porter Decl., Ex. E.) The record from that appointment also states: "consult to DOC to *continue* to wear workbooks," (emphasis added), suggesting that he already wore workboots before the appointment and after his transfer to DOC custody. (Walker Decl., Ex. B.)

Additional records, including medical reports and Houston's own grievance submissions, point to the same conclusion. On June 21, 2010, for example, Houston was issued a workboot pass from a physician's assistant with the notation "please *continue* workboot." (Porter Decl., Ex. 1) (emphasis added). On September 3, 2010, records from Houston's visit with another physician's assistant indicate that he inquired about workboots and the established treatment plan was to *"[c]ontinue* to wear workboots ." (Porter Decl., Ex. J) (emphasis added). Moreover, Plaintiff's first grievance related to footwear, filed on June 7, 2011, requested that he "keep *work boots,* in place of medical boots," (Johnson Decl., Ex. E), suggesting that he already possessed workboots. In reply to his second footwear grievance, filed on August 10, 2011, the IGRP response stated: "You have been given a

pair of workboots from the MDC clothesbox, your action requested has been granted." (Johnson Decl., Ex. F at 3.)

Even if the evidence establishes a genuine question of fact as to whether Houston was in fact provided with workboots, Plaintiff offers no evidence to demonstrate that Defendants operated with a "sufficiently culpable state of mind" and an awareness of serious harm that would result. *See Salahuddin,* 467 F.3d at 263, 279–80. The documentation available indicates that Defendants intended Plaintiff to have access to workboots. Moreover, Houston admits that he rarely wore the prison-issued footwear that he complained about; rather, he generally wore one of two pairs of slippers, which he claims were comfortable and appropriately sized. (Houston Dep. at 149:5–150:19.) He therefore fails to identify a genuine dispute of fact as to whether the alleged deprivation was sufficiently serious. For these reasons, Plaintiff's footwear claims are dismissed.

### 3. *Meals*

Viewed in the light most favorable to Plaintiff, the evidence provides a basis for a reasonable jury to conclude that Houston was denied low-sodium halal meals and compelled to choose between maintaining a low-sodium or a halal diet. Houston filed a grievance on September 7, 2010, alleging that Sharon Jones, the MDC dietician, informed him "via [his] 6S steady 3–11 officer Ms. C," that he "had to change [his] diet from Muslim to regular because Muslim prisoners don't get special diet meals-low sodium." (Johnson Decl., Ex. G at 3.) Ms. Jones denies that she has ever informed an inmate that he or she must alter his or her religious practices to receive a particular diet and claims that she is "not aware of a DOC policy which requires" it. (*Id.* at ¶¶ 6, 8.) This is not fully responsive to Houston's allegations, as another officer may still have informed Houston of his choice and a policy may have been in place at the time of Houston's incarceration that is no longer in effect. Jones does not explicitly attest that meals that were both halal and low-sodium were in fact available to Plaintiff. In any case, Houston's conflicting testimony creates a dispute of fact requiring a credibility determination. *See Amnesty Am.,* 361 F.3d at 122.

**\*9** DOC's dietary records suggest that Houston was taken off a low-sodium halal diet. Prior to September 16, 2010, dietary logs indicate that Houston received low-sodium halal meals based on the notations "LS"

and "Muslim ID Card." *See, e.g.,* Pl.'s Ex. G2. The September 16 and September 23 lists indicate Houston's dietary restriction as "xxxx," suggesting that his meals were neither low-sodium (in contrast to other inmates on the list with the "LS" notation) nor halal. Pl.'s Ex. G1 at 1–2. On the September 30 log, a handwritten annotation of "LS" suggests that Houston was put back onto a low-sodium diet, but there is no indication that his meals were halal. *Id.* at 3.

Medical records provide additional evidentiary support for Houston's claim. On three separate occasions, Houston complained to a physician's assistant that he was not receiving a low-sodium diet. He first raised this issue with medical staff on October 7, 2010, at which point a low-sodium diet was ordered. (Pl.'s Ex. G at 3.) He brought the same complaint four days later; a low-sodium diet was once again included in the treatment plan. (*Id.* at 4.) Finally, on December 1, 2010, he alleged that he was still not receiving low-sodium meals, calling into question Defendants' claim that low-sodium meals were provided to all prisoners beginning in November. (*Id.* at 7.) The records submitted do not establish when, if ever, Houston was restored to a halal diet.

Plaintiff asserts that the alleged denial of low-sodium meals constitutes a violation of the Eighth Amendment under the deliberate indifference standard. "The denial of a medically prescribed diet may constitute an Eighth Amendment violation under certain circumstances." *Rush v. Fischer,* 923 F.Supp.2d 545, 555 (S.D.N .Y.2013) (citations omitted). *See, e.g., Mandala v. Coughlin,* 920 F.Supp. 342 (E.D.N.Y.1996) (denying summary judgment where the plaintiff claimed he was not provided with a medically-required high-fiber diet); *Johnson v. Harris,* 479 F.Supp. 333 (S.D.N.Y.1979) (holding that the failure to provide a diabetic inmate with an appropriate diet violated the Eighth Amendment).

The first inquiry is whether the denial of low-sodium meals, as a factual matter, resulted in "objectively serious" harm, *see Salahuddin,* 467 F.3d at 279–80, such that it denied "the minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). High blood pressure has been held to constitute a serious medical condition. *Baskerville v. Bolt,* 224 F.Supp.2d 723, 735 (S.D.N.Y.2002) (Plaintiff's "prescription for high blood pressure arguably indicates that he may have an objectively serious medical condition that needed to be

controlled through medication.") However, Houston fails to offer evidence indicating that in this instance, the interruption of his low sodium meals caused serious harm.

First, prison records suggest that the period of the denial was relatively short. DOC dietary records indicate that Houston was returned to a low-sodium diet beginning on October 12, 2010. (Jones Decl. Ex. A at 1.) DOC's dietician claims that all inmates were placed on a low-sodium diet beginning in November, meaning that Houston would have been denied a low sodium diet for less than two months. (*Id.* ¶ 16.) Houston argues that he was not provided with a low-sodium diet until December 2011, when he was transferred to GVRC. (Houston Dep. at 258:20–259:2.)

**\*10** Houston's medical records, however, establish that any consequences for his blood pressure were relatively short-lived. On September 3, 2010, while he was still on a low-sodium diet, Houston's blood pressure was 126/80. (Pl.'s Opp. to Summ. J., Ex. F3 .) By October 7, 2010, after roughly three weeks on a regular diet, his blood pressure was 127/84. (*Id.,* Ex. G, at 4.) During this appointment, Houston complained that he "stopped getting [a] low sodium diet," and the doctor ordered a low-sodium diet as the treatment for Plaintiff's hypertension. (*Id.*) Houston's blood pressure continued to rise, reaching 140/92 on November 26, 2010. (*Id.,* Ex. H.) By December 1, however, Plaintiff's blood pressure dropped to 134/82, which was accompanied in the medical record by an annotation that his vital signs were "within normal limits." (Porter Decl., Ex. K.) His blood pressure continued to drop, reaching 120/80 on December 15. (*Id.,* Ex. L.) Subsequent medical records indicate that his hypertension was "well controlled" thereafter. (Pl.'s Opp. to Summ. J., Ex. D.)

These records are consistent with Defendants' position that the denial of low-sodium meals lasted for a period of several weeks rather than the remainder of Houston's stay in DOG custody. Moreover, Plaintiff fails to provide any evidence that that his somewhat elevated blood pressure, sustained for a period of only a few weeks, amounts to a serious medical condition. For these reasons, Plaintiff's Eighth Amendment claim with respect to his alleged denial of low-sodium meals is dismissed.

Plaintiff also raises First Amendment and RLUIPA claims arising out of the same facts. Inmates are entitled to

reasonable accommodation of religious beliefs, including dietary restrictions. *See, e.g., Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) (It is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."). RLUIPA requires that the government "not 'impose a substantial burden' on the 'religious exercise' of inmates ... unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin,* 467 F.3d at 273 (2d Cir.2006) (citing 42 U.S.C. § 2000cc–1(a)). The free exercise clause requires limitations on prisoner's religious practices to be "reasonably related to legitimate penological interests" *Id.* (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)). It remains unclear whether or not the substantial burden requirement must be met in order for a prisoner to state a claim under the Free Exercise Clause, but "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Holland v. Goord,* 758 F.3d 215, 221 (2d Cir.2014) (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004)).

In this case, there is a genuine question of fact as to whether Plaintiff's halal meal requirement was, in his "own scheme of things, religious." *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). Determining the sincerity of a prisoner's religious beliefs "does not lend itself to a decision on summary judgment." *Pugh v. Goord,* 571 F.Supp.2d 477, 498 (S.D.N.Y.2008); *See also Patrick v. LeFevre,* 745 F.2d at 157 ("[A]ssessing a claimant's sincerity of belief demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination.").

**\*11** Defendants argue that Plaintiff's religious beliefs did not require halal meals, pointing out that Mr. Houston stated in a deposition that if the chicken and goat that he consumed while in prison had not been blessed "as long as I pray over it, it becomes halal." (Houston Dep. 264:16–265:8.) However, other statements in the same deposition suggest that he believes food becomes halal due to "an imam praying over" the animal before its slaughter. (Houston Dep. 249:20–251:12.) Furthermore, Houston identified other types of food that he is not permitted to eat, such as pork (*Id.* at 262:22–23.) Houston has stated that he attended religious services with an imam while

in DOC custody and even requested an imam to attend his dietary grievance proceeding. (*Id .* at 265:12–266:10; Johnson Decl., Ex. G at 2.) It is therefore inappropriate to determine, on summary judgment, that Houston's religious beliefs are insincere.

Defendants seek summary judgment on this claim on the basis that Plaintiff was not required to choose between his religious beliefs and adhering to a low-sodium diet. Because Defendants do not argue that the denial of halal meals served a legitimate penologial objective, *Salahuddin,* 467 F.3d at 275, let alone that it furthered a "compelling government interest" through the "least restrictive means," 42 U.S.C. § 2000cc-l(a), Plaintiff's First Amendment and RLUIPA meal claims survive summary judgment.

## C. *Destruction of Property Claims*

### 4. *Cell Flooding*

To establish a claim for retaliation under the First Amendment, Plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)) (internal quotations omitted). Houston fails to demonstrate that a reasonable jury could find in his favor on either the second or third prongs.

First, Houston offers no reasonable basis upon which to conclude that Cipio intentionally flooded his cell. He did not witness Cipio cause the flooding (Houston Dep. at 192:2–16), and no other inmate or staff member informed him that Cipio intentionally flooded his cell. (*Id.* at 190:21–191:2.) Houston finds it to be "common sense" that because Cipio did not move his documents from the floor he intended them to be destroyed. (Houston Dep. 191:5–21.) However, even if Cipio were negligent in attempting to repair the clog without clearing the area in case of overflow, it would not amount to intentional adverse action. The fact that Cipio gave Houston a "look" that Houston interpreted to communicate that he "did it intentionally" is also insufficient to create an issue of fact. (Houston Dep. at 192:20–193:16.) In sum, Houston's allegation that Cipio flooded his cell is conclusory.

 **\*12** Furthermore, there is insufficient evidence to support a plausible connection between Houston's complaint to the warden and the alleged cell flooding. Houston did not complain directly to Cipio or witness others passing on his complaint. (*Id.* at 194:23–195:8.) As the plumber at MDC, Cipio has no involvement inmate grievances and is not informed when grievances are filed. (Cipio Decl. ¶ 11.) No aspect of the record suggests that Cipio was aware of Houston's complaint, let alone that he intentionally flooded his cell in connection with that complaint. Absent evidence of a retaliatory motive, Defendants are entitled to summary judgment on this claim.

### 5. *Destruction of Medication*

Plaintiff's First Amendment retaliation claim regarding the alleged destruction of medication did not survive Defendants' motion to dismiss, *see Houston,* 2013 WL 4457375, at *8*; however, Houston did plead an actionable Eighth Amendment claim, which is subject to a deliberate indifference standard. *See Caiozzo,* 581 F.3d at 72. Plaintiff's destruction of medication claim fails to meet this standard.

First, Plaintiff is unable to establish that Bowers ordered prison staff to destroy his medication. In her declaration, Bowers states that she did not have the authority to order staff to conduct searches; she did not have knowledge of inmates' medication regimes; and she does not recall Padmore's informing her about Houston's grievances. (Bowers Decl. ¶¶ 7, 9, 11.) Houston offers no evidence to suggest that these claims are untrue. In fact, Houston's deposition makes clear that he has no reasonable basis upon which to believe that Padmore or Bowers was even aware of his medication requirements. He acknowledges that he did not overhear any discussions between Padmore and Bowers regarding his medication; he never spoke to Bowers regarding his medication; none of the staff searching his cell mentioned Bowers's name; and he never filed a grievance with Bowers regarding his medication. (Houston Dep. at 212:23–213:4, 213:17–23, 214:3–15, 231:3–7.) His only basis for claiming that Bowers ordered the destruction of his medication is her alleged statement "[y]eah, you should have dropped dead," which, even if assumed to be true, is insufficient to establish Bowers' involvement in the destruction of his medication. (*Id.* at 231:12–17.)

Moreover, Plaintiff fails to establish that he experienced objectively serious harm. Houston claims that he was taken to Elmhurst Hospital on March 22, 2010 to treat a blood clot (Houston Dep. at 6:17–25), but the medical record of that visit indicates that the only diagnosis was "foreign body—esophagus." (Porter Decl. Ex. P.) Doctors recommended that he "cut [his] food into smaller pieces and chew more before swallowing." *Id.* Because Plaintiff cannot satisfy either element of the deliberate indifference standard, his destruction of medication claim is dismissed.

### D. *Strip Search Claims*

 **\*13** While strip searches are usually upheld as reasonable security measures within prisons, they must be "rationally related to a legitimate penological interest to survive First Amendment scrutiny." *Jean–Laurant v. Wilkerson,* 438 F.Supp.2d 318, 323–24 (S.D.N.Y.2006). Similarly, a strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Id.* at 323 (internal citations omitted).

Defendants do not argue that a female officer observing strip searches of a male inmate furthers a legitimate penological interest, particularly in non-emergency situations such as scheduled institutional searches where alternative staffing arrangements can be planned in advance. Rather, Defendants seek summary judgment on the theory that Webb did not, as a factual matter, observe Houston's strip searches. However, the record does not establish that there is no genuine dispute as to the truth of this theory.

Houston testified in his deposition that Webb was present at and observed each of the six alleged strip searches. (SAC ¶ 42, 57; Houston Dep. at 276:7–25, 279:17–280:2.) In response, Defendants rely on two pieces of evidence in addition to Webb's denials: declarations from Hall and Colon, the warden and deputy warden, and log reports from two of the six searches. Both are insufficient to meet Defendants' burden to demonstrate that there is no genuine dispute of fact.

Although Colon and Hall deny ever witnessing Webb observe the strip search of a male inmate, neither is in a position to offer a firsthand account of the six alleged strip searches at issue. Hall states that he "would be present and observe these searches on occasion," but neither he nor Colon represents that they participated in or witnessed

any searches between August 10, 2011 and August 20, 2011. (Hall Decl. ¶ 8.) DOC search logs cover only two of the six alleged searches and suggest that Hall and Colon were not present. (*See* Webb Ex. A, Ex. B.)

Viewed in the light most favorable to the Plaintiff, the evidence reduces to competing assertions on the part of Houston and Webb. Weighing these contradictory statements requires a credibility assessment, which is not appropriate at the summary judgment stage. See *Amnesty Am.,* 361 F.3d at 122 (noting that courts should "eschew credibility assessments" in ruling on summary judgment motions) (internal citation omitted); *X v. Bratten,* 32 F.3d 564 (4th Cir.1994) (competing assertions over whether a female guard observed a male inmate's strip search created a genuine issue of material fact that should have precluded summary judgment). Therefore, Defendants' motion with respect to Plaintiff's strip search claims is denied.

### E. *Supervisory Liability*

Because Plaintiff's medical and destruction of property claims have been dismissed, there can be no supervisory liability for these claims. See *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010). In addition, Plaintiff's claims against Brown, Harris, Agro, Halyard–Saunders, Wolf, and Schriro for failing to address his complaints about his specialized diet also fail to withstand summary judgment.

**\*14** To show supervisory liability for a § 1983 violation, Plaintiff must demonstrate the "personal involvement" of the supervisor in the alleged wrong. See *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). In *Colon v. Coughlin,* the Second Circuit enumerated five ways that direct involvement could be shown, including where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." 58 F.3d 865, 873 (2d Cir.1995). However, following *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), there has been uncertainty about how the *Colon* standard should be applied. *See Hollins v. City of New York,* No. 10–CV–1650(LGS), 2014 WL 836950 (S.D.N.Y. Mar. 3, 2014) (collecting cases); *Reynolds v. Barrett,* 685 F.3d 193, 206 (2d Cir.2012) (noting the uncertainty about the "continuing vitality" of *Colon* but declining to resolve it.) Because *Iqbal* stated that supervisors could not be held vicariously liable for discrimination by subordinates, some courts have interpreted it as limiting *Colon* to where a supervisory defendant has directly participated in the rights violation or actively created an unconstitutional policy. *See, e.g.*

*Bellamy v. Mount Vernon Hosp.,* No. 07–CV–1801(SAS), 2009 WL 1835939 at \*6 (S.D.N.Y. June 26, 2009) aff'd, 387 F. App'x 55 (2d Cir.2010). However, as Judge Baer noted in his opinion resolving Defendant's motion to dismiss, other judges have held that *Iqbal* restricts only those claims that require intent, such as discrimination or retaliation. *Houston,* 2013 WL 4457375 at \*11 (citing *Hodge v. Sidorowicz,* No. 10 Civ. 428(PAC), 2011 WL 6778524, at \*16 (S.D.N.Y. Dec. 20, 2011)).

Whatever the status of *Colon,* "[t]he law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983 ...," although a detailed response may be sufficient. *Watson v. Wright,* No. 08–CV–00960, 2013 WL 1791079 at \*8 (W.D.N.Y. Mar. 26, 2013), *adopted* No. 08–CV–960A, 2013 WL 1789578 (W.D.N.Y. Apr. 26, 2013) (quoting *Hidalgo v. Kikendall,* No. 08–CV–7536 (DC), 2009 WL 2176334, \*4 (S.D.N.Y.2009). Similarly, ignoring a prisoner's letter or complaint is insufficient to render an official personally liable. *Simmons v. Cripps,* No. 12–CV–1061(PAC)(DF), 2013 WL 1290268 at \*10 (S.D.N.Y. Feb. 15, 2013), *adopted* 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013).

Even assuming Houston's account of the grievances that he filed to be accurate, there is insufficient evidence to establish the personal involvement of the supervisory-defendants. Houston initially filed a grievance with Brown, IGRAC Supervisor for MDC, who responded that the issue was non-grievable. (SAC ¶ 35; Brown Decl. ¶ 16; Johnson Decl., Ex. G.) This response was a form letter in which Brown had placed an "X" to indicate that the complaint "[did] not fall under the purview of the IGRP," (*Id.*) and is far from the substantive response required to establish personal involvement. *See Rosario v. Fischer,* No. 11–CV–4617 (JPO)(FM), 2012 WL 4044901, \*5 (S.D.N.Y.2012), *adopted* 2012 WL 6681695 (S.D.N.Y.2012) ("a *pro forma* response to a letter or grievance" is insufficient.).

**\*15** Houston then claims to have filed an IGRC hearing request with Harris, Director for IGRC Hearings Program for NYC DOC, and appeal requests with Agro, the Warden for MDC, Halyard–Saunders, Assistant Commissioner for Programs Administration and Discharge Planning for NYC DOC, and Wolf, Director of the Board of Corrections for NYC DOC. (SAC ¶ 37). All claim that they never received any

2014 WL 6694468

such grievance, and none responded. (D's 56.1 ¶¶ 153, 155, 156, 158.) Even resolving this factual dispute in favor of Houston, receipt of a grievance does not constitute personal involvement. *Simmons,* 2013 WL 1290268 at *10. Otherwise, the exhaustion requirement would lead to supervisory liability becoming nearly automatic. *Id.* Finally, Houston wrote to Commissioner Schriro. Schriro's office has a record of the letter indicating that she reviewed it and forwarded it to a subordinate to investigate. (Gobin Decl. ¶¶ 3–10.) Such delegation is ordinary and appropriate, and is insufficient to constitute personal involvement. *Mateo v. Fischer,* 682 F.Supp.2d 423, 430 (S.D.N.Y.2010). Accordingly, Defendants' motion for summary judgment on Plaintiff's claims of supervisory liability is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims regarding dental care, destruction of property, inadequate footwear, and supervisory liability. The motion is DENIED with respect to Plaintiff's claims concerning strip searches and the denial of low-sodium halal meals.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6694468

Footnotes

1    Unless otherwise noted, docket numbers referenced herein are those assigned to documents in Case No. 11 Civ. 7374.

2    Defendants named in this claim are Brian Martin, Artemio Colon, Arthur Harris, Rose Agro, Winette Halyard–Saunders, and Richard Wolf.

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Falciglia v. Whalen, N.D.N.Y., March 22, 2010

2006 WL 721568
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard LIGHTHALL, Plaintiff,

v.

Dr. Krishna Kumar VADLAMUDI, Director
of Medical Services at Marcy Correctional
Facility, William Lape, Superintendent of
Marcy Correctional Facility, Barbara Schultz-
Inman, Corrections Counselor at Marcy
Correctional Facility, J.E. Rowlands, Senior
Alcohol and Substance Abuse Counselor at Marcy
Correctional Facility, and Lester Wright, Associate
Commissioner of Health Services, New York State
Department of Correctional Services, Defendants.

No. 9:04-CV-0721.
|
March 17, 2006.

**Attorneys and Law Firms**

Richard Lighthall, Marcy Correctional Facility, Marcy, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Bruce J. Boivin, Assistant Attorney General, The Capitol, Albany, New York, for Defendants.

Bruce J. Boivin, Assistant Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

MORDUE, Chief J.

**\*1** In his *pro se* amended complaint (Dkt. No. 10) in this action under 42 U.S.C. § 1983, plaintiff, an inmate of New York State Department of Correctional Services ("DOCS"), alleges violations of the Eighth Amendment, Due Process and Equal Protection under the Fourteenth Amendment, the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

Presently before the Court are the following motions: (1) plaintiff seeks a preliminary injunction to have the Defendants provide medical treatment, to receive reasonable accommodations for his attendance at the Alcohol and Substance Abuse Training program ("ASAT"), and to enjoin the Defendants from "withholding good time credits and parole eligibility" (Dkt. No. 11); (2) defendant Dr. Krishna Kumar Vadlamudi moves for summary judgment on certain of plaintiff's claims (Dkt. No. 27); and (3) the remaining defendants, joined by Dr. Vadlamudi, move to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 42).

The motions were referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate Judge Treece has submitted a Report and Recommendation (Dkt. No. 51) which recommends that the motion for a preliminary injunction be denied, the motion for summary judgment be granted, the motion to dismiss be granted, and the amended complaint be dismissed in its entirety.

Plaintiff has submitted objections to the Report and Recommendation (Dkt. No. 53). Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of those parts of a magistrate judge's Report and Recommendation to which a party specifically objects. Failure to object to any portion of a Report and Recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993). Defendants have no objection to the Report and Recommendation (Dkt. No. 54).

Upon *de novo* review, the Court determines that the Report and Recommendation of Magistrate Judge Treece is correct in all respects. It is therefore

ORDERED that plaintiff's motion for a preliminary injunction (Dkt. No. 11) is denied; and it is further

ORDERED that the motion for summary judgment by defendant Dr. Krishna Kumar Vadlamudi (Dkt. No. 27) is granted; and it is further

ORDERED that the defendants' motion to dismiss (Dkt. No. 42) is granted; and it is further

ORDERED that the amended complaint (Dkt. No. 10) is dismissed in its entirety.

IT IS SO ORDERED.

*REPORT RECOMMENDATION and ORDER*

TREECE, Magistrate J.

*Pro se* Plaintiff Richard Lighthall brings causes of action pursuant to 42 U.S.C. § 1983 alleging violations of the Eighth Amendment, Due Process and Equal Protection under the Fourteenth Amendment, 42 U.S.C. § 1985, the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.,* and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Dkt. No. 10, Am. Compl. at ¶¶ 79, 80, 83-86, 89-90, 92-93, 95-96, 99-100, 102, 104-07, & 109-110. Plaintiff also seeks a Preliminary Injunction to have the Defendants provide medical treatment, to receive reasonable accommodations for his attendance at the Alcohol and Substance Abuse Training program ("ASAT"), and to enjoin the Defendants from "withholding good time credits and parole eligibility." Dkt. No. 11, Prelim. Inj. Mot., Mem. of Law at pp. 7 & 16. Dr. Krishna Kumar Vadlamudi, Director of Medical Services at Marcy Correctional Facility, opposes the Preliminary Injunction and brings this Cross-Motion for Summary Judgment on Plaintiff's Eighth Amendment claims, Conspiracy claims, and ADA claims. Dkt. Nos. 27-30. Rather than joining Dr. Vadlamudi in filing a Motion for Summary Judgment, William Lape, Superintendent of Marcy Correctional Facility ("Superintendent"), Barbara Schultz-Inman, Corrections Counselor at Marcy Correctional Facility ("Corrections Counselor"), J.E. Rowlands, Senior Alcohol and Substance Abuse Counselor ("Senior ASA Counselor") at Marcy Correctional Facility, and Lester Wright, Associate Commissioner of Health Services ("Associate Commissioner") bring a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6) and Dr. Vadlamudi joins in Defendants' Motion to Dismiss as to all other claims. Dkt. No. 42. For the reasons to follow, it is hereby recommended that the Motion for a Preliminary Injunction be denied, the Motion for Summary Judgment be granted, the Motion to Dismiss be granted, and the Amended Complaint be dismissed in its entirety.

I. FACTS

A. Motion to Dismiss

**\*2** The following allegations contained in Lighthall's Amended Complaint are construed as true as required by the motion to dismiss standard. [1] Prior to Lighthall's imprisonment, Plaintiff suffered multiple injuries after falling from the roof of his home, including a back injury for which he had surgery. Am. Compl. at ¶ 16. In addition to his injuries, Plaintiff had two strokes which caused some paralysis on his left side as well as coordination and speech problems. *Id.* at ¶ 17. Plaintiff's doctor also stated that he suffers from fatigue and sleep apnea. *Id.* at ¶ 21; Ex. A, Timothy A. Mathis, M.D., Lt., dated July 30, 2002.

A few days after his transfer to Marcy Correctional Facility ("Marcy") in early 2003, [2] Plaintiff was seen by Dr. Vadlamudi, the Director of Medical Services at the facility. *Id.* at ¶ 30. Plaintiff told Dr. Vadlamudi of his medical conditions, including the need for vitamin B-12 shots, his paralysis, his trouble sitting for long periods of time, his trouble going to the bathroom, his back pain, along with the possible need for an operation on his back. *Id.* at ¶¶ 30 & 31; Mathis, M.D., Lt.

Soon after the transfer, Plaintiff was also placed into ASAT. *Id.* at ¶ 32. Plaintiff states that the location of ASAT was not set up for the "medically disabled." *Id.* Nevertheless, Plaintiff participated in ASAT until his hospitalization, [3] during which Plaintiff was told he suffered from an enlarged heart and that he would need a catheterization. *Id.* at ¶¶ 33 & 34. One to two months later, Plaintiff was told he would need to see a specialist for the catheterization. As a result of Plaintiff's medical conditions, Dr. Vadlamudi removed Plaintiff from ASAT. *Id.* at ¶ 37.

In March 2003, Plaintiff had requested vitamin B-12 shots from Dr. Vadlamudi. *Id.* at ¶ 39. Plaintiff also complained of "swelling of his left testicle," burning in his legs, and back pain. *Id.* at ¶¶ 40 & 41. Because of these complaints, Plaintiff requested to see a specialist and Dr. Vadlamudi prescribed antibiotics. *Id.* at ¶ 41. In July 2003, Dr. Vadlamudi placed a referral for Plaintiff to be examined by a gastroenterology specialist due to rectal pain and the

enlarged testicle. *Id.* at ¶ 42; Ex. D, Patient Referral Form & Req. and Report of Consultation.

On September 14, 2003, Plaintiff made a formal request for "reasonable accommodations" for participation in ASAT due to his disabilities. *Id.* at ¶ 43; Ex. E, Req. for Reasonable Accommodations. This request was denied by Dr. Vadlamudi and the Deputy Superintendent of Administration affirmed the denial. *Id.* at ¶¶ 45 & 46; Req. for Reasonable Accommodations. Plaintiff filed a grievance complaint, which was denied by Superintendent Lape on December 23, 2003.[4] *Id.* at ¶¶ 47 & 48; Ex. F, Inmate Grievance Compl. Plaintiff appealed to the Central Office Review Committee ("CORC"), and the determination was affirmed based on Associate Commissioner Wright's recommendation. *Id.* at ¶ 48; Ex. G, Inmate Grievance Report of the Superintendent & CORC.

**\*3** On September 25, 2003, Plaintiff was sent to the hospital where he received a colonoscopy for his rectal pain and problems with constipation and diarrhea.[5] *Id.* at ¶ 50; Ex. H, Patient Referral Form & Operative/Procedure Report. The doctor at the hospital recommended a neurological consult for Plaintiff's prior back surgery and a urological consult, which Plaintiff states were never ordered by Dr. Vadlamudi. *Id.* at ¶¶ 50 & 51.

On October 20, 2003, Corrections Counselor Schultz-Inman stated to Lighthall that he had been cleared to rejoin ASAT by the authorization of Dr. Vadlamudi. *Id.* at ¶ 55; Exs. I, Schultz-Inman Lt. to Lighthall, dated Oct. 20, 2003, & J, Schultz-Inman Lt. to Dr. Vadlamudi, dated Oct. 14, 2003. However, that same month, Plaintiff was denied "eligibility for Merit Time and Presumptive Release" for failing to complete ASAT. *Id.* at ¶ 57; Ex. K, Merit Time Determination Notice & Presumptive Release Determination. On November 11, 2003, Plaintiff wrote a letter to Senior ASA Counselor Rowlands requesting that he be allowed to participate in ASAT, which Plaintiff states went unanswered. *Id.* at ¶ 58; Ex. L, Lighthall Lt. to Rowlands, dated Nov. 10, 2003.

In January 2004, Plaintiff was taken to Rome Memorial Hospital in regards to the enlarged testicle. *Id.* at ¶ 59; Ex. M, Rome Memorial Hosp. Notes & Lab Result. After determining there were two small cysts on the right testicle and one large cyst on the left testicle, an operation was performed to drain the cysts. *Id.;* Rome Memorial Hosp.

Notes & Lab Result. Plaintiff then returned to Marcy and was told by Dr. Vadlamudi that "surgery [was not] necessary [for the enlarged testicle]" and that "the only medication" to be dispensed to him would be Motrin. *Id.* at ¶ 60.

On February 23, 2004,[6] Plaintiff met with Corrections Counselor Schultz-Inman to discuss his participation in ASAT. *Id.* At that time Plaintiff was told that his failure to sign up for ASAT would constitute a refusal and that if it was determined that Plaintiff did not write a letter to Senior ASA Counselor Rowlands requesting participation in ASAT then that would also be marked as a refusal. *Id.* at ¶ 61; *see* Ex. N, Inmate Assessment & Case Management Info. In March 2004, Plaintiff received a copy of Corrections Counselor Schultz-Inman's report stating that Plaintiff had refused to participate in ASAT. *Id.* at ¶¶ 62 & 63. As a result, Plaintiff filed another grievance. *Id.* at ¶ 63; Ex. O, Inmate Grievance Compl., dated Mar. 17, 2004. On April 5, 2004, after a hearing, the Inmate Grievance Resolution Committee ("IGRC") found Plaintiff wanted to participate and that Plaintiff should challenge the records supplied for the hearing.[7] *Id.* at ¶ 66; Ex. Q, IGRC Report. Plaintiff appealed the decision to Superintendent Lape who affirmed the IGRC decision, which Plaintiff also appealed. *Id.* at ¶ 67; Ex. R, Superintendent Grievance Report, dated Apr. 13, 2004 & Appeal. The appeal to the CORC was also denied. *Id.* at ¶ 68; Ex. S, CORC Grievance Report, dated June 2, 2004. In June 2004, Plaintiff then wrote to Senior Counselor Mulvihill asking to have his name placed on the ASAT waiting list but was told that Senior ASA Counselor Rowlands stated Plaintiff had not reapplied to join ASAT. *Id.* at ¶¶ 69 & 70; Ex. T, Lighthall Lt. to Mulvihill, dated June 24, 2004.

**\*4** On June 28, 2004, Plaintiff had X-rays taken for his back problems. *Id.* at ¶ 71; Ex. V, Victor Regenbogen, M.D., Lt. about MRI. In August 2004, Plaintiff was suspended from "all programs, recreation and work" due to his medical conditions which remained in effect until February 2, 2005. *Id.* at ¶ 72; Ex. W, Inmate Medical Excuse.

B. Motion for Summary Judgment

Pursuant to the summary judgment standard,[8] the following additional facts present no genuine issues of material fact.[9] Upon Plaintiff's transfer to Marcy on January 29, 2003, Plaintiff was seen by Dr. Vadlamudi but no reference was made in the health records as to Plaintiff's need for B-12 injections until Plaintiff requested B-12 injections on February 12, 2003, to someone other than Dr. Vadlamudi. Dkt. No. 30, Dr. Krishna Kumar Vadlamudi Aff., Ex. A at pp. 84-86.[10] Plaintiff was examined by Dr. Vadlamudi on March 4, 2003, whereby Plaintiff made reference to his B-12 vitamin level. *Id.* at p. 82. Plaintiff's B-12 level was subsequently tested on March 11, 2003, and the results, which were returned on March 13, 2003, indicated that the level was within the normal range. Dkt. No. 28, Dr. Krishna Kumar Vadlamudi's Stat. of Material Facts at ¶ 2; Dr. Vadlamudi Aff., Ex. A at p. 107. Despite one hundred and fourteen (114) Ambulatory Health Records entries dealing with Plaintiff's numerous complaints since March 13, 2003, it was not until October 26, 2004, that the health records showed that the B-12 issue was raised and addressed once again. *See* Dr. Vadlamudi Aff ., Ex. A at pp. 17-80. In November 2004, around the time Plaintiff received his catheterization, Plaintiff was retested for his vitamin B-12 level. Dr. Vadlamudi's Stat. of Material Facts at ¶¶ 3 & 4; Dr. Vadlamudi Aff., Ex. A at pp. 277-78; Dkt. No. 33, Pl.'s Stat. of Material Facts at ¶ 7. When it was found that his level fell slightly below the normal range, on November 11, 2004, Dr. Vadlamudi began giving Plaintiff vitamin B-12 injections, which he prescribed to be given to Plaintiff for six months. Dr. Vadlamudi's Stat. of Material Facts at ¶¶ 3 & 4; Dr. Vadlamudi Aff., Ex. A at p. 277-78; Pl.'s Stat. of Material Facts at ¶ 7.

Prior to Plaintiff's complaints made to Dr. Vadlamudi involving any rectal pain, testing had been conducted on February 18, 2003, regarding some complaints by Plaintiff to the medical staff on rectal problems, where it was found that cultures were negative. Dr. Vadlamudi Aff., Ex. A at p. 108. On March 14, 2003, Plaintiff made his first complaint about rectal pain. *Id.* at p. 80. After several more complaints were made, Plaintiff was again tested on May 9, 2003, where the culture came back negative. *Id.* at pp. 72-80 & 106. After two more complaints on May 11th and 14th, another test was performed on May 20th with the same result as previous tests. *Id.* at pp. 104-105.

On June 19, 2003, Dr. Vadlamudi requested that Plaintiff receive a colonoscopy, which was scheduled for and performed on September 25, 2003. *Id.* at pp. 169 & 171. On October 10, 2003, the surgeon who performed the procedure recommended Plaintiff receive a neurological consult for his 1998 back surgery, a urological consult for his prostate and bladder dysfunction, and Flomax twice a day. *Id.* at pp. 169-70 & 171-72. On September 30, 2003, a urological consult was ordered and the consultation occurred on December 12, 2003, where it was found that Plaintiff had an enlarged testicle and that medications should be prescribed along with a follow up visit in two months. Pl.'s Stat. of Material Facts at ¶¶ 21, 22, & 23; Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Dr. Vadlamudi Aff., Ex. A at pp. 51, 157, & 168. Follow up tests were conducted and another appointment was scheduled for February 13, 2004. Pl.'s Stat. of Material Facts at ¶¶ 27, 28, 30, & 31; Dr. Vadlamudi Aff, Ex. A at pp. 51, 100-01, 120, 140, & 156.

**\*5** However, on January 23, 2004, an ultrasound was performed where it was discovered that Plaintiff had cysts on his testicles, for which medication was prescribed. Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Pl.'s Stat. of Material Facts at ¶¶ 24, 25, & 26; Dr. Vadlamudi Aff., Ex. A at pp. 46 & 121-23. In February 2004, Plaintiff was again seen by the urologist who prescribed antibiotics and recommended monitoring Lighthall's condition with a notation that surgery could be necessary to drain the cysts. Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Pl.'s Stat. of Material Facts at ¶ 27; Dr. Vadlamudi Aff, Ex. A at p. 140. Plaintiff was also seen by the urologist in May, July, and November of 2004 and although Plaintiff returned to the urological specialist several times and medication was prescribed each time, the urologist had not, as of December 1, 2004, recommended surgery for his testicle problem. Pl.'s Stat. of Material Facts at ¶¶ 28, 29, 30, & 31; Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Dr. Vadlamudi Aff. at pp. 97, 98-99, 161, 162, & 282. During the period of Plaintiff's complaints from March 2003 till October 2004 about his testicular pain, Plaintiff not only received consultations but was also prescribed many medications in an attempt to alleviate his pain. Dr. Vadlamudi Aff., Ex. A at pp. 25, 27, 42, 44, 45, 50, 57, 58, 73, & 74.

When Plaintiff was examined upon his entry into Marcy, it was noted that Plaintiff had a heart condition for which he received medications. Dr. Vadlamudi Aff., Ex.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

At p. 86. On March 3, 4, and 18, 2003, Plaintiff complained about chest pains. *Id.* at pp. 77 & 82-83. At those times and because of the complaints, Lighthall was prescribed medication and was told to come back to see Dr. Vadlamudi if he had pains again. *Id.* However, during the March 4th examination, Plaintiff noted he did not have any chest pains at that time but that he had actually felt chest pains the previous night. *Id.* at p. 82. On March 23, 2003, Plaintiff complained of chest pains and was taken to St. Luke's Hospital. Pl.'s Stat. of Material Facts at ¶ 40; Dr. Vadlamudi Aff., Ex. A at p. 76. Several tests were performed and it was determined that Plaintiff had an enlarged heart with blockage and that he would need a catheterization. Pl.'s Stat. of Material Facts at ¶ 41. After Lighthall returned from the hospital, Plaintiff made several complaints regarding some pain, but no direct reference to chest pain was made again until December 9, 2003. Pl.'s Stat. of Material Facts at ¶ 42; Dr. Vadlamudi Aff., Ex. A at pp. 19-51, 52, & 53-76.

On June 23, 2003, Plaintiff was seen by a cardiologist who recommended several medications and that Plaintiff stop smoking. Dr. Vadlamudi Aff., Ex. A at pp. 64 & 180. On December 1, 2003, Plaintiff was again seen by a heart specialist who recommended certain medications and a catheterization. Dr. Vadlamudi Aff., Ex. A at p. 166; Pl.'s Stat. of Material Facts at ¶ 44. On December 18, 2003, Plaintiff refused to have the catheterization performed until he was seen by the heart specialist. Pl.'s Stat. of Material Facts at ¶ 45; Dr. Vadlamudi Aff., Ex. A at p. 165. Besides having chest pain, Plaintiff also complained of rectal and back pain. On October 25, 2004, in conjunction with the possibility of surgery on his back, cardiology clearance was needed and it was at this time when Plaintiff was willing to have the catheterization performed. Dr. Vadlamudi Aff., Ex. A at p. 264. On October 26, 2004, a request was made to schedule catheterization. *Id.* at pp. 17 & 263. On November 10, 2004, Plaintiff received a consultation with the heart specialist who performed a catheterization. Pl.'s Stat. of Material Facts at ¶ 47; Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; Dr. Vadlamudi Aff., Ex. A at pp. 280-281. Prior to the catheterization, Plaintiff has been treated for his heart ailments by receiving blood pressure and cholesterol medications, stress tests, and referrals to a cardiologist. Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; *see generally* Dr. Vadlamudi Aff., Ex. A at pp. 17-282. Since the catheterization, the cardiologist recommended

Plaintiff take certain medications and follow up with Dr. Vadlamudi. Dr. Vadlamudi Aff., Ex. A at p. 280.

**\*6** With regard to Plaintiff's back pain, on April 22, 2003, Plaintiff was prescribed medication and a recommendation was made for an X-ray. Dr. Vadlamudi Aff., Ex. A at p. 73. On April 24, 2003, it was determined that he had some mild back problems. *Id.* at p. 126. Plaintiff then made specific complaints about his back pain on September 30, 2003, November 25, 2003, March 12 and 22, 2004, May 1, 2004, and then again on June 3, 2004. Dr. Vadlamudi Aff., Ex. A at pp. 38, 41, 42, 43, 44, 53, & 59. During this period, Plaintiff received numerous medications for the back pain. *Id.* On June 8, 2004, Dr. Vadlamudi requested an MRI for Lighthall, which was conducted on June 28, 2004. *Id.* at p. 158. The MRI revealed "bulging of discs at L5-S1, L4-5 and L3-4." Pl.'s Stat. of Material Facts at ¶ 56; Dr. Vadlamudi Aff., Ex. A at pp. 124-25. A neurosurgery consult was requested on July 7 and August 11, 2004, and was eventually scheduled on September 15, 2004. Dr. Vadlamudi Aff, Ex. A at pp. 159 & 269. The neurologist recommended a CT scan and referral to a cardiologist for clearance of the back surgery. *Id.* at pp. 269-72. On September 30, 2004, Dr. Vadlamudi requested a follow up visit and approval for the CT scan. *Id.* at p. 136. The CT scan was performed on October 1, 2004. *Id.* at pp. 118-19. After clearance was given by the cardiologist, Plaintiff was scheduled for surgery in March 2005. Dr. Vadlamudi's Stat. of Material Facts at ¶ 5.

As a facility physician, Dr. Vadlamudi notes that he has no role in deciding parole eligibility or the dispensation of good time credits, which Plaintiff admits. Dr. Vadlamudi's Stat. of Material Facts at ¶ 8; Pl.'s Stat. of Material Facts at ¶ 8. Moreover, Dr. Vadlamudi does not have the authority to "approve or disapprove requests for reasonable accommodations" as he can only provide medical recommendations regarding the requests.[11] Dr. Vadlamudi's Stat. of Material Facts at ¶ 9; Pl.'s Stat. of Material Facts at ¶ 63. However, Plaintiff sought many medical excuses to be excused from participation in ASAT. Dr Vadlamudi Aff., Ex. A at pp. 34, 36, 37, 59, & 76. Furthermore, Dr. Vadlamudi gave Plaintiff medical restrictions that would have allowed him to participate in ASAT.[12] Dr. Vadlamudi's Stat. of Material Facts at ¶ 10; Pl.'s Stat. of Material Facts at ¶ 71. Dr. Vadlamudi also notes that he never spoke to Associate Commissioner Wright about Plaintiff's medical condition. Dr. Vadlamudi's Stat. of Material Facts at ¶ 11.

2006 WL 721568

## II. DISCUSSION

### A. Motion to Dismiss Standard

Upon a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), a court may dismiss a complaint "only if 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Equal Employment Opportunity Comm'n v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) & citing *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 171 (2d Cir.1998)); *see also Green v. New York State Dep't of Corr. Serv. et al,* 2003 WL 22169779, at *1 (N.D.N.Y. Aug. 27, 2003). Furthermore, the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). Additionally, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ], the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green,* 2003 WL 22169779, at *1 (internal quotation marks and citations omitted) (alterations in original).

**\*7** Moreover, pleadings submitted by *pro se* litigants "should be 'construed liberally,' ' and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations.' " *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (internal citations omitted). A "dismissal on the pleadings is *never* warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Id.* at 128.

### B. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

## C. Eleventh Amendment

**\*8** Plaintiff brings suit against Defendants Vadlamudi, Lape, Schultz-Inman, Rowlands, and Wright in both their individual and official capacities. Am. Compl. at ¶¶ 3-7. Plaintiff seeks a declaratory judgment, injunctive relief, as well as compensatory and punitive damages against these individuals in their individual and official capacities. *Id.* at § VII(a), (b), (d), & (e).

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the " 'real, substantial party in interest .' " *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Lighthall may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for declaratory and injunctive relief in both their individual and official capacities because " 'official-capacity actions for prospective relief are not treated as actions against the State." ' *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989)).

## D. Eighth Amendment Cruel and Unusual Punishment Claim

Lighthall claims that Dr. Vadlamudi violated his Eighth Amendment rights by acting with deliberate indifference to his medical needs when Dr. Vadlamudi did not

adequately treat Plaintiff's conditions, delayed treatment, failed to follow another doctor's recommendations, and provided medications that were ineffective. Am. Compl. at ¶¶ 83, 92, & 93. Plaintiff states that Dr. Vadlamudi declined to take additional measures to "improve his deteriorating serious medical conditions." *Id.* at ¶ 93. Additionally, Plaintiff claims that Associate Commissioner Wright was deliberately indifferent by failing to "train and supervise health services employees under his authority." *Id.* at ¶¶ 79 & 80. Plaintiff also states that Associate Commissioner Wright implemented policies that allowed for denial of Plaintiff's grievances, thus aiding in Dr. Vadlamudi's Eighth Amendment violations. *Id.* at ¶ 86. Plaintiff further alleges that Superintendent Lape was deliberately indifferent to his medical needs when Lape affirmed Dr. Vadlamudi's determination and the denial of Plaintiff's grievances. *Id.* at ¶ 84 & 102.

**\*9** The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which " 'involve[s] the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element " 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825 (1994)).

This deliberate indifference must be in regards to the "prisoner's serious illness or injury[.]" *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Additionally, " '[b]ecause society does not expect that prisoners will have unqualified access to health care,' a prisoner must first make this threshold

Case 9:15-cv-00777-GLS-DEP   Document 105   Filed 03/12/19   Page 149 of 210
Lighthall v. Vadlamudi, Not Reported in F.Supp.2d (2006)
2006 WL 721568

showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith,* 316 F.3d at 184 (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)) (further citation omitted). Some factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

The prisoner has to show "more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference "when [they] 'know [ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. at 837). The Eighth Amendment deals with "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith,* 316 F.3d at 186 (citations omitted). Moreover, the "severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187 (citation omitted).

**\*10** A prisoner's disagreement with the form of treatment proscribed by medical personnel will not necessary implicate the Eighth Amendment. *Ifill v. Goord,* 2004 WL 1663994, at \*3 (W.D.N.Y. Apr. 8, 2004) (citation omitted). Furthermore,

> disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment. Thus, disagreements over medications, diagnostic techniques (e.g., the need

for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

*Id.* (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)).

Notably, when a prisoner, in essence, claims medical malpractice,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omission sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Estelle,* 429 U.S. at 106 & n. 14).

If the malpractice involved "culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of harm," ' then it may constitute deliberate indifference. *Id.* (quoting *Farmer,* 511 U.S. at 839). Additionally, "[p]rison officials and medical personnel have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Ifill v. Goord,* 2004 WL 1663994, at \*3 (internal quotation marks and citation omitted).

Because every doctor does not treat an illness in the same way, the mere difference in treatment by a defendant physician does not amount to culpability. *McKenna v. Wright,* 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) (citing *Douglas v. Stanwick,* 93 F.Supp.2d 320, 325 (N.D.N.Y.2000)). There will be no Eighth Amendment claim then " 'when a *doctor* disagrees with the professional judgment of another doctor." ' *Id.* (quoting *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) (emphasis in original)); *see also Webb v. Jackson,* 1994 WL 86390, at *3 (S.D.N.Y.), *aff'd* 47 F.3d 1158 (2d Cir.1995) (stating that "mere differences in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment pursuant to section 1983" (citation omitted)).

Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment. The "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm." ' *Thomas v. Nassau County Corr. Ctr.,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (quoting *Chance,* 143 F.3d at 703). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years." *Freeman v. Stack,* 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000) (internal quotation marks omitted).

**\*11** Moreover, if a plaintiff seeks to bring a § 1983 action for supervisory liability, there needs to be a showing of personal involvement by the supervisor. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Id.* at 144-45 (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)) (alterations in original). However, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation

> of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)) (further citations omitted).

In this case, it must first be determined whether Lighthall's illnesses and injuries are serious. It has been well documented that Lighthall at least suffered from back, chest, and testicular pain as well as conditions resulting from his stroke. *See* Am. Compl. at ¶¶ 16, 17, 30, 33, 42, 50, 59, & 71; *see also* Dr. Vadlamudi's Aff., Ex. A at pp. 1-282. None of the Defendants dispute whether Lighthall's illnesses or injuries were serious. Dkt. No. 29, Dr. Vadlamudi's Mem. of Law in Opp'n to Prelim. Inj. and for Mot. for Summ. J. at pp. 13-18; Dkt. No. 42, Mot. to Dismiss, Mem. of Law at pp. 15-16. In fact, Defendants fail to address the issue of serious illness or injuries. [13] Dr. Vadlamudi's Mem. of Law in Opp'n to Prelim. Inj. and for Mot. for Summ. J. at pp. 13-18. Therefore, it will be assumed that Lighthall can withstand the first prong of the analysis.

Next, Lighthall must show deliberate indifference on the part of Dr. Vadlamudi. Plaintiff must show that Dr. Vadlamudi disregarded excessive risk to his health or safety. Lighthall must also show that Dr. Vadlamudi committed something more than mere negligence. Here, Plaintiff claims that Dr. Vadlamudi failed to treat his illnesses and injuries by "disregarding" the recommendations of other doctors and specialists. Am. Compl. at ¶ 92. Lighthall also claims that despite receiving medications and treatment from Dr. Vadlamudi, they were ineffective and Dr. Vadlamudi did nothing further to alleviate his pain. *Id.* at ¶ 93.

Here, there were over a hundred Ambulatory Health Records entries dealing with Lighthall's medical complaints and the treatment provided or course of action to be taken. *See* Dkt. No. 33, Pl.'s Aff., Ex. at pp. A1

& A47; *see generally* Dr. Vadlamudi's Aff., Ex. A at pp. 17-282. Plaintiff also had several lab analyses performed for his various conditions. *See generally* Dr. Vadlamudi's Aff., Ex. A at pp. 1-282. In addition, there were numerous requests and reports for consultations provided by Dr. Vadlamudi. Pl.'s Aff., Ex. at pp. A16, A19, A20-21, A24, & A26-27; Dr. Vadlamudi's Aff., Ex. A at pp. 26-28, 32, 52-53, 61, 74, 118, 121-24, 128-31, 133, 136-41, 145-51, 153-59, 161-62, 166-68, 171-73, 177-80, 182-83, 185-90, 192, 197, 199-200, 237, 262-65, 267-69, & 274-76. Plaintiff also received several hospital stays and emergency room visits for his ailments including chest and testicular pain. Pl .'s Aff., Ex. at p. A15; Dr. Vadlamudi's Aff., Ex. A at pp. 90, 93, 195, & 203-06. Moreover, Plaintiff received medications and treatment, some pursuant to recommendations by other doctors. Pl.'s Aff., Ex. at pp. A22, A28, & A42-43; Dr. Vadlamudi's Aff., Ex. A at pp. 29, 39-40, 44-46, 50, 54, 58, 63-65, 68, 71, 73, 84, 88, 91, 169-70, 223, & 249.

**\*12** A thorough review of the record does not indicate that Dr. Vadlamudi provided a course of treatment that was different from any of those recommended by the specialists. *See generally* Dr. Vadlamudi Aff., Ex. A at pp. 17-282. When tests revealed that Plaintiff's B-12 level was low, Dr. Vadlamudi ordered six months of injections. Dr. Vadlamudi Aff., Ex. A at pp. 277-78. Plaintiff's testicular pain was dealt with in numerous ways including testing, prescribing medications, requesting further consultations and providing a colonoscopy and ultrasound. Dr. Vadlamudi Aff., Ex. A at pp. 46, 51, 72-80, 97, 98-99, 100-01, 104-105, 106, 108, 120, 121-23, 140, 156, 157, 161, 162-168, 169, 171-72, & 282; *see supra* Part I.B. When Plaintiff complained about his chest pain, Dr. Vadlamudi provided medications for the pain and sent Plaintiff to the hospital for tests. Dr. Vadlamudi Aff., Ex. A at pp. 76, 77, 82-83, & 86; *see supra* Part I.B. Plaintiff was then seen by a cardiologist several times; he received medications that were recommended, and a catheterization was performed once Plaintiff had consented. Dr. Vadlamudi Aff., Ex. A at pp. 64, 165, 166, 180, 264, 280-81; Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; *see supra* Part I.B. In regards to Plaintiff's back pain, he received medications, an X-ray, an MRI, and a CT scan along with neurological consults and surgery was slated for March 2005. Dr. Vadlamudi Aff., Ex. A at pp. 38, 41-44, 53, 59, 73, 118-19, 124-25, 126, 136, 158, 159, & 269-72; Dr. Vadlamudi's Stat. of Material Facts at ¶ 5; *see supra* Part I.B. The Court notes that

differing opinions in the form of treatment will not necessarily implicate the Eighth Amendment. *See Ifill, 2004 WL 1663994, at \*3; Webb, 1994 WL 86390, at \*3.* This includes disagreements over medications and forms of treatment. *See Ifill, 2004 WL 1663994, at \*3.* Here, only Plaintiff disagrees with the treatment he received. The specialists and Dr. Vadlamudi did not have differing opinions as to the course of treatment that should take place for Plaintiff. The ambulatory health records, reported extensively above, verifies that there was no disagreement between the medical professionals on how to treat and manage Plaintiff's multitude of medical infirmaries, and furthermore, clearly confirms that Dr. Vadlamudi followed the advice and directions provided by the medical consultants. *See supra* Parts I.A. & B. In any case, Dr. Vadlamudi would not be required to follow the recommendations of other doctors since doctors treat ailments differently. Plaintiff has not shown that Dr. Vadlamudi was deliberately indifferent to his medical needs and that Dr. Vadlamudi knew of and disregarded any risks to Plaintiff's health, his disagreement notwithstanding.

In addition, Plaintiff claims substantial delays in the treatment of his numerous ailments. However, delay in and of itself will not necessarily implicate the Eighth Amendment unless "it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas, 288 F.Supp.2d at 339* (citing *Chance, 143 F.3d at 703).* That is not the case here. Plaintiff's Ambulatory Health entries reflect, beginning in January 2003 and up till October 26, 2004, that there were over one hundred entries dealing with Plaintiff's chest, back, and testicular pain along with other ailments involving his stomach. Dr. Vadlamudi Aff., Ex. A at pp. 17-86. Presumably, the only ostensible delay was that of the B-12 vitamin injections. However, Plaintiff had been tested with results in the normal range in March 2003 and it was not until he was tested for his heart problems when it was revealed that the levels were only slightly below the normal range; injections were immediately ordered. There was no conscious disregard of risk to Plaintiff. In the mean time, Plaintiff was treated for all his other ailments. Some delays in receiving consultations naturally occurred since they had to be approved ostensibly by either the administration or consultant. Once approved, however, appointments and even follow-up visits were scheduled. *See supra* Part I.B. For example, a urological consult was ordered a few days after Plaintiff's colonoscopy and

Plaintiff received the consult about two months after the request was placed. Dr. Vadlamudi Aff., Ex. A at pp. 51, 157, & 168. There were no appreciable gaps in the treatment of Plaintiff and Plaintiff has failed to show that Dr. Vadlamudi evinced a conscious disregard of a substantial risk of serious harm. All of Plaintiff's arguments with regard to the Eighth Amendment could connote at best negligence on the part of Dr. Vadlamudi possibly amounting to medical malpractice, but it does not implicate the Eighth Amendment. Therefore, Plaintiff has failed to show that Dr. Vadlamudi violated his Eighth Amendment rights.

 **\*13** Additionally, Plaintiff asserts that Associate Commissioner Wright and Superintendent Lape were deliberately indifferent to his serious medical needs.

Lighthall has stated that Associate Commissioner Wright did not properly train and supervise his health employees. Am. Compl. at ¶ 79. Plaintiff also alleges that Wright implemented health policies that in turn aided in Dr. Vadlamudi's deliberate indifference. *Id.* at ¶ 86. Plaintiff does not allege that Wright had actual and direct participation in the constitutional violation in either case. Therefore, with regard to employee training and supervision, it must be shown that Wright was grossly negligent in the supervision of employees who committed a constitutional violation. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (citation omitted); *Hernandez v. Keane,* 341 F.3d at 145 (quoting *Colon v.. Coughlin,* 58 F.3d at 873); *see also Brock v. Wright,* 315 F.3d at 165. As to the health policies, Wright could be held liable if Lighthall could prove that "a jury could reasonable find that [Wright] 'created a policy or custom under which unconstitutional practices occurred or [that Wright] allowed the continuance of such a policy or custom." ' *Brock,* 315 F.3d at 165 (quoting *Colon,* 58 F.3d at 873).

Plaintiff has failed to plead facts that Wright was grossly negligent in any fashion in the training or supervision of his health employees who may have committed a constitutional violation. Furthermore, according to Lighthall, his sole complaint is that the health policy gives Dr. Vadlamudi "sole discretion as to what treatments Plaintiff would receive, regardless of the recommendations of specialists[.]" Am. Compl. at ¶ 86. This is akin to the argument of differing medical opinions as stated previously. *See supra* at pp. 18-19. As previously stated, no Eighth Amendment constitutional violation

was found to have occurred by Dr. Vadlamudi. Because Associate Commissioner Wright's Motion to Dismiss on this issue is derivative of Dr. Vadlamudi's Motion for Summary Judgment regarding violations of the Eighth Amendment, and since no unconstitutional practices occurred, no supervisory liability exists against Defendant Wright on any basis.

In regards to Superintendent Lape, Plaintiff states that the denial of his appeals which were affirmed by Lape and the failure to act upon the grievance constituted deliberate indifference in violation of Plaintiff's rights. Am. Compl. at ¶¶ 84 & 102. As noted above, Dr. Vadlamudi was not deliberately indifferent to Lighthall's medical needs in violation of the Eighth Amendment. Since no constitutional violation occurred and there was no wrong to remedy, no supervisory liability exists as to Defendant Lape.

For the reasons stated above, it is hereby recommended that the Motion for Summary Judgment be granted, and the Motion to Dismiss be granted on the issue of deliberate indifference to Lighthall's medical needs in violation of the Eighth Amendment.

### E. Fourteenth Amendment

 **\*14** Plaintiff alleges that Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands violated his due process rights by conspiring to deny Lighthall "the right to consideration for discretionary release from prison" when documents were forged and false information was placed in his file. Am. Compl. at ¶ 104. In addition, Plaintiff claims that Superintendent Lape denied his due process rights by depriving him of "Merit Time Eligibility" pursuant to N.Y. CORRECT. LAWW § 803 when Lape "affirm[ed] grievances" filed by Lighthall. *Id.* at ¶ 84. Furthermore, Plaintiff claims that Defendants Schultz-Inman and Rowlands violated his due process rights by conspiring to forge documents and give false information to deny Lighthall "Merit Time." *Id.* at ¶ 85. Plaintiff asserts this was done with the intent to deny him "Good Time Eligibility" and "discretionary release to Parole Supervision." *Id.* Plaintiff claims that his Due Process claim arises out of a protected liberty interest in "discretionary release consideration" and his

"disqualification" from ASAT due to his disabilities. *Id.* at ¶ 106.

The Due Process Clause of the Fourteenth Amendment states that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. It is well-established that a prisoner who has been lawfully incarcerated will only have "a narrow range of protected liberty interests." *Morris v. Dann,* 1996 WL 732559, at *3 (N.D.N.Y. Dec. 11, 1996). The Supreme Court has stated that "the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano,* 427 U.S. 215, 224 (1976); *see also Benjamin v. Fraser,* 264 F.3d 175, 189 (2d Cir.2001). Therefore, in order to succeed on a § 1983 claim based on the Fourteenth Amendment, the prisoner would have to prove "a deprivation of a liberty interest protected by the Due Process Clause itself, or a violation of a state-created liberty interest." *Morris,* 1996 WL 732559, at *3.

It is well-settled that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex,* 442 U.S. 1, 7 (1979); *see also Leevon v. Goord,* 2003 WL 22384787, at *7 (W.D.N.Y. Sept. 4, 2003). And, for a prisoner to survive a motion to dismiss on a Due Process claim, the prisoner must allege that: 1) "the State has granted inmates, by regulation or statute, a protected liberty interest with respect to the terms or conditions of confinement; and 2) the defendants' action creates an 'atypical and significant hardship' with regard to those terms or conditions of confinement." *Shariff v. Artuz,* 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) & quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

*15 Here, the state has not created a protected liberty interest in "Merit Time" or participation in a program that has implications on good time credit. The law states that the prisoner does not have the right to demand or require the state officials to provide "Merit Time." New York's Correction Law [hereinafter N.Y. CORRECT. LAWW] sets forth the standards for good behavior allowances against indeterminate and determinate sentences and states "[n]o person shall have the right to demand or

require the allowances authorized by this section. The decision of the commissioner of correctional services as to the granting, withholding, forfeiture, cancellation or restoration of such allowances shall be final and shall not be reviewable if made in accordance with law." [14] N.Y. CORRECT. LAW § 803(4). N.Y. CORRECT. LAW § 803(3) gives the Commissioner of Correctional Services the discretion to decide whether a prisoner is to receive "Merit Time." In addition, denial of participation in a program that could lead to a loss of good time credit is "speculative and 'fail[s] to allege interference with a protected liberty interest." ' *Shariff,* 2000 WL 1219381, at *6 n. 7 (quoting *Brooks v. DiFasi,* 1997 WL 436750, at *3 (W.D.N.Y. July 30, 1997)).

Even if Plaintiff's allegations that documents were forged and falsified were taken as true, as the standard of review for a motion to dismiss directs, Lighthall could not survive a motion to dismiss on his Fourteenth Amendment cause of action. Since there is no constitutional right to be conditionally released, Plaintiff must show that New York created a protected liberty interest in the terms of confinement and that the Defendants created an "atypical and significant hardship" as a result of the interest. *Shariff,* 2000 WL 1219381, at *6. Here, N.Y. CORRECT. LAWW § 803(4) is clear that the state did not create a protected liberty interest. Additionally, Plaintiff has failed to plead any atypical and significant hardship that was placed upon him with regard to his conditions of confinement. "Merit Time" and good time credits are not guaranteed to any prisoner. Therefore, Plaintiff has not stated a cause of action based on the Due Process Clause of the Fourteenth Amendment. [15]

In addition to Lighthall's first claim under the Fourteenth Amendment, Plaintiff alleges that Dr. Vadlamudi violated the Due Process Clause when he acted with deliberate indifference to Plaintiff's medical needs. Am. Compl. at ¶ 96. Plaintiff's cause of action for deliberate medical indifference through the Fourteenth Amendment is misplaced.

"[I]ncarcerated prisoners are protected from cruel and unusual punishment in the form of inadequate medical care by the Eighth Amendment, as applied to the state by the Fourteenth Amendment." *McKenna v. Wright,* 2002 WL 338375, at *9 (S.D.N.Y. Mar. 4, 2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 101-05 (1976)). A cause of action for deliberate indifference of medical care brought by a *pro se*

prisoner under the Fourteenth and Eighth Amendments will only be construed as a claim pursuant to the Eighth Amendment. *McKenna,* 2002 WL 338375, at *9. Therefore Lighthall's cause of action under the Due Process Clause of the Fourteenth Amendment against Dr. Vadlamudi is construed as an Eighth Amendment claim, a claim that was disposed of above. *See supra* Part II.D.

**\*16** In addition to the Due Process claims, Plaintiff claims that Dr. Vadlamudi violated his Equal Protection rights under the Fourteenth Amendment "by increasing the punishment" of the crime for which he was incarcerated when Dr. Vadlamudi "fail[ed] to treat his medical condition." Am. Compl. at ¶ 95. Furthermore, Plaintiff alleges that Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands violated his Equal Protection rights when they conspired to deny Lighthall any "consideration for discretionary release from prison" when documents were forged and false information was placed in his file. *Id.* at ¶ 104. Plaintiff states that the Equal Protection Clause applies because he is in a suspect class as being physically disabled, was discriminated against by not being able to complete ASAT, and was further discriminated against when records were falsified. *Id.* at ¶ 105.

The Equal Protection Clause of the Fourteenth Amendment states no "State [shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe,* 457 U.S. 202, 216 (1982) (citation omitted).

The Second Circuit has held that in order for a prisoner to state a violation of the Equal Protection Clause, the prisoner "must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). An Equal Protection claim may be brought "by a 'class of one' where a plaintiff alleges that [ ]he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362-63 (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). However, the plaintiff need not specifically identify "actual instances where others have been treated differently" in order for the equal protection claim to

be sufficient. *DeMuria v. Hawkes,* 328 F.3d 704, 707 (2d Cir.2003).

As to Plaintiff's claim against Dr. Vadlamudi, it seems as if Lighthall disguises another Eighth Amendment claim under the Equal Protection Clause. Plaintiff fails to state a cause of action under the Equal Protection Clause since he fails to allege that he was treated differently than other inmates who were similarly situated. *See generally* Am. Compl. Additionally, as Plaintiff claims with a marvelously creative theory that Dr. Vadlamudi increased his punishment by failing to treat his medical conditions, nowhere does Plaintiff state that his sentence was increased by any amount of time. *See generally id.*

In regards to Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands, construing that documents were falsified and forged, Plaintiff has failed to plead a cause of action. As noted above, Plaintiff does not claim that he was treated differently. Even though he does not have to state the disparity with specific or particular instances, it still must be pled, which Plaintiff has failed to do. Lighthall also has not shown that any dissimilar treatment was intentional or purposeful discrimination. Since Lighthall failed to plead the inescapable crux of the Equal Protection claim, it is unnecessary to determine whether any rational basis existed for a possible disparity in treatment.

**\*17** For the reasons stated above, it is hereby recommended the Motion for Summary Judgment and the Motion to Dismiss be granted as to the causes of action alleging violations of the Fourteenth Amendment Due Process and Equal Protection Clauses.

## F. Conspiracy Claims

Plaintiff asserts that Dr. Vadlamudi and Associate Commissioner Wright conspired by implementing policies and customs that "denied Plaintiff's grievances without investigating the facts" and the conspiracy also deprived Plaintiff of medical treatment. Am. Compl. at ¶¶ 99 & 100. Additionally, Plaintiff claims that Corrections Counselor Schultz-Inman and Senior ASA Counselor Rowlands conspired to deprive him of early release "by forging documents and relaying false information" to Superintendent Lape about Plaintiff's participation in ASAT. *Id.* at ¶ 89. Plaintiff also states that Superintendent

Lape furthered the conspiracy by affirming the denial of Plaintiff's grievance and "acting in concert with Defendant's [sic] Schultz-Inman and Rowlands." *Id.* at ¶ 90.

42 U.S.C. § 1985(3) states that if two or more people conspire to deprive a person of equal protection of the laws thereby injuring the person, then that party "may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." [16] To recover under this section, a plaintiff must be able to show 1) a conspiracy; 2) meant to deprive a person or persons of equal protection of the laws or privileges and immunities under the laws; 3) "an overt act in furtherance of the conspiracy; and 4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (citations omitted).

The conspiracy need not be shown by an "explicit agreement" between the parties, but can be established through "the parties hav[ing] a tacit understanding to carry out the prohibited conduct." *Id.* (internal quotation marks and citations omitted). If the allegations of a conspiracy to deprive a person of his constitutional rights are " 'conclusory, vague or general," 'then dismissal is proper. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (quoting *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993)); *see also Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003). However, the conspiracy does have to be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas,* 165 F.3d at 146 (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993)).

In this case, Plaintiff has failed to state a cause of action under § 1985. First of all, Plaintiff's assertions regarding Superintendent Lape are general and as such warrant dismissal. Plaintiff merely states that Lape affirmed grievances that had been denied. Am. Compl. at ¶ 90. Despite the general allegations as to Lape, Plaintiff has not pled that any of the conspiracies claimed to have occurred were motivated by some racial or class-based discriminatory animus. Even though no racial discrimination was alleged, Plaintiff noted, "Marcy Correctional Facility is designated as a Medical Facility [ ] because it is set up on flat ground for medically disabled inmates, has housing units designated as wheelchair

accessible and does not have stairs." *Id.* at ¶ 27 n. 3. In spite of Plaintiff's residence in a facility for the medically disabled, Plaintiff has also failed to allege that he was discriminated against based on medical disabilities.

**\*18** For the reasons stated above, it is hereby recommended that the Motion for Summary Judgment be granted, and the Motion to Dismiss be granted on the 42 U.S.C. § 1985 action.

### G. The ADA and Rehabilitation Act

Plaintiff states that Dr. Vadlamudi and Superintendent Lape violated the ADA and § 504 of the Rehabilitation Act by discriminating against him based on his disability in making a determination of whether he could "participate in therapeutic programming." Am. Compl. at ¶ 109. In addition, Plaintiff claims that Dr. Vadlamudi and Superintendent Lape discriminated against Lighthall in their refusal of Plaintiff's request for "reasonable accommodations so that he would be able to participate and complete his recommended therapeutic programs [.]" *Id.* at ¶ 110.

The Supreme Court has stated that Title II of the ADA applies to state prisons and inmates. *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210-12 (1998) (cited in *Singleton v. Perilli,* 2004 WL 74238, at \*4 (S.D.N.Y. Jan. 16, 2004)). Although suit may be brought against a prison, the Second Circuit has held "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. State Univ. of New York Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001).

42 U.S.C. § 12202 states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this [Act]." The Supreme Court has affirmed that this statute is "an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *Unites States v. Georgia et al.,* 546 U.S. 151, 126 S.Ct. 877, 879 (2006). Moreover, the Supreme Court has held that Title II of the ADA creates a private cause of action for damages for conduct that *actually* violates the Fourteenth Amendment as Title II validly abrogates the sovereign immunity of the states. *Unites States v. Georgia et al.,* 126 S.Ct. at 882; *see*

*also Tennessee v. Lane,* 541 U.S. 509, 518 & 520 (2004) (holding that "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment" if " 'congruence and proportionality [exists] between the injury to be prevented or remedied and the means adopted to that end.' " (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976) & quoting *City of Boerne v. Flores,* 521 U.S. 507, 520 (1997))).

The Second Circuit has stated that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by discriminatory animus or ill will due to the disability[.]" *Garcia,* 280 F.3d at 111-12. If a plaintiff were to sue individuals in their official capacities for money damages, the Second Circuit has held that it would in fact be a suit against New York and therefore the Eleventh Amendment would shield the individuals to the same extent as it would shield New York. *Garcia,* 280 F.3d at 107 (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) & *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985)). As the Supreme Court has abrogated sovereign immunity against the states under Title II, a plaintiff may bring a lawsuit against individuals in their official capacities. In addition to a lawsuit for money damages, a plaintiff may pursue prospective injunctive relief against a person in his or her official capacity. *Ex parte Young,* 209 U.S. 123, 155-56 (1908); *Cruz v. Gomez,* 202 F.3d at 595 n. 2.

**\*19** In order to state a claim under 42 U.S.C. § 12132, Title II of the ADA, prisoners must show:

> (1) they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

*Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003) (citation omitted).

Additionally, to establish a cause of action under § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), the prisoner must show:
(1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was "otherwise qualified" for the benefit that has been denied; (3) that he has been denied the benefits "solely by reason" of his disability; and (4) that the benefit is part of a "program or activity receiving Federal financial assistance."

*Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998) (quoting *Flight v. Gloeckler,* 68 F.3d 61, 63 (2d Cir.1995)).

Since Title II of the ADA and § 504 of the Rehabilitation Act are so closely related, "unless one of those subtle distinctions is pertinent to a particular case, [the Second Circuit will] treat claims under the two statutes identically." *Henrietta D.,* 331 F.3d at 272.

A disability under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2) (quoted in *Bragdon v. Abbott,* 524 U.S. 624, 630 (1998)). The consideration of subsection A requires a three step process set forth by the Supreme Court. First, it must be determined if a plaintiff's conditions constitute a physical impairment. *Bragdon,* 524 U.S. at 631. The Supreme Court, looking to the Department of Health, Education and Welfare regulations to interpret the Rehabilitation Act, defines a physical or mental impairment as:

> (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following bodily systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental

retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

45 C.F.R. § 84.3(j)(2)(i) (1997) (quoted in *Bragdon v. Abbott,* 524 U.S. at 632).

Second, upon determining whether a physical or mental impairment exists, an identification must be made as to the "life activity upon which [plaintiff] relies ... and determine whether it constitutes a major life activity under the ADA." *Id.* at 631. Major life activities include " 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " 45 C.F.R. § 84.3(j)(2)(ii) (1997) & 28 C.F.R. § 41.31(b)(2) (1997) (quoted in *Bragdon v. Abbott,* 524 U.S. at 638-39) (noting that the list is not exhaustive and that reproduction, the claimed activity, was a major life activity). The final step is to ascertain whether "the impairment substantially limited the major life activity." *Id.* at 631.

**\*20** Here, Plaintiff has alleged that there was discrimination based on his disability. Am. Compl. at ¶ 109. Therefore, Plaintiff may proceed with a suit for money damages against Dr. Vadlamudi and Superintendent Lape in their official capacities as well as for prospective relief in both their individual and official capacities.

Plaintiff must state a cause of action under Title II of the ADA and § 504 of the Rehabilitation Act. First, it must be determined if Lighthall is a "qualified individual" within the meaning of Title II. Although Lighthall does not state with any specificity which of his conditions constitute physical impairments, it could be concluded that his heart troubles along with testicular and back problems fall within the definition of physical impairments which include cardiovascular, genito-urinary, and musculoskeletal conditions. The second step concerning the major life activity becomes difficult to address since Plaintiff again fails to identify a major life activity upon which he relies. However, reviewing his Amended Complaint, Lighthall alleges that he has trouble speaking, walking, using the bathroom, and needs assistance in caring for himself. *See* Am. Compl. at ¶¶ 17, 18, 19, 23, & 31. These would constitute major

life activities. The last step, which Plaintiff also fails to address, is to determine whether the physical impairments substantially limit the major life activities asserted. It would be a logical conclusion that Plaintiff's physical impairments have substantially limited the life activities described in the Amended Complaint. Therefore, Plaintiff would be a "qualified individual."

Nevertheless, Plaintiff's claim for reasonable accommodations must fail. Pursuant to Title II of the ADA, "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(7). Therefore, the prison need only make reasonable modifications to policies to avoid discrimination on the basis of disability. However, since there is a lack of evidence to show discrimination, the prison would not be required to make the modifications.

Even though the prison would not have to make reasonable modifications, Plaintiff received reasonable accommodations. It must be noted, however, that Dr. Vadlamudi does not have the authority to approve or disapprove requests for reasonable accommodations and that he merely provides medical advice. Dr. Vadlamudi Aff. at ¶ 100. ASAT requires a participant to sit for an hour and a half "followed by a break," then another forty minute class is held. *Id.* at ¶ 105. In Plaintiff's September 14, 2004 request for reasonable accommodations to attend ASAT, he stated that he was "limited in his ability" to walk, stand, or sit for a long period of time and that he was requesting "that [he] not be held to the same physical standards and expectations as a person ... that had no medical problems or disabilities." Am. Compl., Ex. E. The request was denied stating that Lighthall could "receive a medical excuse for a specific medical need if medically warranted." *Id.* Lighthall, on several occasions, did indeed request medical excuses so that he would not have to participate in ASAT. Dr Vadlamudi Aff., Ex. A at pp. 34, 36, 37, 59, & 76. Notwithstanding, conditions were placed so that Lighthall could participate in the program. On August 18, 2004, Dr. Haidershah stated that Lighthall did not have to sit for more than two hours and that he could stand every ten to fifteen minutes. Dr. Vadlamudi Aff. at ¶ 106, Ex. A at p. 24. Then, on

August 30, 2004, Dr. Haidershah modified the conditions so that Lighthall could attend ASAT for up to three hours, while allowing Plaintiff to stand every ten to fifteen minutes. Pl.'s Stat. of Material Facts at ¶¶ 70 & 71; Dr. Vadlamudi Aff. at ¶ 107, Ex. A at p. 23. Plaintiff contests the discretion other officials would have on when and how he could stand. Pl.'s Stat. of Material Facts at ¶ 72. Despite Plaintiff's claim of discrimination, it would, in fact, seem as though Plaintiff's requests were granted. Contrary to his Amended Complaint, Plaintiff is receiving benefits that the normal inmate would not solely because of Plaintiff's disabilities and medical conditions.

**\*21**  Plaintiff has not made a showing that any potential violation was motivated by discriminatory animus or ill will due to his disability apart from his general allegations. As a result, Plaintiff is not entitled to money damages or prospective relief as no Title II nor § 504 violation has occurred.

Therefore, it is recommended that the Motion for Summary Judgment and the Motion to Dismiss be granted on this issue.

### H. Preliminary Injunction

Plaintiff seeks a preliminary injunction to obtain medical treatment for sleep apnea, his vitamin B-12 deficiency, his heart condition, and physical therapy for his stroke. Prelim. Inj. Mot., Mem. of Law at pp. 9-11. As a component to this relief, Lighthall also requests reasonable accommodations to attend ASAT. *Id.* at p. 11. Additionally, Plaintiff seeks a preliminary injunction to enjoin the Defendants from "withholding good time credits and parole eligibility" because of Plaintiff's failure to complete ASAT. *Id.* at p. 16.

Plaintiff's first ground for a preliminary injunction arises out of a deliberate indifference claim under the Eighth Amendment and a claim under the ADA for reasonable accommodations. Plaintiff's second ground for a preliminary injunction arises from the Due Process Clause of the Fourteenth Amendment. As stated above,

by virtue of his claims being dismissed, the preliminary injunction motion is now moot. *See supra* Parts II.D, II.E, & II.G.

For the reasons stated above, it is hereby recommended that the Motion for a Preliminary Injunction be denied.

### III. CONCLUSION

For the reasons stated herein, it is hereby

RECOMMENDED, that the Motion for a Preliminary Injunction (Dkt.11) be DENIED; and it is further

RECOMMENDED, that the Cross-Motion for Summary Judgment (Dkt. No. 27) be GRANTED; and it is further

RECOMMENDED, that the Motion to Dismiss (Dkt. No. 42) be GRANTED; and it is further

RECOMMENDED, that since all the claims have been disposed of by the above Recommendations, it is further recommended that the Amended Complaint be DISMISSED in its entirety (Dkt. No. 10); and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir.1989)*); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2006 WL 721568

---

Footnotes

1    *See infra* Part II.A.

2    Plaintiff states that shortly after sending a letter to Lester Wright in December 2002, he was transferred to Marcy Correctional Facility. Am. Compl. at ¶ 26; Ex. B, Lighthall Lt., dated Dec. 5, 2002.

3    Plaintiff was taken to St. Elisabeth's Hospital in Utica. *Id.* at ¶ 33; Ex. C, Ambulatory Health Record.

4    The grievance also challenged his medical treatments. *Id.* at ¶ 47.

5    The results of the colonoscopy were normal. *Id.* at ¶ 50; Ex. H, Patient Referral Form & Operative/Procedure Report.

6    The Amended Complaint reflects a date of February 23, 2003, but a careful examination of Plaintiff's timeline in the Amended Complaint and attached Exhibits would make it 2004, not 2003. *Id.* at ¶ 61; Ex. N, Inmate Assessment & Case Management Info.

7    Plaintiff states that Corrections Counselor Schultz-Inman "perjured" herself by submitting documents that said Senior ASA Counselor Rowlands had contacted "Medical" to determine whether Plaintiff could join ASAT, that Rowlands had answered Plaintiff's letter, and that Dr. Vadlamudi had cleared Plaintiff to participate in ASAT. *Id.* at ¶ 65; Ex. P, Marcy Mem.

8    *See infra* Part II.B.

9    *See* N.D.N.Y.L.R. 7.1(a)(3).

10   The exhibits include documents of records of medical consultations, diagnoses, treatments, ambulatory health records as well as related documents.

11   Furthermore, in regards to Plaintiff's grievance filed based on accommodations in September 2003, the reason for the denial was that Lighthall could "receive a medial excuse for a specific medical need if medically warranted." Pl.'s Aff., Ex. at p. A-31.

12   Plaintiff only argues that Dr. Vadlamudi did not specify the medical restrictions, not that Dr. Vadlamudi refused to allow Plaintiff to participate in ASAT. Pl.'s Stat. of Material Facts at ¶¶ 70 & 71.

13   The Court acknowledges that Plaintiff's heart and back problems from the record provided could be serious illnesses; furthermore, the cumulative effect of Plaintiff's illnesses and injuries, including the chest, back, and testicular pain would constitute serious conditions.

14   N.Y. CORRECT. LAWW § 803 states in pertinent part:

     1. (a) Every person confined in an institution of the department or a facility in the department of mental hygiene serving an indeterminate or determinate sentence of imprisonment, except a person serving a sentence with a maximum term of life imprisonment, may receive time allowance against the term or maximum term of his sentence imposed by the court. Such allowances may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and may be withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned.

     (d)(i) Except as provided in subparagraph (ii) of this paragraph, every person under the custody of the department or confined in a facility in the department of mental hygiene serving an indeterminate sentence of imprisonment with a minimum period of one year or more or a determinate sentence of imprisonment of one year or more imposed pursuant to section 70.70 or 70.71 of the penal law, may earn a merit time allowance.

     3. The commissioner of correctional services shall promulgate rules and regulations for the granting, withholding, forfeiture, cancellation and restoration of allowances authorized by this section in accordance with the criteria herein specified. Such rules and regulations shall include provisions designating the person or committee in each correctional institution delegated to make discretionary determinations with respect to the allowances, the books and records to be kept, and a procedure for review of the institutional determinations by the commissioner.

15   Defendants Lape, Schultz-Inman, Rowlands and Wright also allege that Plaintiff failed to commence an Article 78 proceeding regarding his Due Process claims. Mot. to Dismiss, Mem. of Law at pp. 12 & 14. However, as there were no Due Process violations, this issue is moot. Nonetheless, the Prisoner Reform Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) states that administrative remedies must be exhausted when an inmate brings suit about prison life. *Porter v. Nussle,* 534 U.S. 516, 532 (2002). According to the New York State Department of Corrections, a three-step process to exhaust all administrative remedies is available to inmates. *See generally* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 701.7(a)(1), (3)-(5), (b), & (c). Here, Plaintiff administratively exhausted his remedies. Am. Compl. at ¶¶ 45-48, 62-63, & 66-68.

16   In its entirety, 42 U.S.C. § 1985(3) states:

     Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within

2006 WL 721568

such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Martin v. Oey, Not Reported in Fed. Supp. (2017)

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 161 of 210

2017 WL 6614680

2017 WL 6614680
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas MARTIN, Plaintiff,
v.
R. OEY, et al., Defendants.

9:16-cv-00717 (TJM/TWD)
|
Signed 11/27/2017
|
Filed 11/28/2017

**Attorneys and Law Firms**

NICHOLAS MARTIN, 00-A-0008, Shawangunk
Correctional Facility, P.O. Box 700, Wallkill, NY 12589,
pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York, OF COUNSEL: SHANNAN
C. KRASNOKUTSKI, ESQ., Assistant Attorney
General, The Capitol, Albany, NY 12224, Counsel for
Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

*1 Plaintiff Nicholas Martin, an inmate in the custody
of the New York State Department of Corrections
and Supervision ("DOCCS"), commenced this action by
submitting a *pro se* civil rights complaint pursuant to 42
U.S.C. § 1983, together with an application to proceed
*in forma pauperis* ("IFP Application"). (Dkt. Nos. 1, 2.)
Construed liberally, Plaintiff alleged he was disciplined by
Defendants Oey, Venettozzi, and Annucci in violation of
his right to due process under the Fourteenth Amendment
to the United States Constitution. (Dkt. No. 1.) By
Decision and Order filed July 22, 2016, Plaintiff's IFP
Application was granted, but the initial complaint was
dismissed without prejudice and with leave to amend
pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for
failure to state a claim a claim on which relief may
be granted. (Dkt. No. 5.) Plaintiff's amended complaint

(Dkt. No. 8), which restated and clarified the Fourteenth
Amendment due process claim against Oey, Venettozzi,
and Annucci, survived the District Court's *sua sponte*
review. (Dkt. No. 11.)

On November 18, 2016, Defendants moved pursuant to
Federal Rule of Civil Procedure 12(b)(6) to dismiss the
amended complaint in its entirety for failure to state a
claim upon which relief may be granted. (Dkt. No. 17.)
Plaintiff opposed the motion. (Dkt. No. 19.) By Decision
and Ordered filed September 20, 2017, Plaintiff's amended
complaint was dismissed in its entirety without prejudice
and with leave to file a second amended complaint. (Dkt.
No. 31.)

Plaintiff's second amended complaint is before the
Court for initial review. (Dkt. No. 34.) Construed
liberally, Plaintiff restates the Fourteenth Amendment
due process claim against Oey, Venettozzi, and Annucci,
and raises Eighth Amendment claims against Defendants
Corrections Officer ("C.O.") Wyckoff, [1] C.O. Wentzel,
and Lieutenant Mitchell. *Id.*

For the reasons below, the Court recommends dismissal
of Plaintiff's Fourteenth Amendment due process claim
against Oey, Venettozzi, and Annucci with prejudice
because Plaintiff does not allege he was denied any of
the procedural protections to which he was entitled under
*Wolff v. McDonnell*, 418 U.S. 539 (1974). As to Plaintiff's
newly asserted claims against Wyckoff, Wentzel, and
Mitchell, mindful of the Second Circuit's instruction that
a *pro se* plaintiff's pleadings must be liberally construed,
*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191
(2d Cir. 2008), the Court recommends that Wyckoff be
directed to respond to Plaintiff's Eighth Amendment
excessive force claim but that all other claims be *sua
sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)
and 1915A.

**II. STANDARD OF REVIEW**

Even when a plaintiff meets the financial criteria for *in
forma pauperis*, 28 U.S.C. § 1915(e) directs that when a
person proceeds *in forma pauperis*, "the court shall dismiss
the case at any time if the court determines that ... the
action ... (i) is frivolous or malicious; (ii) fails to state
a claim on which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from
such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

2017 WL 6614680

**\*2** In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* (internal quotation marks and citation omitted). In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. SUMMARY OF THE SECOND AMENDED COMPLAINT

Plaintiff alleges numerous claims arising out of his confinement at Upstate Correctional Facility ("Upstate") and Clinton Correctional Facility ("Clinton"). (Dkt. No. 34.) Plaintiff was transferred to Upstate on January 23, 2015. *Id.* at ¶ 19. During his initial interview with a sergeant, Plaintiff requested that he not be placed in a double bunk because of a prior incident. *Id.* The sergeant agreed and Plaintiff was assigned to Housing Unit-B, C1-19T. *Id.*

Approximately thirty minutes later, Wyckoff walked to Plaintiff's cell, looked in, and yelled, "you are trying to kill yourself, huh? You are trying to commit suicide." *Id.* at ¶ 20. Wyckoff then "pulled the pin or activated the alarm on his radio." *Id.* at ¶ 21. A sergeant and several officers responded to the alarm. *Id.* Plaintiff was handcuffed and slammed into the sink. *Id.* Plaintiff was kicked and fell to the floor. *Id.* Wyckoff and the responding officers proceeded to kick, beat, and strike Plaintiff on his head, face, arms, legs, ankles, and back. *Id.* at ¶¶ 21, 41. Subsequently, the sergeant, who was standing by, yelled, "that is enough, get him the fuck up and the hell out of here." *Id.* at ¶ 21. Plaintiff was "pulled up from the floor by way of the handcuffs to his feet," and escorted to a medical holding cell. *Id.* at ¶ 22. At some point, Plaintiff lost consciousness and fell to the floor. *Id.*

After the incident, Plaintiff was transported to the infirmary. *Id.* at ¶ 22. Plaintiff fell off of the stretcher. *Id.* at ¶ 22. At the infirmary, the attending nurse "found nothing wrong" with Plaintiff. *Id.* at ¶ 24. Plaintiff was not physically examined and X-rays were not taken. *Id.*

**\*3** Thereafter, Plaintiff was escorted to an observation room in the Mental Health Unit ("MHU") for "one-on-one watch." *Id.* at ¶ 25. Plaintiff's clothes were removed and he was provided a smock and paper slippers. *Id.* On January 24, 2015, Plaintiff showed a nurse "the cuts and impression of the handcuffs on both wrists" and complained about his bruises and swollen limbs. *Id.* at ¶ 27. Although the nurse asked Plaintiff if he wanted Ibuprofen for his pain and A&D Ointment for his cuts, Plaintiff was not physically examined by anyone in the "Medical Department." *Id.*

On January 26, 2015, Plaintiff was interviewed by an [Office of Mental Health] physician or attending MHU staff. *Id.* at ¶ 28. Without any tests or examinations, it was determined that Plaintiff would remain in the MHU "to

Case 9:15-cv-00777-GLS-DEP   Document 105   Filed 03/12/19   Page 163 of 210

Martin v. Oey, Not Reported in Fed. Supp. (2017)

2017 WL 6614680

cover-up or hid (sic) the wounds and injuries that Plaintiff had sustained from the physical beating and mayhem." *Id.* The next day, Plaintiff was transferred to Clinton's MHU. *Id.* at ¶ 29. Plaintiff was provided a smock and paper slippers. *Id.*

Plaintiff's MHU cells consisted of a mat bolted to the floor, which was covered with a blanket. *Id.* The lights were extremely bright and hot, and on twenty-four hours a day. *Id.* His food at Clinton was never hot, mixed together, and served on a styroform tray without utensils. *Id.* Due to the conditions of the MHU cells at Upstate and Clinton, Plaintiff suffered from sleep deprivation. *Id.* at ¶ 26. Plaintiff remained in these "barbaric conditions" twenty-four hours a day until February 2, 2015, when Plaintiff was transferred back to Upstate. *Id.* at ¶ 31. Upon his arrival at Upstate, Plaintiff was interviewed, "cleared," and assigned to Housing Unit-B, C1-19T. *Id.*

On February 3, 2015, Wentzel personally served Plaintiff a "sham, false, and fictious (sic)" inmate misbehavior report relating to the January 23, 2015, incident that was authored by Wyckoff and reviewed by Mitchell. *Id.* The false misbehavior report charged Plaintiff with violating Rules 102.10 (threats) and 109.15 (refusing to double bunk). *Id.* at ¶¶ 32-34. Mitchell also "made the determination" that the false misbehavior report "should be adjudicated under the provision of 7 NYCRR Part 254 *et seq.*, as amended." *Id.* at ¶ 33. [2] Oey was designated to conduct the Superintendent's hearing. *Id.* at ¶¶ 35-36.

On February 6, 2015, Oey conducted Plaintiff's Tier III disciplinary hearing. *Id.* During the hearing, Oey did not use, or even attempt to use, the codified provision of 7 NYCRR Part 254 Section 254.6(c) to (g), as amended." *Id.* [3] "When Oey was asked about it, she was from the outset outright arrogant (sic), haughty, belligerent (sic), hostile, bias, aggressive and bigotry (sic)." *Id.* at ¶ 36. Oey found Plaintiff "guilty as charged" and sentenced Plaintiff to 60 days in the special housing unit ("SHU"), and 30 days without packages, commissary, and telephone privileges. *Id.* at ¶ 37.

## IV. ANALYSIS

Plaintiff seeks relief for violation of his constitutional rights pursuant to 42 U.S.C. § 1983, which "provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and

laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also* *Myers v. Wollowitz*, No. 95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995 [4] ) (stating that "[§ 1983] is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights.").

**\*4** "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The personal involvement of a defendant is a prerequisite for the assessment of liability in a § 1983 action, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), and the doctrine of *respondeat superior* is inapplicable to these claims. *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Thus, a plaintiff must demonstrate "a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Liberally construing the second amended complaint, Plaintiff alleges he was issued a false misbehavior report, subjected to excessive force, subjected to inhumane conditions of confinement, denied medical care, and denied procedural due process.

### A. False Misbehavior Report

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord* *Pittman v. Forte*, No. 9:01-CV-0100 (LEK/GLS), 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002); *see also* *Santana v. Olson*, No. 07-CV-0098A (DGL), 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief."). Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (rejecting the prisoner's "but for" argument as to guard who prepared the misbehavior report but was not involved the disciplinary hearing) (citation omitted).

Martin v. Oey, Not Reported in Fed. Supp. (2017)

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 164 of 210

2017 WL 6614680

Therefore, to the extent Plaintiff claims Wyckoff issued a false misbehavior report, and Mitchell, Wentzel, and Oey, "aided and abetted" Wyckoff by reviewing the report, serving the report, and being designated as the hearing officer, respectively, the Court recommends dismissing this claim with prejudice pursuant to 28 U.S.C. §§ 1915e(2)(B)(ii) and 1915A(b)(1) for failure to state a claim.

**B. Eighth Amendment Claims**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

1. Excessive Force and Failure to Intervene

The Eighth Amendment prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotation marks omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained.").

**\*5** A prison official who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g.*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. Mar. 15, 2010). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: (1) possessed actual knowledge of the use by another of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), Plaintiff claims Wyckoff and nine officers subjected him to excessive force on January 23, 2015, while a sergeant was present and failed to intervene. (Dkt. No. 34 at ¶¶ 40-41.) Therefore, the Court recommends that Wyckoff be directed to respond to Plaintiff's Eighth Amendment claim for excessive force.[5] The Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

2. Conditions of Confinement

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer*, 511 U.S. at 832. To demonstrate that the conditions of his confinement constitute cruel and unusual punishment a plaintiff must show that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *Id.* at 834; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298-99.

"Sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (citing, *inter alia*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010) ("Courts have previously recognized that sleep constitutes a basic human need and conditions [including constant illumination] that prevent sleep violate an inmate's constitutional rights.")). "Requiring inmates to live in constant illumination can ...

Martin v. Oey, Not Reported in Fed. Supp. (2017)

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 165 of 210

2017 WL 6614680

under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-447 (NAM/TWD), 2013 WL 4804500, *10 (N.D.N.Y. Sept. 6, 2013) (citing, *inter alia*, *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (an allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment that could withstand a motion for summary judgment)).

**\*6** "The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact driven,' turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." *Jones v. Smith*, No. 9:09-cv-1058 (GLS/ATB), 2015 WL 5750136, at *14 (N.D.N.Y. Sept. 30, 2015) (collecting cases).

The Eighth Amendment also requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983); *Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, *10 (N.D.N.Y. Mar. 26, 2009); *Midalgo v. Bass*, No. 9:03-CV-1128 (NAM/RFT), 2006 WL 2795332, *11 (N.D.N.Y. Sept. 26, 2006). "The provision of cold food, is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Waring v. Meachum*, 175 F. Supp. 2d 230, 239 (D. Conn. 2001) (internal quotation marks and citation omitted); *see also Phelan v. Hersh*, No. 9:10-CV-0011 (GLS/RFT), 2011 WL 6031940, at *12 (N.D.N.Y. Sept. 13, 2011) ("There is no constitutional right to have a hot meal every day, but only that inmates be provided nutritionally adequate food prepared under safe conditions."), *report and recommendation adopted by*, 2011 WL 6031071 (N.D.N.Y. Dec. 5, 2011); *Brooks v. NYC DOC Comm'r*, No. 14-CV-6283 (RRM/CLP), 2016 WL 4530456, at *4-5 (E.D.N.Y. Aug. 29, 2016) (*sua sponte* dismissing cause of action based on the failure to provide hot meals where there was no allegation that the inmate

did not receive nutritionally adequate meals) (collecting cases).

Upon review, and even assuming Plaintiff has alleged facts sufficient to plausibly suggest that the conditions of his MHU confinement posed a substantial risk of serious harm to his health and safety, the second amended complaint does not allege any facts which even suggest that any Defendant was aware of the conditions, including constant illumination, let alone that they acted with deliberate indifference to or refused to take steps to address this situation. *See, e.g.*, *Gomez v. Sepiol*, No. 11-CV-1017SR, 2014 WL 1575872, at *9 (W.D.N.Y. Apr. 11, 2014); *see also Toliver v. Dep't of Corrs.*, No. 10 Civ. 6298 (LAP/JCF), 2012 WL 4510635, at *9 (S.D.N.Y. Apr. 10, 2012) (dismissing the deliberate indifference claim for failure to plead facts identifying a responsible official who acted with a sufficiently culpable state of mind).

Here, Plaintiff has not sufficiently alleged that any Defendant acted with a deliberate state of mind. *See Gaston v. Coughlin*, 249 F.3d 156, 157 (2d Cir. 2001). Therefore, it is recommended that Plaintiff's condition of confinement claim be dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 3. Medical Care

There are two elements to a claim that officials violated a plaintiff's right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted).

**\*7** "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'

2017 WL 6614680

" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837).

"[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Mendoza v. McGinnis*, No. 9:05-CV-1124 (TJM/DEP), 2008 WL 4239760, at *11 (N.D.N.Y. Sept. 11, 2008) ("Determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients.). Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind" or "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992) (quoting *Estelle*, 429 U.S. at 102, 105-06).

In the second amended complaint, Plaintiff alleges he sustained cuts, bruises, and swollen limbs as a result of the "severe physical beating he had received" on January 23, 2015. (Dkt. No. 34 at ¶¶ 22-24.) At some point, Plaintiff lost consciousness. *Id.* at ¶ 24. Generally, such injuries do not amount to a condition of urgency that may produce death, degeneration or extreme pain. *See, e.g.*, *Benitez v. Straley*, No. 01-CV-0181 (RCC/RLE), 2006 WL 5400078, at *3, 4, 12 (S.D.N.Y. Feb. 16, 2006) (cut on the plaintiff's lips and head, and "severe cuts" to his wrists-none of which required stitches-did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if the allegations were assumed to be true); *Hickey v. City of New York*, 01-CV-6506 (GEL), 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004) (cuts and bruises do not constitute sufficiently serious medical needs); *Decayette v. Goord*, 06-CV-0783 (TJM), 2009 WL 1606753, at *1 (N.D.N.Y. June 8, 2009) (injures limited to cuts, bruises, and swelling do not constitute sufficiently serious medical need); *Rodriguez v. Mercado*, 00-CV-8588, 2002 WL 1997885, at *3, 8 (S.D.N.Y. Aug. 28, 2002) (bruises to inmate's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness, did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment); *Sonds*, 151 F. Supp. 2d at 311 ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief").

Even assuming Plaintiff's cuts, bruises, and swelling, along with loss of consciousness, constitute a serious medical need for purposes of an Eighth Amendment claim, Plaintiff has failed to allege any facts establishing which medical personnel were responsible or personally involved in the alleged unconstitutional medical care. As discussed above, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright*, 21 F.3d at 501 (quoting *Moffitt*, 950 F.2d at 885); *see also Gaston*, 249 F.3d at 157.

**\*8** Upon review, the facts alleged in the second amended complaint do not plausibly suggest that the unidentified nurse acted with deliberate indifference, was reckless in his treatment, or provided him with medical treatment that was "inadequate" in a constitutional sense. Although Plaintiff takes issue that he was not examined by the medical department and diagnostic examinations were not ordered, Plaintiff states that on January 24, 2015, the day after the incident, the nurse asked Plaintiff if he wanted Ibuprofen for his pain and A&D Ointment for his cuts. *Id.* at ¶ 27. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703. [6] At best, Plaintiff's allegations suggest a disagreement over treatment, which does not give rise to a constitutional claim. *Id.*

Therefore, the Court recommends dismissing Plaintiff's Eighth Amendment medical indifference claim without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### C. Fourteenth Amendment Due Process Claim

To successfully state a claim under § 1983 for denial of due process, a plaintiff must show both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

2017 WL 6614680

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*. The Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of 101 days will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal condition." *Ortiz*, 380 F.3d at 654; *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).

"The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). In addition, the hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

In the second amended complaint, Plaintiff alleges Oey sentenced him to serve 60 days in the SHU. (Dkt. 34 at ¶ 37.) As set forth above, the Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*. *Colon*, 215 F.3d at 231. In this case, however, Plaintiff argues for the aggregation of his various SHU sentences, amounting to 330 days of consecutive SHU confinement. (Dkt. No. 34 at ¶ 57.)

**\*9** "Overlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky*, 292 Fed.Appx. 120, 122 (2d Cir. 2008) (summary order); *see, e.g.*, *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (aggregating sentences where the inmate's segregation at one facility was "simply a continuation of his segregation at" the facility from which

he had been transferred, and a "review of the record indicate[d] that the two periods of confinement were based on the same administrative rationale"). However, the Court need not determine whether Plaintiff's 60-day SHU sentence should be considered in the aggregate to his other segregated confinement. Even if it was determined that Plaintiff's SHU confinement, aggregated or not, deprived him of a liberty interest because it imposed an "atypical and significant hardship" on him, Plaintiff has failed to allege that his liberty was denied without due process. Meeting the *Sandin* threshold would only establish that a liberty interest was involved, not that Plaintiff's liberty interest was denied without due process. Here, as more fully discussed below, Plaintiff alleges no facts to plausibly suggest Oey denied him due process at the February 6, 2015, disciplinary hearing. Therefore, regardless of the length of Plaintiff's SHU confinement, the Court finds Plaintiff has failed to state a Fourteenth Amendment due process claim.

As set forth above, to state a claim under § 1983, a plaintiff must allege that the conduct deprived him or her of a right guaranteed under the Constitution of the United States. *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)). In the second amended complaint, Plaintiff claims Oey conducted Plaintiff's February 6, 2015, disciplinary hearing in violation of DOCCS rules and regulations. (Dkt. No. 34 at ¶ 36.) Further, when Oey "was asked about it, she was from the outset outright arrogant (sic), haughty, beligerent (sic), hostile, bias, aggressive and bigotry (sic)." These allegations do not state a plausible Fourteenth Amendment due process claim.

First, as this Court explained in the July 19, 2017, Report-Recommendation (Dkt. No. 28), whether prison regulations were followed precisely is not a basis to conclude that any constitutional rights have been violated. *See Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985). An alleged violation of prison directives or regulations does not give rise to a federal claim, because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990) (citations omitted); *see also Hyman v. Holder*, No. 96 Civ. 7748, 2001 WL 262665, at \*6 (S.D.N.Y. Mar. 15, 2001). Thus, "regardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed

Martin v. Oey, Not Reported in Fed. Supp. (2017)

2017 WL 6614680

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 168 of 210

by the Constitution, as outlined in *Wolff*...." *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004).

Second, although an inmate does have the right to an impartial hearing officer, the degree of impartiality required of prison hearing officers does not rise to the level required of judges generally. *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) (citations omitted). Further, because prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased," Plaintiff's conclusory allegation of "bias," without more, fails to state a due process claim. *Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 WL 1086001, at *11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Additionally, "disagreement with rulings made by a hearing officer does not constitute bias." *Johnson v. Doling*, No. 9:05-CV-376 (TJM/RFT), 2007 WL 3046701, at *10 (N.D.N.Y. Oct. 17, 2007) (citing *Dumpson v. Rourke*, No. CIVA96CV621 (RSP/GJD), 1997 WL 610652, at *6 (N.D.N.Y. Sept. 26, 1997) (stating "[t]he fact that the hearing officer did not decide in the plaintiff's favor does not make him biased in the constitutional sense")).

**\*10** Because Plaintiff fails to allege that Oey denied him any of the procedural protections to which he was entitled under *Wolff*, the Court finds Plaintiff has failed to state a Fourteenth Amendment due process claim.

As to Plaintiff's allegations against Annucci and Venettozzi, Plaintiff claims they "knew or should have known" that Plaintiff's due process rights were violated at the hearing and yet they refused and failed to correct Oey's "wrongdoing" on appeal. *Id.* at ¶ 53. Here, because the Court finds Oey did not violate Plaintiff's constitutional rights, there was no "misconduct" for Annucci and Venettozzi to "correct" on appeal. *See, e.g.*, *Toole v. Connell*, No. 9:04-CV-0724 (LEK/DEP), 2008 WL 4186334, at *1, 7 (N.D.N.Y. Sep. 10, 2008) (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under *§ 1983*); *Linares v. Mahunik,* No. 9:05-CV-0625 (RFT/GLS), 2006 WL 2595200, at *11 (N.D.N.Y. Sept. 11, 2006) (finding the plaintiff could

not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation").

Lastly, Plaintiff claims Annucci and Venettozzi violated his due process rights because they "failed and refused to follow-up and comply with the Judicial mandate to insure (sic) that [Plaintiff's] rehearing was in fact timely[.]" *Id.* at ¶ 55. The Court construes this claim as an alleged violation of the so-called "fourteen-day rule" set forth in *7 N.Y.C.R.R. § 251-5.1*. However, as discussed above, this allegation, without more, is not sufficient to state a federal constitutional claim. *See Shakur*, 391 F.3d at 119 ("regardless of state procedural guarantees, the *only* process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff*...."); *see, e.g.*, *Bolanos v. Coughlin*, No. 91 CIV. 5330, 1993 WL 762112, at *14 (S.D.N.Y. Oct. 15, 1993) (stating that an inmate does not have a federally created right to have his disciplinary hearing commenced within a certain time); *see also Barnes v. Henderson*, 628 F. Supp. 2d 407, 413 (W.D.N.Y. 2009) (collecting cases) (stating that the failure to provide a speedy hearing under the state regulation is not enough to establish a federal due process violation).

In the second amended complaint, Plaintiff alleges that his rehearing was not timely commenced but does not allege that the delay was unreasonable or that the delay resulted in a constitutional violation. Further, documents attached to the second amended complaint indicate Venettozzi "cancelled the rehearing and the matter [was] completely expunged from [Plaintiff's] records" because "the facility failed to timely conduct the ordered rehearing." (Dkt. No. 34-1 at 18.)

Based on the forgoing, the Court recommends that Plaintiff's Fourteenth Amendment due process claim against Oey, Annucci, and Venettozzi be dismissed pursuant to *28 U.S.C. §§ 1915(e)(2)(B)(ii)* and *1915A(b)(1)* for failure to state a claim. Because Plaintiff has already been afforded two opportunities to amend this claim, and the allegations in the second amended complaint, liberally construed, give no indication that a valid Fourteenth Amendment due process claim might be stated if Plaintiff were provided another opportunity to amend, *see Gomez*, 171 F.3d at 795, the Court recommends that the dismissal against Oey, Venettozzi, and Annucci be with prejudice.

**\*11 WHEREFORE**, it is hereby

Martin v. Oey, Not Reported in Fed. Supp. (2017)

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 169 of 210

2017 WL 6614680

**RECOMMENDED** that Plaintiff's second amended complaint (Dkt. No. 34) be accepted for filing as the operative pleading in this action; and it is further

**RECOMMENDED** that Defendant Wyckoff be directed to respond to Plaintiff's Eighth Amendment excessive force claim; and it is further

**RECOMMENDED** that the following claims be **DISMISSED with prejudice**: Plaintiff's Fourteenth Amendment due process claim against Defendants Oey, Venettozzi, and Annucci, and Plaintiff's claim based on the false misbehavior report against Defendants Wyckoff, Mitchell, Wentzel, and Oey; and it is further

**RECOMMENDED** that the following claims be **DISMISSED without prejudice**: Plaintiff's Eighth Amendment conditions of confinement and medical indifference claims; and it is further

**ORDERED** that if the District Court adopts this Report-Recommendation the Clerk is directed to amend the docket to add Doe Corrections Officer 1-9 and Sergeant Doe as Defendants; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); *Fed. R. Civ. P. 72*, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6614680

**Footnotes**

1    Plaintiff also refers to this Defendant as "Wykoff." The Court will use "Wyckoff" herein.
2    Section 254 sets forth the procedures to be implemented in a Superintendent's hearing. 7 N.Y.C.R.R. § 254.
3    Section 254.6(c) to (g) sets forth the procedures regarding assessment of an inmate's mental state in a Superintendent's hearing. 7 N.Y.C.R.R. § 254.6(c) to (g).
4    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curium).
5    If this Report-Recommendation is adopted by the District Court, the Clerk is directed to amend the docket to add Doe Corrections Officer 1-9 and Sergeant Doe as Defendants. Plaintiff is advised to take reasonable steps through discovery to ascertain the name of the Doe Defendants. If Plaintiff fails to ascertain their identity so as to permit the timely amendment of the second amended complaint and service of process on these individuals, the Court will recommend dismissal of the second amended complaint as against them.
6    The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cty. Dep't of Corrs.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).
7    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. *Fed. R. Civ. P. 6(d)*. If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. *Fed. R. Civ. P. 6(a)(1)(C)*.

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Martin v. Oey, Not Reported in Fed. Supp. (2017)

2017 WL 6611575

2017 WL 6611575
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas MARTIN, Plaintiff,

v.

R. OEY, et al., Defendants.

9:16-cv-717 (TJM/TWD)
|
Signed 12/27/2017

**Attorneys and Law Firms**

Nicholas Martin, Wallkill, NY, pro se.

**DECISION and ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**\*1** The Court referred this 42 U.S.C. § 1983 action, which alleges that prison guards and officials violated Plaintiff's constitutional rights, to the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Rule 72.3(d) of the Local Rules of the Northern District of New York. The Report-Recommendation, dated November 28, 2017, recommends that the Court dismiss all but one of the claims in Plaintiff's Second Amended Complaint.

Plaintiff filed objections to the Report-Recommendation. When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further

evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendations of Magistrate Judge Dancks for the reasons stated in the Report-Recommendation.

Accordingly:

The Plaintiff's objections to the Report-Recommendation, dkt. # 36, are hereby OVERRULED. The Report-Recommendation, dkt. # 35, is hereby ACCEPTED. According:

1. the Plaintiff's Second Amended Complaint, dkt. # 34, is accepted for filing as the operative pleading in this action;

2. Defendant Wyckoff is DIRECTED to respond to Plaintiff's Eighth Amendment excessive force claim;

3. Plaintiff's Fourteenth Amendment due process claim is hereby DISMISSED WITH PREJUDICE against Defendants Oey, Venettozzi, and Annuuci;

4. Plaintiff's claim based on a false misbehavior report against Defendants Wyckoff, Mitchell, Wentzel, and Oey is hereby DISMISSED WITH PREJUDICE; and

5. Plaintiff's Eighth Amendment conditions of confinement and medical indifference claims are hereby DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6611575

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4055415
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph PARKS, Plaintiff,

v.

Joseph T. SMITH, et al., Defendants.

No. 9:08–CV–0586 (TJM/GHL).
|
March 29, 2011.

**Attorneys and Law Firms**

Joseph Parks, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Aaron M. Baldwin, Esq., of Counsel,
Albany, NY, for Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable Thomas
J. McAvoy, Senior United States District Judge, pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff
Joseph Parks alleges that Defendants violated his right
to exercise his religion when they disciplined him for
attempting to mail a photograph of himself with his hands
in what he characterizes as a prayer pose and Defendants
characterize as a gang sign. Currently pending before
the Court is Defendants' motion for summary judgment.
(Dkt. No. 51.) For the reasons that follow, I recommend
that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant
times an inmate at Shawangunk Correctional Facility
("Shawangunk"), was raised as a Jehovah's Witness, but
did not fully accept the religion until 2000 or 2001. (Dkt.
No. 51–8 at 6:6–11.[1]) Thereafter, Plaintiff prayed five or
six times per day. *Id.* at 22:6–11. Each time he prayed,
Plaintiff placed his hands in a meditative hand position.

*Id.* at 17:17–18:5.) He assumed this hand position so
that he could "make sure [he] went before [his] Father
clean. Not just physically but mentally." *Id.* at 22:16–
21. The hand position is not mandated for all Jehovah's
Witnesses, but Plaintiff's own research and study led him
to believe that he, personally, is required to use the hand
position "[b]ecause where I am spiritually and what I
know pertaining to the Bible as well as research. What you
know holds you accountable." *Id.* at 24:11–17; 25:7–26:6.
Plaintiff believes that he cannot pray without using the
hand position. *Id.* at 12:13–13:13, 31:3–18.

On February 27, 2007, Plaintiff attempted to mail a letter
and photograph to a personal ad service. (Dkt. No. 51–
4 at 2 ¶ 6.) The photograph depicted Plaintiff, clad in a
shirt and red pants, sitting on a chair. (Dkt. No. 51–6; Dkt.
No. 51–8 at 16:14–18.) Plaintiff's feet were placed wide
apart and his elbows were resting on his thighs. (Dkt. No.
51–6.) His hands were pressed together with his fingertips
pointed downward and his thumbs meeting at the top to
form a heart or diamond shape. *Id.* At his deposition,
Plaintiff testified that he was not praying or meditating
when the picture was taken. (Dkt. No. 51–8 at 28:14–
16.) Rather, he "was just trying to relax and in the course
of just trying to relax," he made the hand sign. *Id.* at
28:14–23. In the letter that accompanied the photograph,
Plaintiff indicated that he wanted "to begin a good
friendship" with "someone special" and hoped to "find
my ideal woman who can complete me ... as I complete
her." (Dkt. No. 51–5 at 7.) In the letter, Plaintiff referred
to himself several times as a "spiritual" person, but did
not mention that he is a Jehovah's Witness. (*Id.;* Dkt.
No. 51–8 at 36:3–7.) At his deposition, Plaintiff testified
that he included the photograph with the letter to "have
a resemblance of me.... [t]o show what I looked like."
(Dkt. No. 51–8 at 16:19–23.) In a declaration submitted
in opposition to Defendants' motion for summary judgment,
Plaintiff states that he "included the photo, not only to
show what I look like but to attract someone who practices
the same religion I do." (Dkt. No. 55 at 36.)

**\*2** The photograph was taken in the gym at
Shawangunk, and DOCS personnel screened it before
allowing Plaintiff to leave the gym with it. (Dkt. No.
51–8 at 15:4–23.) However, when Defendant Corrections
Officer Kim Skwera, who was assigned to review outgoing
inmate mail on February 27, 2007, saw the photograph,
she "suspected that the photograph depicted [Plaintiff]
making a gang sign with both his hands." (Dkt. No.

51–4 at 2 ¶¶ 6–7.) Based on this suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco, who had training in these matters and was one of the staff members who regularly reviewed incoming media and other materials to ensure that they do not contain any unauthorized gang material." *Id.* ¶ 8.

There is no written DOCS policy, procedure, or directive governing specifically how to identify gang insignia or materials. (Dkt. No. 51–3 at 3 ¶ 12.) Rather, staff members such as Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit. *Id.* ¶ 13. During this training, staff hear oral instruction and see examples of gang signs and symbols. *Id.* ¶ 15. The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS ." *Id.* at 4 ¶ 16. Staff learn that "The Bloods original color is RED ... Members' display of hand signs varies depending on the Set they belong to. The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers." *Id.* ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign. *Id.* at 5 ¶ 22. He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture. *Id.* at ¶¶ 23–24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia,* violating DOCS Rule 105.12. (Dkt. No. 51–4 at 2 ¶ 10.) That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007. (Dkt. No. 51–5 at 3, 13.) Defendant Lt. G. Gardner served as the hearing officer. *Id.* at 3. Plaintiff alleges that Defendant Gardner

"created a hostile environment, using intimidation tactics of taunting and facial gestures." (Dkt. No. 1 at 8 ¶ 16.)

**\*3** Plaintiff called Defendants Skwera and Franco as witnesses. (Dkt. No. 51–5 at 3.) Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign. *Id.* at 6. Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly ... an unauthorized hand sign." *Id.* at 9. Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them. *Id.* at 9–10. Defendant Franco testified that the "only religious ... group that comes close to that type of hand sign ... would be the Rastafarians.... [T]hat's the only one I'm familiar with. I am not familiar with ... meditation ... at all." *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation ... I reacted when trying to get calm for the picture ." *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge. *Id.* at 16. He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision. *Id.* at 17. He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges. *Id.* He stated that the reason for his decision was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited." *Id.*

Plaintiff appealed Defendant Gardner's decision. (Dkt. No. 51–5 at 18.) In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant to my religious beliefs ... so to find me guilty is to infringe on my Constitutional rights that guarantee[ ] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40. Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007. *Id.* at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion. (Dkt. No 1 at 9 ¶ 21.) Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." *Id.* When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith. *Id.* ¶ 22. When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director. *Id.* at 9–10 ¶ 23. Plaintiff did not receive a response. *Id.* at 10 ¶ 24.)

**\*4**  Plaintiff filed the complaint in this action on June 4, 2008. (Dkt. No. 1.) Plaintiff's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[ ] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a tier hearing consistent with his constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11–12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56–2.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*5**  To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Id.; accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the

legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. RLUIPA

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

> **\*6** [n]o government shall impose a substantial burden on the religious exercise of a person residing in or

> confined to an institution [3] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages. (Dkt. No. 51–10 at 6–13.)

### 1. *Whether Plaintiff Was Engaged in a Religious Exercise*

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise." (Dkt. No. 51–10 at 8–9.) I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A)." Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51–10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice. At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture." (Dkt. No. 51–5 at 12, 14.) Plaintiff testified at his deposition that he

"fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51–8 at 29:7–11.) Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA. Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice. (Dkt. No. 51–10 at 8–9.)

**\*7** Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise. *See, e.g., Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007). Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere. As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations...." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis. As the Supreme Court has noted:

Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose. As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is insincere and that he was, in fact, making a gang sign. But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax. But as a matter of law, I cannot credit one interpretation over the other. The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit ... protection." *Thomas,* 450 U.S. at 714. Further, "[c]ourts should not undertake to dissect religious beliefs because the ... [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715.

**\*8** Finally, I note that *Farid v. Smith,* 850 F.2d 917 (2d Cir.1988), cited by Defendants, is distinguishable. In

that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards ..." *Farid,* 850 F.2d at 926. Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

### 2. *Substantial burden*

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise. 42 U.S.C. § 2000cc–1(a). Defendants argue that even if Plaintiff was disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff. (Dkt. No. 51–10 at 9–11.) I find that Plaintiff has raised a triable issue of fact on this issue.

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use ... meditation poses ... while praying ...." (Dkt. No. 51–10 at 10.) Defendants cite Defendant Franco's declaration as support for the latter assertion. In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying ..., *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* ...." (Dkt. No. 51–3 at 6 ¶ 33, emphasis added.) In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007. I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs. A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this

pressure was not substantial. Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

### 3. *Least Restrictive Means of Furthering a Compelling Governmental Interest*

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). The burden of proving this element is on Defendants. *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) ("[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest.").

**\*9** Defendants argue that they were motivated by the compelling governmental interest of preventing gang activity and that their "zero tolerance" policy is the least restrictive means of furthering that interest. (Dkt. No. 51–10 at 11.) Defendant Franco's declaration discusses, at length, the security problems posed by gang activity within the DOCS system. Defendant Franco declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled the Department to take steps to slow the growth of these groups and monitor them closely." (Dkt. No. 51–3 at 2 ¶ 5.) Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying themselves and communicating with other members both within and outside correctional facilities. These include the use of code words, slang, hidden messages (sometimes contained in letters or newspaper classified advertisements), and signs, symbols, and insignia which can range from anything [from] wearing certain color clothing or jewelry, to tattoos, and the use of hand signs, symbols and gestures, whether in person or in photographs.

2011 WL 4055415

*Id.* ¶ 6.

"Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007). Courts must be sensitive to these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). This, however, does not end the inquiry.

In *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009), the Second Circuit noted with approval that "[o]ther circuits have ... recognized that the state may not merely reference an interest in security ... in order to justify its actions...." Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id.* at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). The Second Circuit also noted with approval that "[o]ther circuits ... have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " *Id.* (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir.2005)). As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices. *Forde v. Baird,* 720 F.Supp.2d 170, 180 (D.Conn.2010).

**\*10** Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities." (Dkt. No. 51–3 at 3 ¶ 9.) Otherwise, he states:

it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous. Without a zero tolerance policy, the prohibitions could also be applied ... inconsistently from one situation to another.

*Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods. If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment. However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate. (Dkt. No. 51–3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

### 5. *Availability of Money Damages*

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief. (Dkt. No. 51–10 at 13.) Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The United States Courts of Appeals

are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (money damages not available) *with Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir.2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted* ––– U.S. ––––, 130 S.Ct. 3319, 176 L.Ed.2d 1218 (2010) (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon,* I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

**B. Free Exercise Clause Claim**

**\*11** Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51–10 at 6–13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens[4] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging

conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274.

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

**C. Retaliation**

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> **\*12** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners'

claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff —namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51–10 at 11–12.) As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph. Therefore, I find Defendants' argument regarding the first prong to be without merit.

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action ..." (Dkt. No. 51–10 at 11.)

Regarding the third prong:

[t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Vega v. Artus,* 610 F.Supp.2d 185, 207 (N.D.N.Y.2009) (citations and punctuation omitted) (Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants were substantially motivated by Plaintiff's religion. Defendants Franco and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion until they heard him testify at the disciplinary hearing. (Dkt. No. 51–3 at 5–6 ¶¶ 27–30; Dkt. No. 51–4 at 4–5 ¶¶ 21–25.) Although Defendant Gardner was aware of Plaintiff's faith when he found Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was substantially motivated by Plaintiff's religion to punish Plaintiff. Although the complaint characterizes Defendant Gardener's conduct at the hearing as "hostile" and "intimidating" (Dkt. No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything derogatory about Jehovah's Witnesses or people who use hand poses to pray. As for the other defendants, Plaintiff asserts that they must have known about his religion because, when he became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion. (Dkt. No. 51–8 at 6:2–20.) However, there is no evidence that any of the named defendants were aware of that form. Accordingly, I find that Plaintiff has not raised a triable issue of fact that there was a causal connection

2011 WL 4055415

between his protected conduct and the adverse action. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

### D. Personal Involvement

**\*13** Defendants argue that, even if Plaintiff had raised a triable issue as to any of his substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement. (Dkt. No. 51–10 at 18–22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [5]

#### 1. Claims Against Defendant Smith

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19–20);

(2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9–10 ¶¶ 22–23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all. Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at \*2–3 (W.D.N.Y. Dec.7, 2009). [6] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at \*2–3. Here, there is no evidence that Defendant Smith proactively participated in the review.

**\*14** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement. *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Thus, Defendant Smith's alleged failure to respond to Plaintiff's grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked, unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally involved in any alleged constitutional violations.

### 2. Claims Against Defendant Maly

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary conviction. (Dkt. No. 1 at 9 ¶¶ 19–20.) As discussed above, such a claim is insufficient to establish personal involvement unless there is evidence that the defendant was proactively involved in the appeal. Here, there is no such evidence regarding Defendant Maly. Therefore, Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any alleged constitutional violations.

### 3. Claims Against Defendants Krom and Egan

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance. (Dkt. No. 1 at 9–10 ¶¶ 22–24.) As discussed above regarding Defendant Smith, this is insufficient to establish personal involvement. Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4055415

### Footnotes

1  Page numbers refer to the page number assigned by the Court's electronic filing system.

2  A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

3  An "institution" is, *inter alia,* "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1)(B)(ii) (2003).

4  Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

5  In *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

6  The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

7  *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 23744272
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Laura Ann RAMBALDI, Plaintiff,
v.
CITY OF MOUNT VERNON, Mayor Ernest D. Davis,
Officer Anne Madden, Capt. Joseph P. Pizzuti,
Chief Michael F. Mosca, Police Commissioner
Gertrude La Forgia, Jean Johnson, Peggy Slattery,
Individually and as Officials, Police Officers and
Agents for the City of Mount Vernon, Defendants.

No. 7:01–CV–03648–GAY.
|
March 31, 2003.

MEMORANDUM ORDER

YANTHIS, Magistrate J.

I. PROCEDURAL HISTORY

 *1 The parties have consented to try this matter before
me pursuant to 28 U.S.C. § 636(c). Plaintiff Laura
Rambaldi ("plaintiff") brought this action pursuant to 42
U.S.C. § 1983, and the First, Fourth, Fifth and Fourteenth
Amendments of the United States Constitution. In
particular, plaintiff alleges that defendants Jean Johnson
("Johnson") and Peggy Slattery ("Slattery") deprived her
of her rights to due process and equal protection, and
violated her free speech rights; that defendants Johnson,
Slattery and Officer Anne Madden ("Madden") conspired
to violate plaintiff's free speech and equal protection
rights; that defendant Captain Joseph Pizzuti ("Pizzuti")
also violated plaintiff's free speech rights; that defendant
Madden unreasonably seized plaintiff and violated her
equal protection rights; that defendants Chief Michael
Mosca ("Mosca") and Police Commissioner Gertrude
LaForgia ("LaForgia") failed to properly train and
supervise the Mt. Vernon Police Department; and that
defendants City of Mt. Vernon ("City") and Mayor
Ernest Davis ("Davis") exhibited negligent indifference
to the rights of the city's citizens. Before this Court are
defendants' motion for summary judgment, and plaintiff's
cross-motion for summary judgment. For the reasons set

forth below, these motions are granted in part and denied
in part.

II. BACKGROUND

Plaintiff Laura Rambaldi signed and submitted a City
Liability Waiver at Mount Vernon Police Headquarters in
October 1995, received rabies vaccinations in December
1995, and together with defendants Jean Johnson and
Peggy Slattery, began to volunteer at the Mount Vernon
Animal Shelter ("the Shelter"). In 1996, Johnson and
Slattery became members of the Mount Vernon Animal
Shelter Task Force ("the Task Force"), formed by Mayor
Ernest Davis to facilitate communication between the
Shelter and the City; plaintiff was not a member of this
Task Force. In 1998, defendant Madden became the
officer in charge of the Shelter and its volunteers.

From 1995 to 1999, in her capacity as a Shelter
volunteer, plaintiff brought animals to the veterinarian
for medical care, placed advertisements to promote
animal adoptions, exercised and walked the dogs,
administered medicines and tended to injuries, and fed
the animals. Madden alleges that during this period,
plaintiff also interfered with adoptions, criticized and
questioned Madden's authority, particularly with regard
to decisions to euthanize certain animals, disobeyed
Madden's instructions, declined to perform all the duties
required of Shelter volunteers, such as cleaning, criticized
Shelter practices in front of members of the public, and
disregarded Shelter rule and guidelines.

On February 10, 1999, plaintiff sent a get-well card
to Assistant Dog Warden Tom Smith, who was facing
amputation surgery at Mount Vernon Hospital. In this
card, plaintiff wrote the following words, which she
characterizes as a joke: "Hope you get well soon. Sorry
to hear about your toe. At least it's not your dick. Best
regards, Mayor Davis." Plaintiff later relayed the contents
of the card to Madden. The same day, the Task Force
held a vote, and decided to dismiss plaintiff as a Shelter
volunteer, based on the card she wrote to Tom Smith—
which they deemed to be an act of forgery—and her prior
violations of Shelter rules. The Task Force sent plaintiff
a letter dated February 15, 1999, and signed by Task
Force members including Slattery and Johnson, informing
her that her dismissal was based upon "your disregard
for the 'Mt. Vernon Animal Shelter Volunteer Guidelines

& Rules' and your highly damaging actions of forgery pertaining to an Animal Shelter worker." Plt.'s Exh. V.

**\*2** Plaintiff viewed this dismissal as invalid, and on several occasions after receiving the Task Force's letter, she attempted to return to the Shelter. On February 25, 1999, when plaintiff tried to enter the Shelter, Madden asked her to leave and locked the door behind her. On November 3, 1999, Madden refused to allow plaintiff to enter the Shelter at all. Mount Vernon police officers, including defendant Pizzuti, responded to plaintiff's call. Pizzuti informed plaintiff that she was no longer considered a Shelter volunteer, and thus was no longer allowed inside the Shelter; if plaintiff persisted in going to the Shelter, Pizzuti stated that he would arrest her for harassment. Although plaintiff requested a police report, Pizzuti did not give her one. On November 27, 1999, plaintiff filed a Civilian Complaint regarding this incident.

Plaintiff entered the Shelter again on November 21, 1999. She claims that Madden took her by the arm and removed her from the building, locking the doors behind her. The police told plaintiff to go to Police Headquarters to file a Civilian Complaint, and she did so. On December 5, 1999, plaintiff entered the Shelter and went to the kennels to see the animals, despite a Shelter worker informing her that she was not allowed to be there. When the worker called the police, plaintiff agreed to leave the building. Finally, on January 2, 2000, plaintiff entered the Shelter lobby and found Johnson, Slattery and another volunteer, Isobel Doyle, working there. Plaintiff tried to proceed to the kennel area, but Madden allegedly pushed the door shut against her. Plaintiff claims that Madden again held her by the arm and removed her from the Shelter, locking the door behind her. Plaintiff filed a Civilian Complaint regarding this incident and requested a copy of the complaint, but not receive one from the officers at Police Headquarters or from defendant Mosca's office.

On February 3, 2000, plaintiff went to Police Headquarters to obtain a police report regarding the incidents of November 21, 1999 and January 2, 2000. Plaintiff alleges that defendant Pizzuti refused to give her a copy of the police report, and filed another Civilian Complaint regarding this incident on March 20, 2000. Plaintiff also alleges that defendant Davis promised to schedule a meeting for March 1, 2000, at which time Davis would attempt to mediate between plaintiff, the police and

other Shelter volunteers. However, plaintiff claims this meeting was cancelled by the City and never rescheduled.

## III. STANDARD OF REVIEW

Local Civil Rule 56.1 (former Local Civil Rule 3(g)) reads as follows:

> (a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for the denial of the motion.

> **\*3** (b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

> (c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Federal Rule of Civil Procedure 56(c) further provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995); *see generally, Celotex Corp. v. Catrett,* 477 U.S. 317, 320–23 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247 (1986).

The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993), *aff'd,* 107 F.3d 3 (2d Cir.1996), *cert. denied,* 117 S.Ct. 1721 (1997), *quoting Anderson,* 477 U.S.

at 250. "The moving party has the burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997), *citing Celotex,* 477 U.S. at 323.

In deciding whether a genuine issue of material fact exists, "the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989). If the opposing party "propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983). "On a motion for summary judgment, a court 'cannot try issues of fact; it can only determine whether there are issues to be tried'." *Cronin,* 46 F.3d at 203, *quoting Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992).

*Pro se* pleadings and papers are to be liberally construed, *Estelle v. Gamble,* 429 U.S. 97, 106 (1976), and are to be interpreted "to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). "[A] *pro se* complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers'." *Estelle,* 429 U.S. at 106, *quoting Haines v. Kerner,* 404 U.S. 519, 510–21 (1972). However, dismissal is warranted when statute or controlling precedent clearly forecloses the liberally construed pleadings. *See Love v. Coughlin,* 714 F.2d 207, 208 (2d Cir.1983). With these principles in mind, this Court considers the instant motions.

## IV. DISCUSSION

### A. *Section 1983*

**\*4** Plaintiff alleges that all of the defendants are liable for violating her constitutional rights pursuant to Section 1983. 42 U.S .C. § 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State ...

> subject, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...."

There are two threshold elements of a Section 1983 claim: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiffs suffered a denial of their federal rights and privileges. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998) (citation omitted). No action pursuant to § 1983 may be maintained unless the challenged conduct is attributable at least in part to a person acting under color of state law. *See Chan v. City of New York,* 1 F.3d 96, 106 (2d Cir.1993) (*citing Rendell–Baker v. Kohn,* 457 U.S. 830, 835 (1982)).

### 1. *Defendants Johnson and Slattery*

"A private individual can be held liable under § 1983 'only as a willful participant in joint activity with the State or its agents." ' *Carlucci v. Kalsched,* 78 F.Supp.2d 246, 251 (S.D.N.Y.2000) (*quoting Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992) (internal quotations omitted)). The Supreme Court has set forth three tests to determine whether a private individual is deemed to be a 'state actor' for § 1983 purposes: (1) the public function test, *see West v. Atkins,* 487 U.S. 48, 49–50 (1988); (2) the state compulsion test, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970); and (3) the symbiotic relationship or nexus test, *see Burton v. Wilmington Parking Auth.,* 365 U.S. 715 (1961).

Under the 'public function' test, a plaintiff must show that a defendant's function "has been 'traditionally the *exclusive* prerogative of the State." ' *Rendell–Baker,* 457 U.S. at 842 (emphasis in original). "If the private actor is functioning as the government, that private actor becomes the state for purposes of state action." *Atkinson v. B.C.C. Assoc. Inc.,* 829 F.Supp. 637, 648 (S.D.N.Y.1993). Pursuant to the 'state compulsion' test, the private actor's actions are "otherwise chargeable to the State ... when the State, by its law, has compelled the act." *Albert v. Carovano,* 824 F.2d 1333, 1341 (2d Cir.1987) (citations omitted). In other words, the private actor becomes a state actor when "the state has provided

2003 WL 23744272

'significant encouragement, either overt or covert,' for the actions of the parties." *Atkinson,* 829 F.Supp. at 648 (*quoting Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982). The 'symbiotic relationship' test focuses on the state's over-all relationship with the private actor, and examines whether "the state has so far insinuated itself into a position of interdependence ... that it must be recognized as a joint participant in the challenged activity." *Burton, supra; see also Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1082 (2d Cir.1990). One of the factors in determining whether a symbiotic relationship between the state and the private actor exists is whether the state shared in any profits. *See Rendell–Baker,* 457 U.S. at 843. Finally, the 'close nexus' test examines the state's link to the challenged action. *See Hadges,* 918 F.2d at 1082. This test is not satisfied "merely by the fact that the private entity is a business 'affected with the public interest'; or that the state 'approved of or acquiesced in the initiatives' of the private entity." *Chan,* 1 F.3d at 106 (internal quotations omitted). Neither "the mere existence of a contract between a governmental agency and a private party" nor the fact that "a private entity leases space from a governmental agency" is sufficient to create state action. *Simescu v. Emmet County Dept. of Social Servs.,* 942 F.2d 372, 375 (6 $^{\text{th}}$ Cir.1991).

 **\*5** Here, defendants Johnson and Slattery are private actors who do not meet any of the 'state actor' tests set forth above. They are volunteers of the Shelter, and members of the Task Force, a group of Shelter volunteers which received no funding from the City of Mount Vernon. *See* Defs.' Mot. at 3. It is a "loose organization" whose existence is endorsed by the Mayor and serves to "make recommendations to him about the operation of the Shelter." Plt.'s Exh. A at 33, Exh. B at 8. The Mayor apportioned no "powers" to the Task Force, and it created its own rules and guidelines, which were reviewed and left unaltered by defendant Madden, the police officer assigned to help manage the Shelter at the time. Plt.'s Exh. B at 8–10.

Plaintiff has presented to the Court no evidence showing that operation of the Shelter, now in the purview of the Task Force and volunteers, has even been the "exclusive prerogative" of the City of Mount Vernon. *Rendell–Baker,* 457 U.S. at 842 (emphasis omitted). Nor is there evidence that either the Mayor or any other City official compelled Johnson, Slattery or any other Task Force member to behave in a certain way or take certain action

against plaintiff. The Court also sees no evidence that a symbiotic relationship or a close nexus existed between the City and the Task Force or other volunteers at the Shelter. Accordingly, the Court finds that Johnson and Slattery are not state actors subject to suit under Section 1983. Therefore, the Court grants summary judgment in favor of defendants Johnson and Slattery on all of plaintiff's claims against them.

### 2. *Defendant City of Mount Vernon*
A municipality cannot be held liable under Section 1983 for the conduct of an employee solely on the basis of respondeat superior. *See Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 122 (2d Cir.1991). Instead, the municipal entity will be held responsible if the violation of the plaintiff's rights resulted from municipal custom or policy. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 478–79 (1986); *City of Oklahoma v. Tuttle,* 471 U.S. 808, 818 (1985); *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 694 (1978). Liability may be imposed even if the policy or custom alleged is informal and not an explicitly adopted rule or regulation. *See Sorlucci v. New York City Police Dept.,* 971 F.2d 864, 870 (2d Cir.1992) (*citing Ricciuti,* 941 F.2d at 122). However, mere assertions "that a municipality has ... a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993); *see also City of Canton v. Harris,* 489 U.S. 378, 388–92 (1989).

In the instant case, plaintiff alleges that the City maintained a custom or policy of failing to train and supervise its employees, and failing to conduct meaningful investigations into civilian complaints such as hers. However, she has presented no evidence to support these claims against the City. Accordingly, the Court grants summary judgment in favor of defendant City of Mt. Vernon on all of plaintiff's claims against it.

### 3. *Defendants Sued in Their Official Capacities*
 **\*6** Plaintiff sues defendants Mosca, LaForgia, Pizzuti and Davis in their individual and official capacities. The Court recognizes that state officials sued in their official capacities are not "persons" within the meaning of Section 1983. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 64, 71 (1989); *Yorktown Medical Lab. v. Perales,* 948 F.2d 84, n. 1 (2d Cir.1991). Accordingly, the Court

2003 WL 23744272

dismisses all of plaintiff's claims leveled against these defendants in their official capacities.

#### 4. *Section 1983* Conspiracy

A non-state entity can conspire with a state actor and thus act under color of state law. *See Skinner v. Dwyer, et al.,* No. 91 Civ. 238, 1992 WL 265995, at *2 (N.D.N.Y. Sept. 9, 1992) (*citing Spear, 954 F.2d at 68*). Such a conspiracy claim must allege that "the nonstate actor 'acted in concert with a state actor to commit an unconstitutional act.' " *Id.* "[A] plaintiff's conclusory allegation that a nonstate actor conspired with a state actor does not suffice to state a section 1983 violation. *Id.* (*citing Zemsky v. New York,* 821 F.2d 148, 151–52 (2d Cir.1987)).

Here, plaintiff has made only conclusory allegations of conspiracy between defendants Johnson, Slattery and Madden to violate her constitutional rights. Moreover, her allegations are unsupported by any facts tending to show conspiracy. Plaintiff has not identified any material issues of fact regarding a *Section 1983* conspiracy. Accordingly, the Court grants summary judgment in favor of defendants on all of plaintiff's conspiracy claims against them.

#### B. *Eleventh Amendment and/or Qualified Immunity*

Defendants claim that they are entitled to qualified immunity and/or Eleventh Amendment immunity because their actions lacked the necessary mental culpability and causality to reach a Section 1983 violation of plaintiff's constitutional rights.

#### 1. *Eleventh Amendment Immunity*

It is well-settled that the Eleventh Amendment bars suits against a state "unless Congress has abrogated or the state has waived its sovereign immunity." *Aguilar v. New York Convention Ctr. Operating Corp.,* 174 F.Supp.2d 49, 51 (S.D.N.Y.2001). *See also, Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99 (1984). Here, however, plaintiff has not sued New York State, but the City of Mount Vernon. The Supreme Court has made clear that Eleventh Amendment immunity protects states and state officials, "but does not extend to counties and similar municipal corporations ." *Mt. Healthy City Sch. Dist.,* 429 U.S. at 280. In fact, the Supreme Court has refused to extend Eleventh Amendment protection to counties and municipalities, even if they exercise "a slice

of state power." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401 (1979). Accordingly, the Court finds that defendants are not entitled to Eleventh Amendment immunity.

#### 2. *Qualified Immunity*

##### a. *Defendants Mosca, LaForgia and Davis*

**\*7** Plaintiff alleges that defendants Mosca, LaForgia and Davis violated her First, Fourth and Fourteenth Amendment rights by failing to properly train and supervise defendants Madden and/or Pizzuti, failing to investigate her complaints about defendants Madden and/or Pizzuti, and failing to grant her the relief she requested.

Qualified immunity shields government officials from Section 1983 liability as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Dockery v. Barnett,* 167 F.Supp.2d 597, 605 (S.D.N.Y.2001) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The extent of the protection of qualified immunity depends upon the "objective legal reasonableness of defendants' actions assessed in light of the legal rules that were clearly established at the time [they were] taken." *Dockery,* 167 F.Supp.2d at 605 (quoting *Anderson v. Creighton,* 483 U.S. 635 (1987)(internal quotations omitted)). A defendant is entitled to summary judgment on the grounds of qualified immunity "only if, drawing all inferences in favor of plaintiff [ ], no rational jury could conclude that it was objectively unreasonable for him to believe that his actions did not violate a clearly established right ." *Dockery,* 167 F.Supp.2d at 605. See also *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998); *Williams v. Greifinger,* 97 F.3d 699, 706 (2d Cir.1996).

However, qualified immunity may not protect supervisory officials if they are found to be sufficiently involved in the acts of their subordinates to impose liability, as evidenced by their "(1) direct participation in the alleged constitutional violation; (2) failure to remedy a wrong after learning of it; (3) creation or maintenance of a policy under which constitutional violations occurred; (4) gross negligence in managing subordinates who committed the unconstitutional acts; or (5) exhibiting deliberate indifference to the rights of others by failing to act on information indicating the unconstitutional acts were occurring." *Dockery,* 167 F.Supp.2d at 605 (*citing Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In the instant case, the record demonstrates that no rational jury could conclude that defendants Mosca, LaForgia, and Davis reasonably knew or should have known that their actions violated plaintiff's First and Fourth Amendment rights. With respect to her First Amendment claim, defendants' alleged actions were objectively reasonable, given the information they possessed and relied upon regarding the circumstances of plaintiff's dismissal as a Shelter volunteer. With respect to her Fourth Amendment claim, defendants' actions were objectively reasonable, in light of the fact that they received her complaints regarding Officer Madden and forwarded them through appropriate channels to the office of the Mt. Vernon Corporation Counsel. Accordingly, the Court finds that defendants Mosca, LaForgia and Davis are entitled to the defense of qualified immunity on plaintiff's First and Fourth Amendment claims.

## C. *Plaintiff's First Amendment Claim*

 **\*8** Plaintiff alleges that defendant Madden violated her First Amendment rights by dismissing her as a Shelter volunteer and barring her from working in the Shelter in retaliation for her criticisms and complaints about the treatment of animals at the Shelter. Plaintiff also claims that defendant Pizzuti violated her First Amendment rights by intimidating and harassing her in retaliation for her speech. Defendants argue that plaintiff was dismissed as a volunteer because she did not abide by Shelter rules and guidelines, and disrupted the work and reputation of the Shelter with her behavior and the inappropriate joke she included in a get-well card to Assistant Dog Warden Tom Smith. [1]

A Section 1983 claim that a state actor retaliated against a plaintiff for exercising a constitutional right is analyzed pursuant to a burden-shifting scheme, defined by the Supreme Court in *Mt. Healthy Sch. Dist. v. Doyle,* 429 U.S. 274 (1977), as follows: the plaintiff bears the initial burden of demonstrating that (1) her speech—that is, the criticisms and complaints she leveled against the officers in charge of the Shelter and other Shelter employees—may be "fairly characterized as constituting speech on a matter of public concern," *Connick v. Myers,* 461 U.S. 138 (1983), and (2) the speech was "at least 'a substantial' or 'motivating' factor in the adverse action taken by the employer." *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.1993) (*quoting Mt. Healthy City Sch. Dist.,* 429 U.S. at 287). Whether speech is protected as a matter of public concern is a question of law for the court to decide. *See Brennan v. Straub, et al.,* No. 02 Civ. 7655, 2003 WL 554620, \*5 (S.D.N.Y. Feb. 27, 2003). If plaintiff so demonstrates, the burden then shifts to defendants to show by a preponderance of the evidence that they would have taken the action in question "even in the absence of the protected conduct." *Mt. Healthy Sch. Dist.,* 429 U.S. at 287. "Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To constitute speech of public concern, it must "relat[e] to [a] matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146. The Court must consider "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48. Plaintiff does not deserve First Amendment protection if she "speaks not as a citizen upon matters of public concern, but instead as [a volunteer] upon matters only of personal interest." *Id.* at 147; *see also Versarge v. Township of Clinton,* 984 F.2d 1359, 1364 (3 rd Cir.1992). Moreover, although the speech does not have to be public in order to be protected as a matter of 'public concern', the choice of forum for the speech is relevant to the inquiry. *See Connick,* 461 U.S. at 148; *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410 (1979). Here, plaintiff—before and after becoming a Shelter volunteer—complained about the conditions at the Shelter "to City officials, the Mayor and to the press." Plt.'s Memo. of Law in Opp., at 1–2. In particular, she alleged animal abuse and "needless euthanasia" by the officials in charge of the Shelter and Shelter employees, and these allegations are published in numerous local newspaper articles. *Id.,* at 2; *see also* Plt.'s Exhs. T, NN. Accordingly, the Court finds that plaintiff's speech constituted a matter of public concern.

 **\*9** The second element of plaintiff's prima facie case—whether or not her speech was a substantial or motivating factor in defendants' alleged actions against her—is a question of fact. *See Verri v. Nanna, et al.,* 972 F.Supp. 773, 784 (S.D.N.Y.1997). Based upon the record, the Court finds that there are no remaining genuine issues of material fact. In the first instance, defendant Madden did not dismiss plaintiff as a Shelter volunteer; that action was taken by the members of the Task Force in the February 15, 1999 letter, a copy of which was also sent to Madden.

Further, Madden's conduct in barring plaintiff from the Shelter occurred after Madden received notice from the Task Force that plaintiff had been dismissed. *See* Plt.'s Exh. C at 18–19. Plaintiff has failed to show any causal connection between her protected speech and Madden's conduct. Moreover, Madden's actions in barring plaintiff from the Shelter were objectively reasonable given the contents of the Task Force letter dismissing plaintiff as a volunteer, and she is entitled to qualified immunity.

Defendant Pizzuti arrived at the Shelter at plaintiff's request, after she was removed by Madden. *See* Plt.'s Exh. F at 13–14. The Court finds that plaintiff has failed to establish a causal connection between her protected speech and Pizzuti allegedly threatening her with arrest and not providing her with copies of her civilian complaints. A First Amendment violation is not evident on this record. In any event, Pizzuti would be entitled to qualified immunity. Accordingly, the First Amendment claims against Madden and Pizzuti are dismissed.

D. *Plaintiff's Fourth Amendment Claim*

Plaintiff claims that defendant Madden violated her Fourth Amendment right to be free from unreasonable seizure by "grabbing [plaintiff]" and "forcibly turning [plaintiff] around and removing her from the building." Plt.'s Memo. of Law in Opp. at 7. Plaintiff also alleges that defendant Pizzuti violated her Fourth Amendment rights by using his authority to "intimidate Plaintiff and thereby restrain[ ] her liberty interest in entering or going to the [S]helter." *Id.* at 19.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ..., against unreasonable searches and seizures." U.S. Const. Amend. IV; *Atwater v. City of Lago Vista,* 532 U.S. 318, 326 (2001). A person has been "seized" within the meaning of the Fourth Amendment when she is physically or constructively detained by a police officer in such a manner that a reasonable person would not feel that she is free to leave. *See Terry v. Ohio,* 392 U.S. 1 (1968); *Tennessee v. Garner,* 471 U .S. 1 (1985). A seizure under the Fourth Amendment does not occur "whenever there is a governmentally caused termination of [a person's] freedom of movement ... nor even whenever there is a governmentally caused [ ] termination of [a person's] freedom of movement ... but only when there is a governmental termination of freedom of movement

*through means intentionally applied." Brower v. County of Inyo,* 489 U.S. 593, 596–97 (1989) (emphasis in original).

**\*10** As a threshold matter, the Court finds that the facts as alleged with regard to defendant Pizzuti do not rise to the level of a Fourth Amendment violation. With respect to defendant Madden, plaintiff claims that the officer used her hands to physically remove her from the Shelter on two occasions, but she does not make any claim of excessive force. *See* Plt.'s Memo. of Law in Opp. at 7. The Court concludes that the record does not demonstrate any seizure by Madden that reaches constitutional dimensions. To the contrary, the evidence reveals that plaintiff was clearly free to leave the building and was allowed to do so. Moreover, Madden would be entitled to qualified immunity on said claim as her actions were objectively reasonable, in light of the notice she received from the Task Force informing her that plaintiff was dismissed as a volunteer. Accordingly, the Court grants said defendants' motion for summary judgment on plaintiff's Fourth Amendment claim.

1. *Defendants Mosca, LaForgia and Davis*

Plaintiff also alleges that defendants Mosca, LaForgia and Davis violated her Fourth Amendment rights by failing to properly train and supervise the police, failing to investigate her complaints against Madden, and failing to afford her the relief she requested.

In order to establish personal liability pursuant to Section 1983, plaintiff must prove that the defendants caused the deprivation of her rights. *See Taylor v. Brentwood Union Free Sch. Dist.,* 143 F.3d 679, 685 (2d Cir.1998) (citing *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 692 (1978)). The Second Circuit has delineated several ways in which a defendant may be personally involved in a constitutional deprivation so as to be liable under Section 1983:(1) "[t]he defendant may have directly participated in the infraction;" (2) "[a] supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong;" (3) "[a] supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices continue;" (4) "a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

Here, plaintiff asserts that on at least two occasions, she filed civilian complaints against Madden for allegedly unreasonably seizing her and removing her from the Shelter. Plaintiff also claims that she made several phone calls to the Mayor's office, as well as Mt. Vernon Police Headquarters in efforts to follow up on her complaints. Defendants acknowledge that they received, saw or knew of plaintiff's complaints against Madden, and state that they appropriately forwarded the paperwork to Mosca's office, or the office of the Mt. Vernon Corporation Counsel. As aforementioned, Madden's conduct was not wrongful. Therefore, there were no 'wrongs' to remedy. Moreover, plaintiff has not raised a material issue of fact or shown that any defendant was grossly negligent in supervising Madden. Accordingly, the Court grants summary judgment on plaintiff's Fourth Amendment claims against said defendants.

### E. *Plaintiff's Fourteenth Amendment Claim* [2]

#### 1. *Due Process Violation*

**\*11** Plaintiff claims that defendants Madden and Pizzuti violated her Fourteenth Amendment rights to procedural due process by unlawfully preventing her from reentering the Shelter and ordering Shelter staff to keep her out of the building. Plaintiff also claims that Pizzuti violated her due process rights by informing her that he would arrest her for harassment, and refusing to provide her with copies of police reports regarding complaints she had filed. Plaintiff further alleges that defendants Mosca, LaForgia and Davis, collectively, failed to investigate her complaints against Madden and Pizzuti, failed to properly train and supervise Pizzuti, and failed to grant her the relief requested.

A plaintiff "must have a property interest in [her] former employment in order to bring a claim under the Fourteenth Amendment." *Brennan,* No. 02 Civ. 7655, 2003 WL 554620, at \*6. In order to claim a property interest in a benefit, plaintiff must have a "legitimate claim of entitlement to it," and must have "more than a unilateral expectation of it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Further, property interests are not created by the United States Constitution, but "are created and ... defined by existing rules or understandings that stem from an independent source such as state law." *Id.* "A person's interest in a benefit is a property interest for due process purposes if there are ... rules or mutually explicit understandings that support [her]

claim of entitlement." *Perry v. Sindermann,* 408 U.S. 593, 601 (1972); *see also Hamid v. John Jay College of Criminal Justice,* No. 99 Civ. 8669, 2000 WL 666344, at \*5 (S.D.N.Y. May 19, 2000). Plaintiff will fail to state a due process violation if she "has not demonstrated that [s]he was deprived of a constitutionally protected interest in ... property and that 'such deprivation was achieved under color of law.' " *Laupot v. City of New York,* No. 01 Civ. 3294, 2002 WL 83673, at \*2 (S.D.N.Y. Jan. 18, 2002) (*quoting Paul v. Davis,* 424 U.S. 693, 696 (1976)).

Here, plaintiff was appointed by defendant Davis as a Shelter volunteer in October of 1995. *See* Plt.'s Exh. HH. The Volunteer Service Statement and Release signed by plaintiff at that time indicates that she would be providing "uncompensated services" at the Shelter for the specified period of one year, from October 30, 1995 to October 30, 1996. *Id.* The Release also specifies that plaintiff is "not an employee ... of the City of Mount Vernon and [is] not entitled to any compensation, benefit, or health insurance coverage from the City." *Id.* Finally, the Release suggests that the City is entitled to terminate plaintiff's volunteer services at any time "if such is deemed necessary," and makes no provisions for the continuation or renewal of plaintiff's volunteer status. *Id. See Roth,* 408 U.S. at 578 ("the terms of the respondent's appointment ... supported absolutely no possible claim of entitlement to re-employment.... Nor, significantly, was there any [ ] rule or policy that secured his interest in re-employment or that created any legitimate claim to it."). Therefore, the Court finds that plaintiff has no secured property interest in her volunteer status at the Shelter. Accordingly, the Court grants summary judgment in favor of defendants on plaintiff's Fourteenth Amendment due process claims.

#### 2. *Equal Protection Violation*

**\*12** Plaintiff alleges that defendants also violated her Fourteenth Amendment right to equal protection by treating her differently than other Shelter volunteers and barring her access to the Shelter for exercising her constitutional right to freedom of speech. Although plaintiff frames her claim as an equal protection issue, the Court construes said allegations as a reiteration of her First Amendment claims, discussed above. Accordingly, the Court grants summary judgment in favor of defendants on plaintiff's Fourteenth Amendment equal protection claim.

## VI. CONCLUSION

Summary judgment is GRANTED in favor of all defendants, dismissing all claims. Plaintiff's cross-motion for summary judgment is DENIED. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 23744272

Footnotes

1    Defendants construe plaintiff's First Amendment claim as alleging retaliation for the 'joke' she wrote inside a get-well card delivered to Assistant Dog Warden Tom Smith. *See* Defs.' Mot. at 14–15. However, the Court construes plaintiff's First Amendment claim as alleging retaliation for the public statements she made criticizing the Shelter and its officials and employees. *See* Plt .'s Memo. of Law in Opp. at 10. With regards to the get-well card, plaintiff claims that its contents were used by defendants as a pretext to terminate her volunteer status. *See id.*

In any event, the Court determines that the words written by plaintiff in the get-well card do not constitute a matter of public concern. Accordingly, this incident of plaintiff's speech is not protected by the First Amendment.

2    Plaintiff also alleges that defendants violated her constitutional rights pursuant to the Fifth Amendment. Fifth Amendment due process claims are imputed to the state pursuant to the Fourteenth Amendment.

---

**End of Document**                                                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 191 of 210
Simmons v. Robinson, Not Reported in F.Supp.2d (2011)

2011 WL 31066

2011 WL 31066
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Alphonso SIMMONS, Plaintiff,

v.

Frank ROBINSON, Grievance Supervisor, Sing Sing
Correctional Facility; Anthony Chu, Food Service
Administrator, Sing Sing Correctional Facility;
Kenneth Decker, Acting Superintendent, Sing
Sing Correctional Facility; John Nuttal, Deputy
Commissioner of Program Services, New York
State Department of Correctional Services; Brian
Fischer, Commissioner of the New York State
Department of Correctional Services, Defendants.

No. 07 Civ. 7383(DAB).
|
Jan. 4, 2011.

*ADOPTION OF REPORT
AND RECOMMENDATION*

DEBORAH A. BATTS, District Judge.

**\*1** Plaintiff Alphonso Simmons, proceeding *pro se*
and *in forma pauperis,* filed this Complaint on July
23, 2007 pursuant to 42 U.S .C. § 1983, alleging
that while housed at Sing Sing Correctional Facility,
Defendants, who are current and former employees
of the New York State Department of Correctional
Services ("DOCS"), violated his rights under the First,
Eighth and Fourteenth Amendments of the United
States Constitution. [1] Defendants moved for Summary
Judgment on October 31, 2008. On January 28, 2010,
Magistrate Judge Douglas F. Eaton Issued a Report
and Recommendation ("Report") in the above-captioned
matter recommending that Defendants' Motion for
Summary Judgment be granted in its entirety. Plaintiff
filed timely objections to the Report.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the District Court
is required to make a *"de novo* determination of those
portions of the report or specified proposed findings
or recommendations to which objection is made." This
Court, therefore, reviews *de novo* Plaintiff's objections
regarding exhaustion of his claims, cross-contamination
at Sing Sing, and religious discrimination. Where a party
raises only general objections, and for portions of the
Report to which no objection is made, "a district court
need only satisfy itself there is no clear error on the face
of the record." *See Advance Coatina Tech. Inc. v. LEP
Chem. Ltd.,* 142 F.R.D. 91, 94 (S.D.N.Y.1992). Because
Plaintiff's remaining objections regarding the scope of
discovery and bias in the proceedings are general or
seek to relitigate prior arguments, this Court reviews the
remainder of the Report for clear error.

After conducting the appropriate level of review, the
Court may then accept, reject, or modify, in whole or
in part, the findings or recommendations made by the
Magistrate. 28 U.S.C. § 636(b)(1)(C); *see also* Local Rule
72.1(d). For the reasons contained herein, this Court
ADOPTS the findings of Magistrate Judge Eaton and
grants Defendants' Motion for Summary Judgment.

## I. BACKGROUND

The facts in this matter are described in Judge Eaton's
Report and will not be restated fully here. Magistrate
Judge Eaton found that 1) Plaintiff failed to exhaust
his claims relating to food preparation at Attica, Green
Haven, and the Food Production Center in Rome, New
York; 2) there is no genuine issue of material fact as
to whether the food sanitation at Sing Sing unlawfully
burdened Plaintiff's religious rights; 3) the Religious
Alternative Menu ("RAM") program is nutritionally
adequate [2] and does not burden Plaintiff's rights under
the First Amendment or RLUIPA; and 4) providing only
the RAM program to Plaintiff while allowing Jewish
inmates to participate in the Cold Alternative Diet
("CAD") program does not violate Plaintiff's Fourteenth
Amendment Equal Protection rights.

Subsequently, on March 2, 2010, Plaintiff filed numerous
objections to the Report, which raise the following
concerns: 1) the scope of discovery was limited
improperly; 2) the proceedings were biased toward
the Defendants; 3) Plaintiff's claims regarding policies

and practices at Attica, Green Haven, and the Food Production Center were exhausted properly; 4) there is a genuine issue of material fact as to whether the utensils or components of the RAM meal were subject to cross-contamination; 5) the food service at Sing Sing is discriminatory to Muslim inmates when compared to the services available to Jewish inmates; and 6) Plaintiff was not permitted to question Defendants' expert witness. On May 7, 2010, Defendants filed a Response to Plaintiff's Objections to the Report.

**\*2** Because Plaintiff is proceeding *pro se,* the Court must consider his submissions liberally, and interpret them to raise the strongest arguments they can suggest. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (citing *Burgos v. Hopkins,* 4 1 F.3d 787, 790 (2d Cir.1994)). Nevertheless, when a party raises only general objections to the report, "a district court need only review the record for clear error." *Brown v. Peters,* No. 95 Civ. 1541, 1997 WL 599355, at \*7 (N.D.N.Y. Sept. 22, 1997) (citing cases).

Even construed liberally, Plaintiff's objection regarding Judge Eaton's bias toward the Defendant does not challenge any factual finding or set forth any legal ground on which Magistrate Judge Eaton erred. The Court need not, and does not, give this objection *de novo* review.

Furthermore, "a *pro se* party's objections to the Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party will be allowed a second bite at the apple by simply relitigating a prior argument." *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (citing *Pickney v. Progressive Home Health Services,* No. 06 Civ. 5023, 2008 WL 2811816, at \*1 (S.D.N.Y. July 21, 2008)). Here, Plaintiff's objection regarding the scope of discovery simply restates the same arguments set forth in Plaintiff's previously rejected motions and papers, and thus is reviewed for clear error. The remainder of Plaintiff's objections are reviewed *de novo.*

Accordingly, the Court reviews de novo the following objections: 1) Plaintiff's claims regarding policies and practices at Attica, Green Haven, and the Food Production Center ("FPC") were exhausted properly; 2) there is a genuine issue of material fact as to whether the utensils or components of the RAM meal were subject to cross contamination in violation of Plaintiff's rights under the First Amendment and RLUIPA; 3) the food service

at Sing Sing discriminates against Muslim inmates; and 4) Plaintiff was not permitted to question the Defendants' expert witness.

## II. DISCUSSION

### A. Legal Standard

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *James v. New York Racing Ass'n,* 223 F.3d 149, 152 (2d Cir.2000). While a court must always construe "the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor," *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008), the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation" to preclude summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005). Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.' " *Zelnik v. Fashion Institute of Technology,* 464 F.3d 217, 224 (2d Cir.2006) (quoting Fed.R.Civ.P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived " 'to put up or shut up.' " *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (citation omitted).

### B. Plaintiff's Specific Objections

#### 1. Exhaustion of Administrative Remedies
**\*3** The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner must exhaust all administrative remedies before bringing an action in federal court regarding prison conditions. 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Failure to exhaust is an affirmative defense that defendants bear the burden of pleading. *Jones v. Block,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

In order to satisfy the PLRA exhaustion requirement, an inmate must exhaust administrative remedies properly, meaning that an inmate "must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). DOCS has a three-step Inmate Grievance Program ("IGP") that an inmate must complete to exhaust administrative remedies fully. *See Neal v. Goord,* 267 F.3d 116, 112 (2d Cir.2001).

In this case, Plaintiff filed and fully exhausted his 2006 Sing Sing grievance, which alleged: (1) that the manner in which pork was being served at Sing Sing subjected the Religious Alternative Menu ("RAM") option to cross contamination; and (2) that the dishes and utensils at Sing Sing were washed in the same machine as those used for the general population and thus were also subject to cross contamination. (Compl.Ex. B).

Plaintiff subsequently commenced this action, alleging that Defendants violated his constitutional rights by: (1) failing to investigate his Sing Sing grievance properly; (2) failing to maintain the integrity of the food service at Sing Sing; (3) causing Plaintiff to use dishes and utensils contaminated by pork products at Sing Sing; (4) discriminating against Muslim inmates by not providing them with hermetically sealed meals and utensils similar to those provided to Jewish inmates at Sing Sing; (5) "failing to ensure all mess halls in all correctional facilities in the State of New York ... provide Muslim inmates with foods that are 'wholly free of pork products,' " (Compl.¶ 41); and (6) failing to notify Plaintiff that products produced at DOCS Food Production Center ("FPC") are possibly made haram, or unlawful for him to eat, because they are prepared and packaged with the same equipment used to prepare and package pork items.

Claims (1) through (3) were raised in Plaintiff's grievance. Defendants concede that Plaintiff has exhausted the discrimination claim (Claim (4)) because it "closely followed issues Plaintiff raised in his grievance." (Reply Mem. at 4). Defendants object to Plaintiff's attempts to raise the remaining claims (Claim (5) and Claim (6)) "to serve as additional constitutional violations or to bolster his claims concerning the constitutionality of Sing Sing's food service." (Reply Mem. at 4). Defendants contend that these claims should be barred because Plaintiff did

not file any grievances regarding issues beyond Sing Sing and has thus failed to exhaust his available administrative remedies. Judge Eaton agreed with Defendants and limited Plaintiff's claims to those raised in his Sing Sing grievance. (Report at 4).

**\*4** Plaintiff, however asserts that his failure to exhaust his administrative remedies should not bar claims 5 and 6. (Obj.¶ 12). Plaintiff contends that he exhausted his claims regarding the alleged cross contamination at DOCS FPC, Attica and Green Haven Correctional Facilities, and his claims regarding the sufficiency of the cleaning procedures at Attica and Green Haven, because his Sing Sing grievance alerted Defendants to the problems of cross contamination and the inadequacy of cleaning procedures generally. (Obj.¶ 11).

The Second Circuit has held that "alerting the prison officials to the nature of the wrong for which redress is sought,' [without filing a formal grievance] does not constitute proper exhaustion." *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (internal citations omitted). Nevertheless, a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance. *See Espinal v. Goord,* 55 8 F.3d 119, 128 (2d Cir.2009) (holding that a claim for denial of medical care was exhausted where a grievance alleged excessive force and retaliation because "it was clear that the state had considered these allegations when reviewing [the] grievance"). Thus, the question for the Court is whether Plaintiff's grievance "provided enough information to alert the prison to the nature of the wrong for which redress [was] sought, and to afford[ ] ... time and opportunity [for the State] to address [the] complaint internally," *Espinal v. Goord,* 558 F.3d at 127 (internal citations omitted).

Drawing all inferences in Plaintiff's favor, the Court finds that Plaintiff's Sing Sing grievance cannot be construed to place Defendants on notice of claims regarding alleged cross contamination at DOCS FPC and at Attica and Green Haven, or claims regarding the cleaning procedures at Attica and Green Haven. Plaintiff's fully exhausted grievance alerted Defendants to two alleged problems: (1) that when pork was served in the Sing Sing mess hall, the manner in which it was served subjected the RAM option to cross contamination; and (2) that all of the dishes at Sing Sing were washed in same machine and thus also subject to cross contamination. (Compl.Ex.

B). Defendants investigated Plaintiff's grievance and issued a decision that addressed the service of pork and the cleaning of dishes at Sing Sing. (Compl. Ex. B; Robinson Decl. Exs. A–C.) The record does not indicate, nor does Plaintiff suggest, that Defendants investigated food production and cleaning procedures at other facilities when addressing Plaintiff's Sing Sing grievance. Accordingly, the Court finds that Plaintiff's claims regarding possible cross contamination at DOCS FPC, Attica, and Green Haven, and his claims regarding the cleaning procedures at Attica and Green Haven are not exhausted for the purposes of this action. Accordingly, Plaintiff's objection to Magistrate Judge Eaton's finding on exhaustion is overruled.

2. Cross Contamination at Sing Sing.

**\*5** Plaintiff objects that there is a genuine issue of material fact as to whether the sanitation practices at Sing Sing subjected the RAM to cross contamination in violation of his rights under the First Amendment and RLUIPA. In support of this contention, he makes the following objections: that DOCS began erecting barriers when pork was served, substantiating his claim that pork was being splashed (Obj.¶ 4); that some dishes at Sing Sing are not washed at high temperatures (Obj.¶¶ 18, 26); that the temperature logs DOCS provided are incomplete (Obj.¶ 19) or have been altered (Obj.¶ 20); that pork is cooked directly in pots and served in hotel pans that are not machine washed (Obj.¶¶ 22, 26); that some components of the RAM overlap with the general meal and are therefore placed adjacent to "haram" items and subjected to cross contamination (Obj.¶ 24); and that there are often visibly dirty dishes at Sing Sing and Defendants were aware of the problem due to grievances they received (Obj.¶¶ 28–29).

Defendants produced evidence that the sanitation and RAM service procedures at Sing Sing were intended to preserve the rights of Muslim inmates to a diet consistent with their religious strictures. The Declaration of Sing Sing Food Administrator Anthony Chu states that pork is served only rarely and is separated from the RAM to the extent practicable. (Chu Decl. ¶¶ 5–6.) Additionally, a serving tray serves as a barrier between the pork and other food items. (Chu Decl., ¶ 6.) Serving equipment, utensils, and cooking pots are cleaned and sanitized by New York State Board of Health-approved methods, either through hand washing or use of a dish machine. (*Id.,* ¶ 8.) The Westchester Department of Health inspects the facility annually and the facility keeps temperature logs showing dishwasher temperatures. (*Id.,* ¶ 9.)

To state a claim under the First Amendment or RLUIPA, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). A recent case found that the sanitation procedures at Green Haven Correctional Facility did not substantially burden the religious beliefs of Muslim inmates. *Majid v. Fischer,* 07 Civ. 4584, 2009 U.S. Dist. LEXIS 71616 (S .D.N.Y. July 31, 2009). In reaching that conclusion, the court relied on the opinion of Defendants' expert, Imam Feisal Abdul Rauf (the "Imam"), who also toured Sing Sing's dining facility to evaluate the claims made in this case. On the subject of proper sanitation, the Imam concluded that the sanitation policies and procedures in place at Sing Sing complied with Islamic dietary law. (Bauman Decl., Ex. C, p. 6.) Nevertheless, the Imam noted the need for greater oversight to ensure that sanitation policies were followed. (*Id.*) In response, DOCS issued a memorandum on RAM service policies and implemented new food service training requirements. (Culkin Decl, ¶ 14; Ex. A.)

**\*6** This Court agrees with the court in *Majid* that the sanitation policies and procedures in place do not impose a substantial burden on Plaintiff's sincerely held religious beliefs. *See Majid,* 2009 U.S. Dist. LEXIS 71616 at \*25 (granting summary judgment on Plaintiff's RLUIPA and First Amendment claims and finding "abundant evidence indicating that service of RAM and the cleaning procedures in place at Green Haven conform to Islamic dietary law"). Accordingly, Plaintiff's Objection regarding cross contamination at Sing Sing is overruled.

3. Plaintiff's Equal Protection Claims

Plaintiff objects to the Report on the grounds that Muslim inmates are provided with cheaper, soy-based products that are kosher and therefore meet the dietary requirements of Jewish inmates, but Jewish inmates get more expensive products in their CAD meals (Obj. ¶ 14; Pl.'s Opp. Mem. p. 4; Pl.'s Decl. ¶ 57), and that a Rabbi oversees the CAD program while no Muslim chaplain inspects food production (Obj. ¶ 41e; Pl.'s Decl. ¶ 58).

To make a claim under the Equal Protection Clause, a claimant "must demonstrate that he was treated differently than others similarly situated as a result

of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Further, "[h]e ... must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to any legitimate penological interests.' " *Id.* (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001)).

Where prison regulations draw distinctions among inmate groups, whether the regulation is reasonably related to a legitimate penological interest depends on application of the four factors described in *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Those factors are: 1) whether there is a rational relationship between the regulation and the legitimate government interest asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that the accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).

Here, Plaintiff's claims fail as a matter of law because he has put forth no evidence tending to show that the disparity in treatment between Muslim and Jewish inmates was the result of intentional or purposeful discrimination. As the court pointed out in *Abdul–Malik v. Goord,* 96 Civ. 1021, 1997 U.S. Dist. LEXIS 2047, at *24–25, 1997 WL 83402 (S.D.N.Y. Feb. 27, 1997), using meat versus vegetables as a proxy for discrimination is inappropriate. The CAD program is not necessarily more desirable, since it is cold and has less menu variety than the RAM program, which provides hot meals. *Id.* Both programs provide nutritionally adequate meals that conform to the respective religious demands. *Id.*

**\*7** Furthermore, courts have found repeatedly that the RAM program withstands scrutiny under the Equal Protection Clause when the *Turner* factors are applied. *See, Majid v. Fischer,* 07 Civ. 4585, 2009 U.S. Dist. LEXIS 71616, at *14–30 (S.D.N.Y. July 31, 2009); *Abdul–Malik,* 1997 U.S. Dist. LEXIS 2047, at *24–29, 1997 WL 83402. As described in *Majid,* DOCS has a legitimate interest in meeting the dietary needs of multiple inmate groups in a cost-effective manner, and the mostly-meatless RAM option allows them to do so. *Majid,* 2009 U.S. Dist. LEXIS 71616 at *27–28. Furthermore, providing a

separate halal meal for Muslims would impose costs on the prison system. *Id.* at 29.

Replacing the meat in the CAD meal with soy-based vegetarian products similar to those served in the RAM program may be more cost-effective, but where the meals provided are nutritionally adequate and meet the religious requirements of the inmates, courts will not "micromanage DOCS's menu planning." *Abdul–Malik,* 1997 U.S. Dist. LEXIS 2047, at *29. Accordingly, Plaintiff's Objection with respect to the Equal Protection claim is overruled.

4. Deposition of Defendants' Expert Witness
Finally, Plaintiff objects that he was not permitted to depose Defendants' expert witness, Imam Feisal Abdul Rauf, (the "Imam"), because of his inability to pay the Imam's witness fees. (Obj.¶ 31).

The Second Circuit has held that federal courts are not authorized to waive or pay witness fees on behalf of an *in forma pauperis* litigant. *Malik v. LaValley,* 994 F.2d 90, 90 (2d Cir.1993); see also *Murray v. Palmer,* 2006 WL 2516485, at *1 (N.D.N.Y.) (holding that the plaintiff's *in forma pauperis* status did not excuse him from paying the costs of a deposition). Plaintiff was allowed to submit interrogatories, but the record does not show that Plaintiff submitted any interrogatory to the Imam. Furthermore, Plaintiff made his request to depose the Imam on October 21, 2008, which was after the close of discovery. (Obj. Ex. C; Defs.' Mem. p. 8.) Plaintiff cannot now raise the issue when he had ample to time to present his request to the Court. Plaintiff's objection is overruled.

III. CONCLUSION

As explained above, Plaintiff's remaining objections are either general, or restate arguments already submitted to and rejected by Magistrate Judge Eaton. Therefore this Court need only review the remainder of the Report for clear error. Having reviewed the Report and finding no clear error, and having conducted an independent *de novo* review of the specifically objected-to portions of the Report, it is ORDERED and ADJUDGED as follows:

1. The Report and Recommendation of United States Magistrate Judge Eaton dated January 28, 2010 is

2011 WL 31066

APPROVED, ADOPTED AND RATIFIED by the Court.

2. Defendants' Motion for Summary Judgment GRANTED with regard to all of Plaintiff's claims.

3. The Clerk of Court is directed to CLOSE the docket in this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 31066

Footnotes

1    Although Plaintiff did not specifically identify the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 114 Stat. 804, 42 U.S.C. §§ 2000cc *et seq.,* in his Complaint, the Defendants addressed it in their briefing given Plaintiff's *pro se* status and RLUIPA's applicability to Plaintiff's claims. (Defs .' Mem. at 20.)

2    Although Magistrate Judge Eaton's Report and Recommendation does not explicitly address the Eighth Amendment, the finding that the RAM program is nutritionally adequate speaks to Plaintiff's Eighth Amendment claims. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) ("[T]he Eighth Amendment ... require[s] that prisoner be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (internal quotation marks omitted).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4186334
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lawrence TOOLE, Plaintiff,

v.

Susan A. CONNELL, et al., Defendant.

No. 9:04–CV–0724 (LEK/DEP).
|
Sept. 10, 2008.

**Attorneys and Law Firms**

Lawrence Toole, pro se.

Hon. Andrew Cuomo, New York State Attorney General, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on August 1, 2008, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report–Rec. (Dkt. No. 62).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report–Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report–Recommendation. Furthermore, after examining the record, the Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 62) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion for summary judgment (Dkt. No. 53) is **GRANTED;** and it is further

**ORDERED,** that the remaining claims contained within the Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Lawrence Toole, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint, plaintiff alleges that 1) he was sexually harassed by Corrections Officer Prusinowski; 2) the remaining defendants failed to fulfill their responsibilities to investigate and remediate the constitutional deprivation associated with that sexual harassment, including by their failure to properly address his grievances concerning the matter; and 3) a misbehavior report was issued against him in retaliation for complaining of the sexual harassment, all in violation of his constitutional rights.

Having already succeeded in securing dismissal of plaintiff's sexual harassment claim against defendant Prusinowski, based upon a finding that the factual allegations offered in support of that cause of action, even if proven, do not rise to a level sufficient to establish an Eighth Amendment violation, defendants now move for summary judgment in their favor dismissing the balance of plaintiff's complaint as a matter of law. In their motion, defendants assert that because the underlying sexual harassment did not rise to a level of constitutional significance, there can be no corresponding liability on the part of the other defendants for failing to investigate the matter and remedy the claimed harassment. Noting that plaintiff has no constitutional right of access to the

internal prison grievance process, and that the record is lacking in any evidence linking the issuance of the disputed misbehavior report—authored by an individual who is not a party to the action—to plaintiff's efforts to obtain redress for Corrections Officer Prusinowski's behavior, defendants seek dismissal of plaintiff's remaining claims.

**\*2** Having carefully reviewed the record now before the court, considered in light of the arguments raised by the defendants and in plaintiff's opposition to their motion, I conclude that no reasonable factfinder could determine that plaintiff's constitutional rights were abridged based upon the acts complained of in his complaint. Accordingly, I therefore recommend that defendants' motion be granted.

## I. *BACKGROUND* [1]

At the times relevant to his complaint plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and designated to the Oneida Correctional Facility ("Oneida"). *See generally* Complaint (Dkt. No. 1). On February 5, 2004, while confined within a dormitory unit at Oneida, plaintiff awoke to someone, later identified as Corrections Officer H. Prusinowski, shaking his buttocks and standing over him, smiling. [2] Complaint (Dkt. No. 1) Exh. A. Defendant Prusinowski, who according to Toole at the time was acting in a sexually provocative manner, asked the plaintiff to accompany him to the laundry room, ostensibly to engage in sexual activity. *Id.* After being asked by plaintiff to leave his cell, defendant Prusinowski stated, "you don't know what you're missing," and left the area. *Id.* In his complaint, plaintiff alleges that Officer Prusinowski had previously appeared in Toole's cube on February 3, 2004, and again on February 4, 2004, in an intoxicated condition "seeking homosexual liaison." *Id.* Following the February 5, 2004 incident plaintiff attempted to apprise the area supervisor of the situation, but was directed by defendant Prusinowski to "get the f__ __k away from the desk." *Id.*

On February 20, 2004 plaintiff filed a grievance with the Inmate Grievance Resolution Committee ("IGRC") at Oneida, claiming that defendant Prusinowski had sexually harassed him on February 3, 4, and 5, 2004. Complaint (Dkt. No. 1) Exh. A. In addition to detailing his encounters with defendant Prusinowski, in that grievance plaintiff also complained that his attempt to report the

February 5, 2004 incident to the desk sergeant had been unsuccessful, and asserted that defendant Prusinowski had arranged to have Toole transferred to a different prison dormitory unit on February 6, 2004. [3] *Id.*

Because Toole's grievance alleged harassment by a staff member, it bypassed the IGRC stage of the normal grievance process and was forwarded directly to the superintendent's office for a determination. Debejian Decl. (Dkt. No. 53–7) ¶ 6. Toole's grievance was subsequently denied by Oneida Superintendent Connell on March 12, 2004. Complaint (Dkt. No. 1) Exh. B. As a basis for her determination, defendant Connell relied principally upon Prusinowski's denial of having engaged in any inappropriate behavior and the lack of any evidence tending to independently substantiate Toole's allegations. *Id.*

Plaintiff appealed the denial of his grievance to the Central Office Review Committee ("CORC"). Complaint (Dkt. No. 1) Exhs. B, C. By decision dated April 14, 2004, Toole's appeal was "unanimously denied with clarification." In its decision the CORC found that the sexual harassment complaint was properly investigated at the facility level, and that substantiation of plaintiff's allegations was lacking. [4] *Id.* Exh. C.

**\*3** Plaintiff was issued an inmate misbehavior report on March 13, 2004 by Corrections Sergeant J. Allison, accusing him of lying regarding the February 5, 2004 incident in violation of prison rules . [5] *Id.* Exh. D. In that misbehavior report, Sergeant Allison alleged that as the desk supervisor to whom plaintiff allegedly tried to complain, he did not observe either any attempt on the part of plaintiff to lodge a complaint or defendant Prusinowski making the statement which the plaintiff now attributes to him, adding that Toole "was not at the desk, but in a doorway." Complaint (Dkt. No. 1) Exh. D. A disciplinary hearing was convened by Corrections Lieutenant Santos on March 19, 2004 to address the charge set forth in the March 13, 2004 misbehavior report. Deposition Transcript of Lawrence Toole (Dkt. No. 53– 10) Exh. A at 19–20. Upon learning from defendant Debejian that the charge was related to a grievance filed by the plaintiff regarding Corrections Officer Prusinowski, Lt. Santos adjourned the hearing. *Id.* at 13–14; *see also* Debejian Decl. (Dkt. No. 53–7) ¶ 11. The hearing was never reconvened, and the disciplinary charge against

the plaintiff arising from the incident was eventually dismissed. Deposition Transcript of Lawrence Tool (Dkt. No. 53–10) Exh. A at 12.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on June 23, 2004. Dkt. No. 1. Listed as defendants in plaintiff's complaint are Oneida Superintendent Susan A. Connell; IGS David DeBejian; Corrections Officer Prusinowski; and K. Bellamy, the Assistant Director of New York's Inmate Grievance Program. Although plaintiff's claims are less than artfully stated, they appear to include his assertions that 1) he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment, based upon defendant Prusinowski's actions; 2) the remaining defendants are implicated in that constitutional violation based upon their awareness of the relevant events and failure to conduct a proper investigation and remediate the violation; 3) plaintiff's rights were violated based upon defendants' failure to properly process and address his inmate grievance concerning the sexual harassment allegations; and 4) the defendants unlawfully retaliated against him, in violation of his First Amendment rights, by arranging for the issuance of a misbehavior report in retaliation for his complaint regarding the matter.

As their initial response to plaintiff's complaint, defendants Connell, Debejian and Bellamy moved to dismiss his claims for failure to satisfy the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Dkt. No. 13. Defendant Prusinowski filed a separate motion seeking dismissal of the sexual harassment claims against him for failure to state a legally cognizable claim that Toole's constitutional rights were violated by his conduct. Dkt. No. 18.

By order filed March 20, 2006, acting upon a report issued by me recommending that relief, District Judge Lawrence E. Kahn granted defendant Prusinowski's motion to dismiss plaintiff's sexual harassment claim against him. Dkt. No. 29. Defendants' companion motion to dismiss the complaint, however, was denied based upon the court's finding that while not a model of clarity, plaintiff's complaint sufficiently apprised the defendants of the nature of plaintiff's claims to permit a meaningful investigation of those claims and formulation of a defense. *Id.* at 2.

**\*4** Following the close of pretrial discovery, defendants have now moved seeking the entry of summary judgment dismissing the remaining portions of plaintiff's complaint. Dkt. No. 53. In their motion, defendants argue that because the court has already determined that plaintiff's allegations against defendant Prusinowski, even if true, are nonetheless insufficient to support a finding of sexual harassment, none of the remaining defendants can be held accountable for constitutional deprivations based upon that conduct. Defendants further submit that plaintiff cannot maintain a cognizable constitutional claim bottomed upon their alleged failure to properly process and address his grievance regarding the matter, and additionally assert that because none of them was involved in the issuance of the misbehavior report upon which plaintiff's retaliation claim is predicated, they bear no liability for any alleged retaliation. Plaintiff has since submitted papers in opposition to defendants' motion. Dkt. No. 59.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending

against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Thus, " 'the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.' " *Jeffreys,* 426 F.3d at 553 (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted).

B. *Retaliation*

When liberally construed, plaintiff's complaint could be deemed to include a retaliation cause of action. The potential retaliation claim discerned from plaintiff's allegations stems from the issuance by Corrections Sergeant James Allison of the March 12, 2004 misbehavior report, and plaintiff's contention that it was prompted by his having complained of Corrections Officer Prusinowski's actions towards him. Defendants seek

dismissal of this claim, citing the lack of evidence suggesting their involvement in the issuance of that disciplinary charge.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*6** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported

by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04–CV–1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D .J. and Lowe, M.J.).

In support of their motion, defendants have submitted a declaration from Corrections Sergeant Allison, the author of the misbehavior report in issue, in which he states that the decision to issue the charge was his, and his alone, and was based upon his own personal observations and determination that plaintiff had committed one or more disciplinary infractions. *See* Allison Decl. (Dkt. No. 53–4) ¶ 4. In addition, defendants Connell and Prusinowski have submitted declarations attesting to their official duties and responsibilities as DOCS employees, and expressly disavowing any involvement in the issuance of the misbehavior report by Sergeant Allison.[6] *See* Connell Decl. (Dkt. No. 53–6) ¶ 9; Prusinowski Decl. (Dkt. No. 53–9) ¶ 3. In response to these submissions, plaintiff has cited no evidence linking the issuance of that report to the remaining defendants in the action.

It may be that plaintiff's retaliation claim, particularly as against Oneida Superintendent Connell, is predicated upon the defendants' positions as supervisors, and his assertion that in light of their positions they should be held accountable for any retaliation committed by Corrections Sergeant Allison. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor—there

is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways; 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). None of these circumstances apply in this instance, based upon the evidence now before the court.[7]

**\*7** Having carefully reviewed the record, I find no evidence from which a reasonable factfinder could conclude that any of the defendants were personally involved in the issuance of the misbehavior report forming the underpinnings of plaintiff's retaliation claim. I therefore recommend dismissal of that claim as a matter of law.

### C. *Failure To Investigate*

In an argument which also implicates personal involvement, at least tangentially, defendants assert that based upon the court's earlier finding that Corrections Officer Prusinowski's actions did not rise to a level of constitutional significance, any claim against the remaining defendants based upon their failure to investigate his allegations of unlawful harassment also fails to state a constitutional claim.

Undeniably, where a supervisory employee knows or reasonably should know of the existence of facts revealing a constitutional deprivation and, by virtue of his or her failure to properly investigate and remediate the matter, perpetuates or fails to prevent additional constitutional violations despite authority to do so, that defendant may face liability under section 1983. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (indicating that supervisory liability was proper where "an official has actual or constructive notice of unconstitutional

practices" by his or her subordinates "and demonstrates gross negligence or deliberate indifference by failing to act"). This principle applies equally to claims of sexual harassment; accordingly, a supervisory prison official who fails to address and take appropriate remedial actions, upon finding the existence of actionable sexual harassment of a prison inmate, bears legal responsibility for a resulting violation of the inmate's Eighth Amendment rights. *See Doe v. Barrett,* No. 3:01–CV–519, 2006 WL 3741825, at \*8–9 (D.Conn., Dec. 19, 2006); *Safadi v. Almanzar,* No. 98 Civ. 7995, 2000 WL 1738403, at \*3 (S.D.N.Y. Nov. 22, 2000). The mere failure to investigate an allegation of unconstitutional activity, without more, however, does not provide a basis for finding liability under section 1983. *Wingate v. Horn,* No. 05–Civ.2001, 2007 WL 30100, at \*6 (S.D.N.Y. Jan. 4, 2007) (citing cases).

In this instance, the court has already determined that Officer Prusinowski's actions, however boorish or offensive they may have been, if substantiated, did not rise to a level of constitutional significance. It logically follows, based upon that finding, that neither could the defendants now accused of failing to investigate and remediate that conduct, already found not to be actionable under section 1983, be held liable for a constitutional deprivation. *See Linares v. Mahunik,* No. 05 Civ. 625, 2006 WL 2595200, at \*11 (N.D.N.Y. Sept. 11, 2006) (Sharpe, D.J. and Treece, M.J.) (holding plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation.") I therefore recommend dismissal of plaintiff's failure to investigate claims against the defendants.

### D. *Failure To Process Plaintiff's Grievance*

**\*8** In a related but arguably distinct claim, plaintiff contends that his constitutional rights were violated based upon the defendants' failure to properly process and investigate his grievance regarding defendant Prusinowski's actions. This claim is asserted against defendant David Debejian, the Inmate Grievance Supervisor at Oneida; defendant Connell, the Superintendent at Oneida; and defendant Bellamy, the Assistant Director of the DOCS Inmate Grievance Program. Defendants also seek dismissal of this claim as a matter of law.

Since New York's inmate grievance program ("IGP"), provides a vehicle to permit inmates to seek internal remedial action within the relevant prison facility before commencing legal action complaining of their conditions of confinement, *see* 7 N.Y.C.R.R. § 701 *et. seq.* (setting forth the stages of the inmate grievance resolution process); *see also Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347 (S.D.N.Y.2002) (requiring New York State prison inmates to avail themselves of the DOCS IGP three step administrative process for the resolution of grievances), and allows them to satisfy their exhaustion requirement under 42 U.S.C. § 1997e, in order to bring an action such as this. *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S .D.N.Y.2004) (An inmate must first exhaust administrative remedies that are available before he may file an action in federal court). It is well-established, however, that a prison inmate has no constitutional right of access to such an internal grievance process. *Rhodes v. Hoy,* No. 05–CV–836, 2007 WL 1343649, at \*6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi,* No. 01 CV0285, 2005 WL 1174088, at \*3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right.") (citations omitted). Accordingly, plaintiff's allegations to the effect that the defendants failed to afford him an adequate investigation and remedial action under section 1983 response to his grievance, provides no basis for finding liability against them. *Cancel v. Goord,* No. 00. CIV.2042, 2001 WL 303713, at \*3 (S.D .N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under section 1983). I therefore recommend dismissal of this remaining claim against the defendants, as a matter of law, based upon the lack of any underlying constitutional obligation on their part to afford plaintiff meaningful access to the internal grievance procedure, and to investigate and properly determine any such grievance.

### IV. *SUMMARY AND RECOMMENDATION*

Pivotal to the plaintiff's claims in this case are actions of Corrections Officer Prusinowski, characterized by him as constituting unlawful sexual harassment, but already found by the court not to rise to a level of constitutional significance, and defendants' alleged failure to properly address and remediate those actions. In light of the court's finding that Corrections Officer Prusinowski's actions, as alleged by the plaintiff, did not constitute cruel and unusual punishment or otherwise result in

a cognizable unconstitutional deprivation, and the fact that the Constitution does not guarantee him access to the internal grievance process, I recommend dismissal of plaintiff's claims.

**\*9** To the extent that plaintiff has also asserted a retaliation cause of action claiming that the issuance by Correction Sergeant Allison, who is not a party to the action, of a misbehavior report accusing Toole of misconduct was motivated by plaintiff's filing of a grievance concerning Corrections Officer Prusinowski's actions, plaintiff has offered no evidence from which a reasonable factfinder could determine that the defendants were involved in, or in any way prompted, the issuance of that misbehavior report. Plaintiff's retaliation claim is therefore also subject to dismissal as a matter of law. It is therefore hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, and

that the remaining claims contained within the plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

The Clerk of the Court is directed to serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4186334

Footnotes

1    In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. See Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005).

2    While Corrections Officer Prusinowski was initially sued as C. Prusinowski, a subsequent application by plaintiff to amend his complaint to identify the intended defendant as H. Prusinowski was granted on March 1, 2005. Dkt. No. 10.

3    That transfer was later rescinded. Complaint (Dkt. No. 1) Exh. A.

4    The CORC decision also noted that DOCS Directive No. 4040 precludes the taking of any action in reprisal for an inmate having resorted to the grievance process, and advised the plaintiff that he was free to "write to anyone he wishes regarding the instant grievance." Complaint (DKt. No. 1) Exh. C.

5    Although the misbehavior report also charged the plaintiff with harassing employees, that accusation was not pursued. Deposition Transcript of Lawrence Toole (Dkt. No. 53–10) Exh. A at 12.

6    The record contains no evidence even remotely tending to suggest that defendants DeBejian, the IGS at Oneida, or Bellamy, the DOCS Assistant Director of the Inmate Grievance Program, were in any way involved in the issuance of the misbehavior report.

7    When liberally construed, plaintiff's complaint could be considered to contain a claim of retaliation based on his transfer from one dormitory to another upon being made aware of his intentions to pursue his sexual harassment claims. See Complaint (Dkt. No. 1) Exh. A. Based on the record before the court, however, no reasonable factfinder could conclude that this transfer amounted to adverse action, particularly in light of the fact that the transfer was rescinded a short time after plaintiff was moved and there being no proof in the record that plaintiff lost any privileges or suffered any negative consequences as a result of the transfer. Contrast Walker v. Pataro, No. 99 CIV. 4607, 2002 WL 664040, at *8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.), adopted, Dkt. No. 50 (S.D.N.Y. Oct. 2, 2002) (Daniels, D.J.) (considering inmate's transfer from one housing unit to another an adverse action given that the transfer resulted in prisoner losing his prison job). Accordingly, any retaliation claim stemming from plaintiff's threatened dormitory transfer must also fail.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

2016 WL 5219997
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shamel WRIGHT, Plaintiff,

v.

Rowland POTTER, Michael Barkman, James
Thomsen, C.O. John Doe #1, C.O. John
Doe #2 and Sgt. John Doe, Defendants.

9:14-CV-01041 (DNH/TWD)
|
Signed 06/28/2016

**Attorneys and Law Firms**

SHAMEL WRIGHT, 346 Furman Street, 1st Floor,
Schenectady, NY 12304, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
for the State of New York, The Capitol, OF COUNSEL:
RYAN E. MANLEY, ESQ., Assistant Attorney General,
Albany, NY 12224, Counsel for Defendants.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** This matter was referred to the undersigned for report
and recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Northern District of New York Local Rule
72.3. *Pro se* Plaintiff Shamel Wright, a former inmate
in the custody of the New York State Department of
Correction and Community Supervision ("DOCCS"), has
commenced this action pursuant to 42 U.S.C. § 1983
alleging violations of his civil rights while confined at
Greene Correctional Facility ("Greene").

Specifically, Plaintiff claims that on August 30, 2013,
Defendants Sergeant Rowland Potter ("Potter"), Sergeant
Michael Barkman ("Barkman"), Sergeant John Doe
("Sergeant Doe"), Correction Officer John Doe #1
("Officer Doe #1"), and Correction Officer John Doe #2
("Officer Doe #2") subjected him to excessive force as well
as failed to intervene or to protect Plaintiff. (*See generally*
Dkt. No. 1.) Plaintiff also alleges an Eighth Amendment

violation arising out of medical indifference against
Defendant James Thomsen ("Thomsen"). *Id.* Currently
pending before the Court is Defendant Thomsen's motion
for summary judgment pursuant to Federal Rule of Civil
Procedure 56. (Dkt. No. 30.) Plaintiff has not opposed the
motion. For the following reasons, I recommend that the
Court grant Defendant Thomsen's motion for summary
judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

The following facts are set forth as alleged in
Plaintiff's verified complaint. [1] On August 30, 2013,
at approximately 8:55pm, Plaintiff was restrained and
transported by Officer Doe #1 and Potter following a
physical altercation between Plaintiff and another inmate.
(Dkt. No. 1 at ¶ 18.) Plaintiff was initially placed in a
holding room before he was moved to an office. *Id.* at
¶ 21. Potter ordered Plaintiff to sit in a metal folding
chair situated to the left of the door. *Id.* Barkman asked
Plaintiff several questions about the cause of the physical
altercation with the other inmate. *Id.* at ¶ 23. When
Plaintiff's answers proved unsatisfactory, Officer Doe #2
pulled the chair from underneath him, resulting in Plaintiff
falling to the ground. *Id.* at 25. Officer Doe #2 then
proceeded to hit Plaintiff over the head with the metal
chair. *Id.* Plaintiff began bleeding immediately. *Id.* at ¶
26. Plaintiff then demanded that pictures of his injury
be taken and that the entire incident be reported. *Id.*
at ¶ 28. Plaintiff also requested that he be sent to an
outside hospital. *Id.* According to Plaintiff, Barkman,
Potter, Sergeant Doe, and Officer Doe #1 were present
and observed the assault. *Id.* at ¶¶ 21-26.

At approximately 9:30pm, Plaintiff was brought to the
nurse's office by Barkman and non-party Correction
Officer Castillo ("Castillo"). [2] *Id.* at ¶ 28. Defendant
Thomsen attempted to wipe the blood off of Plaintiff's
head and chest. *Id.* at ¶ 29. Plaintiff expressed his desire
to have photographs taken of the injury before it was
cleaned. *Id.* Barkman refused to photograph the injury
sustained by Plaintiff. *Id.* Potter came into the room and
asked Plaintiff if he was refusing medical treatment. *Id.*
Plaintiff informed Potter that he was not refusing medical
care but that he wished for pictures to be taken before
the examination. *Id.* Potter informed Plaintiff that he was
refusing medical care and Potter, Defendant Thomsen,
and Castillo signed a refusal form stating that Plaintiff had
refused medical care. *Id.*

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 205 of 210

**\*2** Plaintiff was taken to a cell and approximately forty-five minutes later, Potter returned to Plaintiff's cell with two nurses who examined and cleaned Plaintiff's forehead. *Id.* at ¶ 30. Plaintiff was later taken to Albany Medical Center for treatment where he received two staples. *Id.* at ¶ 34.

Plaintiff alleges that Defendant Thomsen exercised deliberate indifference by failing to provide adequate medical care in violation of his Eighth Amendment rights. (Dkt. No. 1 at ¶ 54.) Specifically, Plaintiff alleges that Defendant Thomsen signed a form falsely indicating that Plaintiff had refused medical care for a laceration on Plaintiff's forehead instead of properly treating the injury. *Id.*

On September 12, 2013, Plaintiff filed an Inmate Grievance Complaint alleging that he had been struck on the head with a chair wielded by Officer Doe #2 on August 30, 2013. (Dkt. No. 30-8.) Plaintiff indicated that Potter, Barkman, and Officer Doe #1 were present for the alleged altercation. *Id.* Plaintiff titled his grievance "CO Assaulted Me With Chair." *Id.* Plaintiff did not fill out any other grievances associated with the incident. (Dkt. No. 30-5 at ¶¶10-18.)

The grievance was filed with Greene's inmate grievance resolution committee ("IGRC") office on September 12, 2013. (Dkt. No. 1 at ¶41.) On October 15, 2013, Plaintiff's grievance was denied. *Id.* at ¶ 42. Plaintiff's appeal was received by the IGRC office on October 21, 2013. *Id.* at ¶ 22. Plaintiff appealed the IGRC decision through the Central Office Review Committee ("CORC") and the appeal was received by CORC on November 15, 2013. *Id.* at ¶ 44. On March 26, 2014, CORC subsequently denied the appeal citing insufficient evidence to substantiate Plaintiff's claim. *Id.* at ¶ 45; *see also* Dkt. No. 1 at 12. [3]

Plaintiff commenced this action on August 22, 2014. *Id.* Defendant Thomsen now moves for summary judgment on the grounds that Plaintiff failed to properly exhaust his available administrative remedies with respect to his medical indifference claim. (Dkt. No. 30-2 at 3-6.) In the alternative, Defendant moves for summary judgement on the merits and also argues that he is entitled to qualified immunity. (Dkt. No. 30-2 at 3-6.) Plaintiff has not opposed the motion. The Court addresses only the exhaustion argument, as it is dispositive.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

**\*3** A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit and "therefore will be considered in determining whether material issues of fact exist[.]" *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or

2016 WL 5219997

unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the defendants. *See Id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

**\*4** Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)(3); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Champion*, 76 F.3d at 486.

Plaintiff was sent a notice of motion (Dkt. No. 30) by Defendant's counsel as well as an attached notification of the consequences of failing to respond to a summary judgment motion. (Dkt. No. 30-1.) Plaintiff failed to submit any papers in opposition to summary judgment as noted above.

### III. ANALYSIS

Defendant Thomsen argues that Plaintiff's Eighth Amendment claim of medical indifference should be dismissed because Plaintiff failed to properly exhaust his available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), prior to filing this federal civil rights action. (Dkt. No. 30-2 at 3-6.) Defendant is correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549

Case 9:15-cv-00777-GLS-DEP    Document 105    Filed 03/12/19    Page 207 of 210

Wright v. Potter, Not Reported in Fed. Supp. (2016)
2016 WL 5219997

U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at § 701.5(d)(3)(ii).

**\*5** If a prisoner has failed to properly follow each of the applicable steps and complete the process prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93.

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) CORC issued its decision on March 26, 2013. (Dkt. No. 1 at 12.) However, the grievance at no point mentioned Defendant Thomsen or medical personnel at Greene, nor did the grievance mention receiving inadequate medical care after the incident. (*See* Dkt. No. 30-8.)

Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from

taking appropriate measures to resolve the complaint internally. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials "to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). Even though "a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies," the inmate is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 126-27 (2d Cir. 2009) (citing NYCRR § 701.7(a)(1)(i)).

While Plaintiff is not required to specifically name Defendant Thomsen in his grievance, Plaintiff's failure to specifically describe *any* problem in his grievance concerning medical treatment after the incident did not give the facility enough information to investigate allegations against Defendant Thomsen. *See Hemby v. Ferrari*, No. 9:13–CV–613, 2014 WL 1584160, at \*26 (N.D.N.Y. Apr. 21, 2014) (holding that Plaintiff had failed to exhaust medical indifference claim alleging denial of medication for an ulcer where Plaintiff had filed a grievance only alleging improper wound care of the ulcer.)

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) In the grievance, Plaintiff stated that he was hit in the head with a chair while handcuffed and subsequently taken to Albany Medical Center where he received staples before being released. (Dkt. No. 30-8.) Plaintiff described the assault as occurring in a sergeant's office with three sergeants and two correction officers present. *Id.* Plaintiff admitted he did not know the names of the correction officers but would be able to identify them in a picture. *Id.* Plaintiff did identify Sergeant Barkman and Sergeant Potter in the grievance. *Id.* Yet, in that same grievance, Plaintiff failed to mention Defendant Thomsen by name or profession, failed to reference any medical personnel, and failed to reference receiving inadequate medical treatment. *Id.* Because Plaintiff's grievance contained no mention of inadequate medical care after the incident, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen has not been exhausted.

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

**\*6** Plaintiff's failure to exhaust, however, does not end the review. For more than ten years, courts in this district have been guided by the Second Circuit's decision in *Hemphill v. New York.* 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances." *Id.*[5]

However, on June 6, 2016, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross v. Blake*, 578 U.S. ____ (2016) *available at* 2016 WL 3128839, at *11 (June 6, 2016). In *Ross*, the question before the Court was whether there is a "special circumstances" exception under the PLRA when the inmate erroneously believed that he had satisfied the exhaustion requirement. 2016 WL 3128839, at *3. In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> The [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id.* (internal citation omitted).

The Supreme Court's rejection of the "special circumstances" exception, however, still does not end a court's review "because the PLRA contains its own, textual exception to mandatory exhaustion." *Id.* at *7. Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id.*

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at *8. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In light of the above, the Court must now consider whether Plaintiff exhausted his *available* administrative remedies regarding his Eighth Amendment medical indifference claim before commencing this action.

Here, Plaintiff has not claimed that the administrative procedure was unavailable to him. To the contrary, Plaintiff utilized the administrative procedure to file a grievance concerning the August 30, 2013, incident.[6] (Dkt. No. 30-5 at ¶¶14-18.) Yet, Plaintiff still failed to file any grievance alleging inadequate medical care or calling into question his treatment at the hands of Greene's medical staff. Thus, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen is not exhausted. Accordingly, the Court recommends that said Defendant's motion for summary judgment (Dkt. No. 30) be granted.

**\*7** Since the Court is recommending that summary judgement be granted for failure to exhaust administrative remedies, the Court need not reach Defendant Thomsen's remaining arguments.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the Court **GRANT** Defendant James Thomsen's motion for summary judgment (Dkt. No. 30); and it is further

**RECOMMENDED** that the Court dismiss all claims against Defendant James Thomsen and terminate him from this action; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5219997

Footnotes

1    A verified complaint, such as Plaintiff's (Dkt. No. 1), is to be treated as an affidavit. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit...and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

2    Castillo was originally named as a defendant in Plaintiff's complaint, however he was subsequently terminated from the suit upon initial review. (Dkt. No. 11 at 10-16.)

3    Citations to page numbers in Court documents refer to the page numbers assigned by the Court's electronic filing system.

4    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

5    Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process. *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir. 2004).

6    While Plaintiff testified during his deposition that one of the unidentified correction officers "threatened" him at a later date, Plaintiff does not allege that the threat prevented him from filing any additional grievances. In fact, Plaintiff subsequently filed an additional grievance based on that alleged threat. (Dkt. No. 30-5 at ¶¶ 10-20.)

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5173283

2016 WL 5173283
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shamel WRIGHT, Plaintiff,

v.

Rowland POTTER, Michael Barkman, James Thomsen, C.O. John Doe #1, C.O. John Doe #2 and Sgt. John Doe, Defendants.

9:14-CV-1041 (DNH/TWD)
|
Signed 09/21/2016

**Attorneys and Law Firms**

SHAMEL WRIGHT, 346 Furman Street, 1st Floor, Schenectady, NY 12304, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, OF COUNSEL: RYAN E. MANLEY, ESQ., Ass't Attorney General, Albany, NY 12224, Attorneys for Defendant James Thomsen.

**AMENDED DECISION and ORDER**

DAVID N. HURD, United States District Judge

*1 *Pro se* plaintiff Shamel Wright brought this civil rights action pursuant to 42 U.S.C. § 1983. On June 28, 2016, the Honorable Thérèse Wiley Dancks, United States

Magistrate Judge, advised by Report-Recommendation that defendant James Thomsen's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be granted, and that he be dismissed from this action. See ECF No. 33. Plaintiff has not filed timely objections.

Based upon a de novo review of the Report-Recommendation, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendant James Thomsen's motion for summary judgment (ECF No. 30) is **GRANTED;**

2. All claims against defendant James Thomsen are **DISMISSED** and he is terminated from this action. The causes of action against the remaining defendants will continue; and

3. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this case.

IT IS SO ORDERED.

Dated: September 21, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5173283

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.